# EXHIBIT 2
## (R. Lubit Deposition
## Day 1 - Apr. 23, 2025
## Day 2 - Apr. 24, 2025)

# Day 1 - Apr. 23, 2025

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

-------------------------------------X
MEGAN THERESA CHASE,

               Plaintiff,

     v.                         Case No.:
                               1:23-cv-00107-
HIRERIGHT, LLC,             HCN-JCB

               Defendant.
-------------------------------------X

         Via Zoom
         WEDNESDAY, APRIL 23, 2025
         10:06 A.M.


         VIDEOCONFERENCE DEPOSITION of DR. ROY LUBIT,

the Expert Witness herein, taken by the Defendant,

pursuant to Notice, held before Colleen Bjornholm, a

Court Reporter and Notary Public of the State of

New York.


                      *   *   *

           MAGNA LEGAL SERVICES
             (866) 624 6221
             www.MagnaLS.com



Page 2

1  APPEARANCES:
   (Via Zoom)
2
   DHF LAW, PC
3  Attorneys for Plaintiff
   2304 Huntington Drive, Suite 210
4  San Marino, CA 91108
   (888) 651-6411
5
   BY:  JOSHUA KIM, ESQ.
6
   MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
7  Attorneys for Defendant
   1735 Market Street, 20th Floor
8  Philadelphia, PA 19103
   (215) 772-1500
9
   BY:  ANDREW NOTARISTEFANO, ESQUIRE
10
11
12 ALSO PRESENT:
   LAYAL ISSA RAMIREZ, ESQ. (Observing),
13 MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              DR. R. LUBIT
2              - - -
3       DR. ROY LUBIT, after having first been duly
4  sworn by a Notary Public of the State of New York, was
5  examined and testified as follows:
6       THE WITNESS:  Yes.
7              - - -
8       THE COURT REPORTER:  Thank you.  And can you
9  please state your full name for the record?
10      THE WITNESS:  Roy Lubit, L-U-B-I-T.
11      THE COURT REPORTER:  Thank you.  And can you
12 please state your office address for the record?
13      THE WITNESS:  I live in New York City.  I do
14 not give out -- judges have allowed me to not give out
15 my entire address because, in some high-impact cases,
16 people have tried to get to me.
17      THE COURT REPORTER:  Okay.  No problem.  Okay,
18 Counselor, you can begin.
19              - - -
20              EXAMINATION
21              - - -
22 BY MR. NOTARISTEFANO:
23      Q.  All right.  Dr. Lubit, good morning.  My name
24 is Andrew Notaristefano.  I'm an attorney for HireRight.
25 In this lawsuit, I'll be asking you questions here

Page 4

1              DR. R. LUBIT
2  today.
3       I think I know the answer to my first
4  question, but have you ever been deposed before?
5       A.  Many dozens of times, probably, you know,
6  one -- probably well over 100 times.
7       Q.  Okay.  I assume you've heard the opening
8  instructions many times.  I'll just try to go through
9  them pretty quickly.  First, I take it you're not under
10 the influence of any drugs, alcohol, or medication that
11 would prevent you from understanding what's going on or
12 telling the truth here today?
13      A.  You're correct.
14      Q.  You understand there's a court reporter here,
15 so we can't talk over each other because she's going to
16 type everything down.  I would ask you to answer your
17 questions verbally.  No uh-huhs or uh-uhs or shaking of
18 the head so that she can make a clear and accurate
19 record.  Okay?
20      A.  Yes.
21      Q.  If you don't understand any question I ask,
22 please ask me to rephrase.  Otherwise, I'm going to
23 assume that you understood the question.  Okay?
24      A.  Yes.
25      Q.  Please no guessing.  Estimating is fine.  Just

Page 5

1              DR. R. LUBIT
2  let us know if you're making an estimation.  Fair?
3       A.  Yes.
4       Q.  If you need to take a break at any time,
5  that's fine.  All I ask is that if there's a pending
6  question, that you answer that question, and then we'll
7  take a break.  Okay?
8       A.  Yes.
9       Q.  I understand you said you're in New York.
10      Is anyone else present with you right now?
11      A.  No.
12      Q.  Okay.  And you understand that if Mr. Kim
13 objects to any of my questions, unless he tells you not
14 to answer, he's making objections for the record and you
15 still have to answer my questions.
16      You understand that?
17      A.  Yes.
18      Q.  Okay.  Are you ready to get started here
19 today?  I'm sorry.
20      A.  Yes.  You did not hear me clearly?
21      Q.  Okay.  I didn't hear your last response.
22      A.  Yes.  I was trying to double-check because I
23 had said yes, and I apologize if I didn't say it loud
24 enough or whatever.
25      MR. NOTARISTEFANO:  It's okay.  I feel like



Page 82

DR. R. LUBIT

1    DR. R. LUBIT
2  her guilty.  She appealed the decision from justice
3  court and the district court.  The charge was supposed
4  to go away when appealed.  Appeals court knocked it down
5  to an infraction and a $200 ticket, and it would
6  eventually be dismissed."
7        Did I read that correctly?
8     A.  Yes.  It's my best understanding of what she
9  said.
10    Q.  Did that information come from her?
11    A.  Yes.  All of it came from her.
12    Q.  Did she -- in this first sentence, I just want
13  to make sure I understand the first sentence.
14  "HireRight ran a background check on Megan and said she
15  pled guilty to a Class B misdemeanor in 2020 or 2021."
16  And then there's further description of the appellate
17  process.
18        Did she tell you that she did plead guilty at
19  first, or was she saying that HireRight reported she
20  pled guilty when she didn't?  I'm not talking about the
21  appeal.  I'm talking about the initial lower court
22  procedure.
23    A.  I did my best, Counselor, to write down what
24  she told me.  Is it possible that I misunderstood
25  something?  It was very complex, this, and it is

Page 83

DR. R. LUBIT

1    DR. R. LUBIT
2  possible that I made an error in exactly what she said.
3  It is possible that she misspoke.  I mean, I -- may I
4  say -- just drop more?
5     Q.  Sure.
6     A.  I mean, trying to separate and fully
7  understand the Alorica versus the HireRight issue, it
8  was very hard for me to follow what she was saying.  We
9  had to go over it, because again, she's not that bright,
10  and some things weren't fully clear.  And I think it was
11  clear to me that she wasn't getting things exactly right
12  or that it changed.
13        We went over it more than once to try to -- so
14  I could best understand.  And I do not think that she
15  was trying at all to mislead me.  I think it's complex,
16  and her intellectual abilities are not very high.
17    Q.  Top of page 4, you wrote, "Megan applied for a
18  job at Alorica, a third-party company that is hired to
19  take calls from companies.  Alorica works with Goldman
20  Sachs.  Megan had been offered the job at Alorica, but
21  the offer was rescinded when they got the background
22  check."
23        Is that correct?
24    A.  Yes.
25    Q.  And is this what Ms. Chase told you?

Page 84

DR. R. LUBIT

1    DR. R. LUBIT
2     A.  I certainly hope so.  I mean, again, I did my
3  best to write down accurately what she stated.  And I
4  think that this made sense to me.  This is, I believe,
5  what she said.
6     Q.  Okay.  Do you agree, it sounds like and --
7  strike that.  This background check and this Class B
8  misdemeanor, it all relates to the 7-Eleven incident.
9  Right?  Or refers, at least, to the 7-Eleven incident?
10    A.  Yes.
11    Q.  Okay.  Did she feel or express to you that she
12  was being punished for what happened at 7-Eleven?
13    A.  Yes.
14    Q.  Under "Mental State," which is the next
15  section or subsection, rather, on page 4 --
16    MR. KIM:  Objection.  Mischaracterizes the
17  evidence.
18    MR. NOTARISTEFANO:  What did I
19  mischaracterize, the next subsection, "Mental Status"?
20    MR. KIM:  Yes.  It says "Mental status."  You
21  said "Mental state."
22    MR. NOTARISTEFANO:  Oh, okay.  All right.
23  Joshua, you could just tell me that I misspoke.
24  BY MR. NOTARISTEFANO:
25    Q.  Okay.  Under page 4, "Mental Status," I think

Page 85

DR. R. LUBIT

1    DR. R. LUBIT
2  it's the fourth sentence, but it's in the middle here.
3  It says, "Her affect.  Her affect was constricted and
4  her mood sad and hurt by how she had been treated and
5  its effect on her life."
6        Is this your observation?
7     A.  Yes.  It was an error on my part to state in
8  this section the reason.  It should have been, "Affect
9  was constricted, and her mood was sad and hurt."  And I
10  should have been above that I said that she feels X, Y,
11  and Z.  The mental status should simply be what you
12  observe.
13    MR. NOTARISTEFANO:  Colleen, did you get that?
14  He jumbled up for maybe a couple words for me.  I got
15  most of it.  It was your internet or it was just
16  something with the virtual session.
17    THE WITNESS:  Can I just restate it, sir, so
18  it --
19    MR. NOTARISTEFANO:  Well, it was only two
20  words that I didn't really get.  I just want to see if
21  Colleen got them.
22    THE COURT REPORTER:  Yeah.  I missed a couple
23  of words.
24    MR. NOTARISTEFANO:  Okay.  Sure.  You can
25  restate it.

MAGNA ▶
LEGAL SERVICES

Page 86

DR. R. LUBIT

1
2      THE WITNESS:  I -- I made a slight error here,
3  in that the -- I should have simply written in the
4  mental status portion that her affect was constricted,
5  and her mood was sad.  And then right before the mental
6  status, I should have said that she expressed feeling
7  sad and hurt by how she was treated and by how it
8  affected her life.  That should have been just before
9  the mental status.
10 BY MR. NOTARISTEFANO:
11     Q.  Okay.  This part where you write, "hurt by how
12 she had been treated," were you referring to anything or
13 anyone specifically when you say how she had been
14 treated?
15     A.  I think this was the combination of 7-Eleven
16 and the issue with Alorica and HireRight.
17     Q.  So that portion, how she had been treated, it
18 had nothing to do with anything else in her previous
19 history, such as her mother's mistreatment of her, the
20 issue with her husband and being cheated on, and those
21 sorts of things?
22     A.  It was my understanding that at this point, we
23 were talking about those two major events.  Now, she
24 certainly is going to be extremely vulnerable to having
25 a big reaction to 7-Eleven and Alorica, HireRight,

Page 87

DR. R. LUBIT

1
2  because of so much stuff in her past.  And she may very
3  well also feel that how she was treated throughout her
4  life.
5      And I would have used slightly different words
6  if it was all the things in her life.  I would have
7  specifically said that.  My understanding is that we
8  were talking about 7-Eleven and Alorica, HireRight at
9  that moment.
10     Q.  Okay.  This next subsection is "Symptoms."
11 You wrote, "On a 10-point scale in which 10 is
12 ecstatically happy, 7 and 8 are where people without any
13 psychological problems function, and 1 is the worst
14 depression possible, Megan stated that at her worst,
15 after Alorica, she was at 3 or 4, and she is currently
16 at 5 or 6."
17     Did I read that correctly?  Was that a yes?  I
18 didn't hear?
19     A.  Yes.
20     Q.  Okay.  This sounds rather verbatim, but I'll
21 just ask.
22     Did you ask her this question and that was her
23 answer that as she was before you on this day when you
24 met her, she was currently at a 5 or 6 and at worst 3
25 or 4 after what happened with Alorica?

Page 88

DR. R. LUBIT

1
2      A.  Yes.  I generally don't mean today.  I mean in
3  recent weeks.  How you -- I usually say -- I tell them
4  about the scale and how it is set up and then ask, you
5  know, in general these -- you know, in past months, how
6  are you feeling?
7      Q.  Okay.  So when you write currently, that meant
8  these past few months?
9      A.  Yes.
10     Q.  Okay.  Did you ask her what her worst was like
11 before the Alorica situation?
12     A.  I did not.  I don't think I asked, you know,
13 what was the worst at any time in her life.
14     Q.  Why not?
15     A.  I don't know if it would really change
16 anything.  The issue is what level of functioning had
17 she gotten to prior to the problems with Alorica and
18 HireRight and the fact that she may have been at even a
19 lower state, you know, with issues with her family many,
20 many years ago is -- is relevant in terms of
21 understanding to what extent she may be an eggshell
22 plaintiff, but not really relative to how -- what level
23 of functioning was she pushed down to as a result of the
24 issues in question.
25     Q.  Is it important to have a longitudinal history

Page 89

DR. R. LUBIT

1
2  of one's symptoms?
3      A.  Counsel, this is again a very, very vague
4  question.  I mean, it's general for various reasons.  As
5  I've said, it's usually I have a general idea of what
6  the person is like.  I certainly did not go in -- and it
7  would be quite wrong to go in and say, "How are you
8  feeling today?"  And I see this all the time in other
9  people's reports.  How are you feeling today?  And they
10 just talk about how the person's doing that day, without
11 any assessment of what they were like beforehand.
12     So I did go through how she was feeling at
13 different points in time.  How she was feeling in time
14 to see how she was affected by recent events.
15     I need to check on something, because I
16 normally would include -- I've got to double check that
17 they -- that this is the right version, because
18 something was taken out, because I normally would put in
19 how she was doing before Alorica and not start with the
20 worst after Alorica.  I would very much want to know how
21 it was before.
22     MR. NOTARISTEFANO:  Okay.  Why don't we take
23 five minutes?  I just want to wrap up this point and
24 this line of questioning, and then we'll take a lunch
25 break.  But why don't we take five minutes, so you can

Page 90

DR. R. LUBIT

1
2  see if there's a draft where something was left out of
3  this part under "Symptoms" that we're on right now?  Do
4  you need more than five minutes?
5      THE WITNESS:  Could we -- I do not think so.
6  But could we just slide down lower while you got this
7  up?  I mean, I'm very concerned about this.  If we could
8  go toward the bottom, go through this category.
9      MR. NOTARISTEFANO:  Do you want to go through
10 the Beck Depression test?
11     THE WITNESS:  To the end, please.  Yes, I want
12 to try to look at my notes and make sure this is the
13 most recent version, because it was very strange that I
14 would have left out how she was doing beforehand.  I
15 think my report -- in one minute, I may be able to have
16 the answer, because this is --
17     MR. NOTARISTEFANO:  Are you checking notes or
18 a previous draft?
19     THE WITNESS:  The draft that I pulled up.
20 Yes, sir.  My current draft has included -- is
21 different.
22     MR. NOTARISTEFANO:  Okay.  So do you believe
23 this is not the updated draft or the updated report that
24 should have been provided in this case?
25     THE WITNESS:  Something happened.  Yeah,

Page 91

DR. R. LUBIT

1
2  because my -- the report I have in front of me includes
3  how she was feeling.  Sentences in bold and black
4  referred to her functioning prior to the incidents in
5  question.
6      MR. NOTARISTEFANO:  Okay.  I think the best
7  way to handle this right now, I mean, I -- we just have
8  to -- why don't we take a 10-minute break.  Let's just
9  take a 10-minute break.
10     THE WITNESS:  Can I make very quick statements
11 that might help?
12     MR. NOTARISTEFANO:  Sure.
13     THE WITNESS:  One could -- so I'm going to
14 send this to you right now.  One can do a -- there are
15 ways on the computer to show differences between two
16 versions.  And then we could see what the final version
17 was.  And actually, if we look at the signature, sir, on
18 page 19, --
19     MR. NOTARISTEFANO:  Sure.
20     THE WITNESS:  What you've got on yours is just
21 Roy Lubit in regular, I assume it's probably Times New
22 Roman.  We have a more signature type on what I've got
23 in front of me.
24     MR. NOTARISTEFANO:  How many pages do you have
25 in front of you?

Page 92

DR. R. LUBIT

1
2      THE WITNESS:  The signature's on page 19.
3  Nothing else.  The wording stops on 18, very close to
4  the bottom, and I couldn't fit the signature lines on
5  the bottom of 18.
6      MR. NOTARISTEFANO:  Okay.  Let's take 10
7  minutes.  It's 12:43.
8          - - -
9      (Whereupon, a brief recess was taken.)
10         - - -
11     MR. NOTARISTEFANO:  The time is 1:03 p.m.  We
12 took a break, after Dr. Lubit realized that the report
13 that we have been provided was a draft report, not his
14 finalized report.  I believe all of that is on the
15 record before we took our break.
16     Just to make the record, Plaintiff's expert
17 report was due on January 27, 2025.  The report that's
18 marked as Exhibit 2 that I've been questioning Dr. Lubit
19 about was produced on that date.  HireRight produced its
20 expert report on -- pursuant to the case management
21 order by its deadline, March 13, 2025.  That report was
22 based on -- well, in large part, part of that report was
23 based on Dr. Lubit's report.
24     Dr. Lubit, I believe during the break, has
25 found a -- well, actually, before we took the break,

Page 93

DR. R. LUBIT

1
2  while we were still on the record, he was looking at his
3  computer and found a more recent report.  I believe he
4  has been trying to get that report to Mr. Kim, Counsel
5  for Ms. Chase.
6      I don't have a copy of that report at this
7  time.  I will say that HireRight reserves all rights
8  with respect to any additional supplemental or revised
9  reports, including, but not limited to, moving to
10 exclude any late-filed report, seeking fees and costs
11 associated with preparing this deposition, taking this
12 deposition, preparing and issuing the report of Dr.
13 Kovnick, and any preparation for his deposition, which
14 is scheduled tomorrow.
15     And if the court permits Plaintiff to file a
16 supplemental report, another report that's not the one
17 that has been provided and was marked as Exhibit 2, we
18 reserve all rights to re-notice and reopen this
19 deposition to depose Dr. Lubit with respect to that
20 report.
21     Additionally, it's now 1:06 p.m.  As I said
22 before, we took our brief break, that we would just wrap
23 up this issue, and then we'd take our lunch break.
24 Right before we went on, we came back on the record, Dr.
25 Lubit asked me how much longer I had.  I told him I was

MAGNA
LEGAL SERVICES

DR. R. LUBIT

1
2  about halfway through my outline, and he said that he
3  has a two o'clock cutoff.  I was not aware that he had a
4  two o'clock cutoff.  We noticed this deposition, and I
5  did not know that there was a time limit on it.
6       So we essentially have less than an hour until
7  Dr. Lubit's cutoff.  And the intent was to take at least
8  a half-hour lunch break.  I don't know if there is a
9  point in taking a half-hour lunch break at this time,
10  considering we would only come back on the record for
11  less than a half hour before Dr. Lubit has to go.
12       Expert discovery deposition discovery closes
13  tomorrow.  So since Dr. Lubit has to go at two o'clock,
14  we'll reserve all rights to strike the entirety of Dr.
15  Lubit, his report, any testimony at trial, if we can't
16  complete this deposition.  The alternative would be, of
17  course, for Counsel to agree to resume the deposition
18  past the deadline.
19       THE WITNESS:  I would be happy to --
20       MR. NOTARISTEFANO:  I don't know that -- I
21  mean, I don't know that we agree to that, and we
22  certainly don't agree to the supplemental report, as I
23  said earlier.  I'll let Mr. Kim speak.  Thank you.
24       MR. KIM:  Right.  Thank you, Andrew.  I
25  actually didn't have a chance to completely review a

DR. R. LUBIT

1
2  copy of the report that Dr. Lubit sent me during the
3  break.  And Plaintiff certainly hasn't made up any
4  decision as to whether to submit this new report as a
5  supplemental or not.
6       To the extent that we have a problem with
7  cutting this deposition off early, Plaintiff certainly
8  is willing and ready to agree to continue the deposition
9  to a date, later date past the discovery cutoff for
10  expert.  And we're, of course, willing to make Dr. Lubit
11  available again for continued deposition after this
12  point, after tomorrow.
13       THE WITNESS:  May I make a statement that
14  might be helpful?  May I?
15       MR. NOTARISTEFANO:  It's up to Mr. Kim.
16       MR. KIM:  Go ahead, Dr. Lubit.
17       MR. NOTARISTEFANO:  No objection by me.
18       MR. KIM:  Yes, go ahead.
19       THE WITNESS:  I can come back in two hours
20  from now, so three o'clock.  I -- the only change I am
21  aware of is that somehow the way she was doing prior to
22  the events in question, I have those numbers, but
23  somehow they got cut out of the form that I sent you.
24       So I know what those numbers are.  And so the
25  information could be given to you in a -- in a minute.

DR. R. LUBIT

1
2  Why there was that error?  I do not know.  And I could
3  start in -- I could get back certainly within two hours
4  and then go on as long as you want.  So I basically need
5  a break.
6       MR. NOTARISTEFANO:  Joshua, do you want to
7  resume in two hours?
8       MR. KIM:  Sure.  That's certainly possible.
9       MR. NOTARISTEFANO:  Okay.  Colleen, how should
10  we -- can we just use the same link?  Should we sign off
11  and then sign back on?  I'll defer to you.  And also, if
12  you can -- I mean, that's two hours that you'll step
13  later.  We're cart before the horse here.  Colleen, can
14  you stay later?
15       THE COURT REPORTER:  Yes.  I'm free all day.
16  It's up to you whether you want to stay on and then just
17  keep your -- your video off, or you can log off and then
18  just use the same link.  Come back in.  It's up to you.
19       MR. NOTARISTEFANO:  Okay.  Well, I'm going to
20  just log off just for safety.  So I'll log off.  So it's
21  1:11 p.m. right now.  Dr. Lubit, are we resuming at
22  three o'clock or should we resume at 3:15?
23       THE WITNESS:  Fine by three.  Counselor, may
24  I, for the record, say I appreciate your flexibility.
25       MR. NOTARISTEFANO:  Okay.

DR. R. LUBIT

1
2       THE WITNESS:  And whatever mistake occurred, I
3  apologize.  I'll take -- I'll take responsibility, even
4  if it wasn't my fault.  And I appreciate your
5  willingness to let us make this change.
6       MR. NOTARISTEFANO:  Sure.  So we'll break
7  until three o'clock.
8       MR. KIM:  Actually, for the record, we have
9  checked our email inbox, and we did actually provide you
10  and the court with the copy of the report that you have
11  in Exhibit 2, which was the most recent one that we
12  received from Dr. Lubit.
13       MR. NOTARISTEFANO:  Right.  Okay.  Thank you.
14       THE WITNESS:  May I ask?  Mr. Kim, are you
15  saying that the one that I just sent you, you had
16  provided it before, or just you said you provided it
17  now?
18       MR. KIM:  No.  One that Andrew was looking at
19  earlier as Exhibit 2 is the one that we received from
20  you.
21       THE WITNESS:  Okay.
22       MR. NOTARISTEFANO:  All right.  I'll see
23  everybody at three o'clock.
24       THE WITNESS:  Thank you very much.
25       MR. KIM:  Thank you.

**MAGNA**
LEGAL SERVICES

DR. R. LUBIT

1
2        - - -
3        (Whereupon, a brief recess was taken.)
4        - - -
5        MR. NOTARISTEFANO:  All right.  We're back on
6    the record.  It's 3:05 p.m.
7    BY MR. NOTARISTEFANO:
8        Q.  Dr. Lubit, did you speak to Counsel at all
9    during our two-hour break?
10       A.  He called me at four minutes ago and just
11   reminded, "We're going on in a minute."
12       Q.  Understood.  Other than that call, did you
13   speak to him?
14       A.  Didn't speak to anyone.
15       Q.  Okay.  Earlier this morning, when we were
16   taking breaks for you to review your report to answer
17   some questions, were you reviewing the version that's
18   marked as Exhibit 2 that I have that I've been showing
19   you, or were you reviewing a different version?
20       A.  That's a very good question.  I was probably
21   reviewing the correct one, but I'm not sure.
22       Q.  Okay.  I'm going to go back to Exhibit 2,
23   picking up where we left off before the break.  I'm
24   going to share my screen.  And right now, I have the
25   bottom of page 4 on the screen.  It's where the Beck

DR. R. LUBIT

1
2    Depression Inventory-II begins.
3        Do you see that?
4        A.  Yes, sir.  This, again, doesn't have -- it
5    doesn't -- it's only showing during and after.  It's not
6    showing before the --
7        Q.  Are you saying there's another version where
8    you asked her -- where the Beck Depression Inventory-II
9    test was given to her, where you asked her questions
10   about how she felt before the Alorica situation?
11       A.  Yes.  The one that I sent to Mr. Kim earlier
12   was where I saw it and was like, how did this happen?
13   It -- it shows a bolded -- for example, you know,
14   sadness was a zero in bold.  Pessimism was a zero in
15   bold.  That was the whole point of what happened and why
16   we needed to send the updated version.
17       Q.  Okay.  Before we went off the record, I was
18   asking you questions, and you were answering questions
19   about the symptoms portion that appears right above the
20   Beck Depression Inventory-II test.
21       You're saying there's also something left out
22   of the Beck Depression Inventory-II test itself that
23   appears below that symptoms portion?
24       A.  Yes.  The whole -- the whole point, Mr. -- I
25   don't want to butcher -- butcher your name -- is that

DR. R. LUBIT

1
2    there were three colors or three different things that
3    were marked on the Beck-II.  You know, current, during
4    the worst portion -- portion of the issue, and prior to
5    the issues.
6        Q.  Okay.  And did you take the prior two -- the
7    Alorica situation into account in formulating your
8    opinions?
9        A.  Absolutely.  It -- it was crucial to it.  But
10   that's not what we see here.  We're -- we're not seeing
11   the correct version on the screen right now.
12       Q.  Okay.  The Beck Depression Inventory test,
13   that's a written test.  Correct?
14       A.  It is generally -- you know, it is generally
15   what's sent to people.  I use it basically because it
16   has a lot of good questions and it makes sures that --
17   makes sure that I cover a lot of important issues and I
18   do it verbally.  It doesn't have a validity indicator.
19   And it's basically a way of going through a whole bunch
20   of good questions.
21       Q.  All right.  My question was that the Beck
22   Depression Inventory II test is a written test.
23       I think if I understand your answer, it's that
24   it can be provided to someone to circle answers, but in
25   this case, you read it verbally to her?

DR. R. LUBIT

1
2        A.  Exactly, sir.
3        Q.  And did she give you the verbal responses that
4    appear on your report?
5        A.  Yes.
6        Q.  Did you follow the instructions of the Beck
7    Depression Inventory II test?
8        A.  No, I used it as -- well, I -- I don't know
9    how often or if people only have -- give it to the
10   person versus read it.  I use it to get answers to a
11   bunch of important questions that relate to depression.
12       Q.  Are you saying that you didn't follow the test
13   but just used the questions from the test?
14       A.  Yes.
15       Q.  Do you document that in this report?
16       A.  I don't get into that.  I -- I don't document
17   that.  I sim -- I know what I do.  I'm using it to get
18   answers to questions related to depression.
19       Q.  Is it generally accepted in the psychiatric
20   field to use questions from a test but not the actual
21   test?
22       A.  Where -- I'm not even sure what the question
23   means.  Well, it doesn't have a validity indicator, so
24   it's not going to be able to provide the exact sort of
25   data that one would have, let's say, with the PAI or the

Page 102

DR. R. LUBIT

1   MMPI or other tests that have validity indicators.
2       My point is to -- psychiatrists generally get
3   their information verbally by asking questions as
4   opposed to giving tests. And one thing that's happened
5   -- the way -- the reason to do it this way is because,
6   number one, make -- make sure that nobody else has any
7   input. Another is that I get more information because
8   depending upon what they say, I then follow up with more
9   information, often around sleeping and things to get
10  clarification.
11      Q. What's the purpose of the Beck Depression
12  Inventory II test?
13      A. People can use it to get a sense of how much
14  depression someone has. You know, someone scores in the
15  40s, which is well above the -- the level for -- for
16  severe depression, you're going to -- it's different
17  than if they get a 15.
18      The first question that I ask beforehand, the
19  -- you know, on a 10-point scale, et cetera, et cetera,
20  that's not on the Beck Depression
21  Inventory. It's a common question that psychiatrists
22  ask to try to get some sense of the amount of
23  depression. And as a standard practice, I ask it
24  verbally.

Page 103

DR. R. LUBIT

1       So this is all gathering information.
2   Psychiatrists are not -- we don't rely so much on
3   written tests. And I think that there are good reasons
4   that written tests have weaknesses.
5       Q. Okay. So my question was, what's the purpose
6   of the Beck Depression Inventory II test? And what I
7   think you said, and the answer to that specific
8   question, is to see how much depression someone has.
9       Is that correct?
10      A. For me, it's to gather information on a number
11  of issues that are symptoms that can be affecting
12  people.
13      Q. My question isn't what it mean -- what it is
14  used for -- what you use it for, my question is the
15  purpose of the test.
16      A. I think the average clinician would use it to
17  -- to rate depression or to see if the person had
18  depression. That if they came out with a 10, it's going
19  to be much milder than if they came out with a 30.
20  And --
21      Q. And that's to rate -- oh, I'm sorry.
22      A. Yeah. And that's -- they can get that sense.
23  There are real problems with doing that. And as a
24  psychiatrist, I don't rely on the results of the Beck to

Page 104

DR. R. LUBIT

1   diagnose depression. I rely on the answers to questions
2   and how it fits in with DSM-4 -- sorry, DSM-5-TR, the
3   diagnostic criteria. But I think other people in -- you
4   know, if you take someone in a pediatric office or a --
5   not pediatric, sorry, someone in a plain doctor's office
6   or a, you know, master's level clinician, it's a good
7   aid. They don't have the same sort of experience that
8   psychiatrists do in assessing depression.
9       Q. So what I think I heard you say is that the
10  average clinician can use it to rate the level of
11  someone's depression.
12      Is that right?
13      A. May -- may I say another word that might be
14  helpful?
15      Q. Sure.
16      A. In general, with tests like this, it has often
17  been found that at local medical clinics, that
18  standardized tests like this are better than the
19  individual trying to apply DSM-5-TR requirements. But
20  when it comes to people with -- who are very well train
21  -- highly trained, they're better off not -- they're
22  better off not using it. I'm not using it. I'm looking
23  at the questions, make sure I ask all sorts of
24  questions, questions that I might not otherwise ask, I

Page 105

DR. R. LUBIT

1   could slip on.
2       Q. I wasn't asking any questions about why you
3   used it. I might ask that, but that's not what I asked.
4       MR. NOTARISTEFANO: Colleen, can you please
5   repeat the question that I asked?
6       THE COURT REPORTER: Sure.
7                   - - -
8       (Whereupon, the pertinent portion of the
9   record was read.)
10                  - - -
11      THE WITNESS: I believe I also asked,
12  Counselor, if I could add something. And that before I
13  went on and I made those other statements, I asked can I
14  add something? And I believe the answer was yes.
15  BY MR. NOTARISTEFANO:
16      Q. The answer what you asked me or what I asked
17  you was yes?
18      A. I thought I answered your question and asked
19  if I could add something. And I thought you said I can.
20  If I didn't answer the -- the original question well
21  enough, please ask it again and I'll do my best to
22  answer it.
23      MR. NOTARISTEFANO: Colleen, can you read back
24  the question again and read back the first sentence of

Page 138

DR. R. LUBIT

1
2  my files dated February 27th, which probably meant later
3  that day, it does document and it shows the levels that
4  she reported having on -- for the various questions of
5  the Beck Depression Inventory.  It gives what she said
6  -- how she said she was doing before.
7     Q.  And as you said, that information is crucial
8  for the basis of your opinions.  Correct?
9     A.  Yes.
10    Q.  You said what was left out of the Beck
11 Depression Inventory II test on Exhibit 2, after the
12 Beck Depression Inventory II test conclusions, you then
13 have this sentence about the GAD-7 and the bullet points
14 that we just went over.
15       Is there anything left out on this section
16 related to the GAD-7?
17    A.  Well, I mean, I think it's there except the
18 last bullet point is not written in the best way.  The
19 last bullet point should not be a bullet point and I
20 should have said 2019, 2020.
21    Q.  Okay.  You've repeated that four times.  My
22 question is if there was anything left out.  So let me
23 ask it a couple different ways then.
24       The sentence says, "Since the problems at
25 Alorica" --

Page 139

DR. R. LUBIT

1
2     A.  Sir, I --
3     Q.  -- do you agree with me that the word --
4  excuse me, I'm not finished with my question.  Please
5  wait until I'm finished with my question.  The sentence
6  says, "Since the problems at Alorica, nearly every day
7  Megan," and then there's bullet points.
8        Do you agree with me that the word "since"
9  means after, after the problems with the Alorica, and
10 then there are bullet points.  Correct?
11    A.  Yes.
12    Q.  You agree that there is nothing in here with
13 respect to the GAD-7 about how Megan was feeling with
14 respect to these bullet points immediately before the
15 situation with the Alorica.  Correct?
16    A.  I do not agree because the last bullet point,
17 which was not well-written, was a clear statement that
18 she had -- that she recalls having nothing like this
19 except perhaps '19 or '20 when she was feeling badly.
20 That's a clear statement that prior to the problems
21 beginning, that she has no recollection of having these
22 symptoms prior to the HireRight, Alorica situation.
23    Q.  What happened in 2019 and 2020?
24    A.  That's around the period when she was applying
25 to Alorica, thought she had gotten the job, and then it

Page 140

DR. R. LUBIT

1
2  was because of the review that came through, she -- it
3  was taken back.
4     Q.  Are you sure about that?
5     A.  Those were the years that she gave me, and
6  those were the years that she gave me for the problems.
7  And those were the years she gave me when the situation
8  with HireRight and Alorica occurred.  Now, she may have
9  gotten the years wrong, but when she told me in '19,
10 '20, she was clearly, in our discussion, referring to
11 the HireRight, Alorica situation.
12    Q.  It's your interpretation, based on your
13 discussion, that when she mentioned 2019 and 2020, that
14 she was referring to Alorica because that's what you
15 believed, that's the time that you believed the Alorica
16 situation happened?
17    A.  She told me the Alorica, HireRight situation
18 was at -- that started at that time.  And she told --
19 and when we were -- we were talking very specifically
20 about the HireRight, Alorica situation.  And the way she
21 phrased that line was nothing like this except perhaps
22 those years.  She was referring to HireRight, Alorica.
23 She was -- that was clear in our discussion.
24    Q.  You don't have a recording of the words that
25 she said surrounding "Nothing like this except perhaps

Page 141

DR. R. LUBIT

1
2  2019 or 2020."  Right?
3     A.  We already -- asked and answered.  I did not
4  make a recording.
5     Q.  And you don't have any notes about what was
6  asked and what she said surrounding this bullet point,
7  "Nothing like this except perhaps 2019 or 2020."  Right?
8     A.  Asked and answered.
9     Q.  Is that a yes?
10    A.  Yes.  Counselor --
11    Q.  Your understanding -- your understanding is
12 that the Alorica situation happened in 2019, 2020.
13 Right?
14    A.  Yes.
15    Q.  Okay.  If the Alorica situation happened after
16 that and the 7-Eleven situation happened in 2019 and her
17 arrest and her court appearances in 2020, does that
18 change anything factoring into or your conclusions
19 themselves?
20    A.  I would then need to double check with her
21 because she was telling me that -- because we were
22 talking clearly about Alorica, not about 7-Eleven,
23 because I put down a lot about 7-Eleven and about
24 Alorica.  And I was given the dates that 7-Eleven was
25 several years before this.  And this is when Alorica

Page 142

DR. R. LUBIT

1
2  occurred.  And I think what -- what -- the whole gist of
3  the interview was about how she was feeling during
4  7-Eleven, after, before Alorica, during Alorica and
5  HireRight, and afterwards.  So it was clear by the
6  nature of the -- it seemed clear by the nature of the
7  conversation that's what she meant.  Whether she could
8  possibly have meant something different that time, it's
9  possible.
10     Q.  Have you ever been involved in a conversation
11  with someone or been aware of conversations that other
12  people have had where people are talking apples and
13  oranges, where one person's understanding about what
14  they're talking about is different than what the other
15  person thinks they're talking about?
16     A.  Yes.
17     Q.  From your viewpoint, you believe it was clear
18  what situation Megan Chase was talking about when she
19  said 2019 or 2020.  Correct?
20     A.  Yes.  When -- when she mentioned these
21  symptoms, yes.
22     MR. NOTARISTEFANO:  Okay.  Let's take a
23  five-minute break.  It's 4:14.  Let's come back at 4:20.
24     - - -
25     (Whereupon, a brief recess was taken.)

Page 143

DR. R. LUBIT

1
2     - - -
3     MR. NOTARISTEFANO:  All right.  We're back on
4  the record.  It's 4:21 p.m.
5  BY MR. NOTARISTEFANO:
6     Q.  The next section of your report marked as
7  Exhibit 2, has the heading Post-Traumatic Stress
8  Disorder.  Right?
9     A.  Yes.
10     Q.  Okay.  Post-traumatic stress disorder has
11  various criteria.  Correct?
12     A.  Correct.
13     Q.  The first criteria, criterion A, is an
14  exposure to a traumatic stressor.  Right?
15     A.  Yes.
16     Q.  You agree Ms. Chase does not have criteria A,
17  with respect to the Alorica situation anyway.  Right?
18     A.  Correct.
19     Q.  I'm sorry?
20     A.  Yes.
21     Q.  Okay.  Would sexual abuse as a child qualify
22  as a category A criterion?
23     A.  Yes.
24     Q.  Would a bad motor vehicle accident qualify as
25  a criterion A categorical event?

Page 144

DR. R. LUBIT

1
2     A.  Yes.
3     Q.  If there is no category A criterion, can you
4  consider the remaining criteria for a PTSD diagnosis?
5     A.  No, I did not diagnose her with PTSD.
6     Q.  Why then do you discuss the PTSD criteria in
7  this section of your report?
8     A.  There are other related diagnoses of -- I'm
9  slipping on the exact words -- other stress or
10  traumatic-related disorder or unspecified other
11  traumatic trauma disorder.  The literature is very clear
12  and the experience is very clear that there are things
13  that do not meet the current diagnostic criteria.  And
14  the A criteria have changed through every version, so
15  version after version of DSM.  And so it's still useful
16  if there's a shocking situation that affects a person.
17  It's still useful to go through and ask about the type
18  of things that can happen in highly stressful trauma,
19  with a small T, situation.
20     You know, we speak about trauma with a capital
21  T, meaning PTSD, DSM-5-TR criteria, and small T,
22  something that is traumatic, shakes somebody up, and it
23  goes to the nature of the event, and -- but it doesn't
24  meet the DSM-5 criteria.
25     Q.  Did I hear you say that there's a thing called

Page 145

DR. R. LUBIT

1
2  an unspecified related traumatic disorder?
3     A.  Something -- yeah, the wording is something
4  like that.
5     Q.  Do you use that phrase --
6     A.  I have.
7     Q.  -- in your report marked as Exhibit 2?
8     A.  No.
9     Q.  I'm sorry?
10     A.  No, I do not.
11     Q.  Is that what you were looking for when you
12  were asking her questions and you talk about these
13  symptoms of PTSD?
14     A.  No, I was -- I was not looking for that.  And
15  I don't -- I'm not looking primarily for diagnostic
16  disorders.  I'm looking for symptoms.  When you do
17  forensic work, the issue is what symptoms does the
18  person have as a result of the event in question and not
19  what diagnostic criteria does it happen to fit?
20     Q.  Why are you asking these symptoms under the
21  heading of PTSD if she doesn't have a criteria 5 event?
22     A.  Because the questions come from the diagnostic
23  criteria.
24     Q.  You say that in this report?
25     A.  I can very clearly say that she doesn't meet

MAGNA
LEGAL SERVICES

Page 146

DR. R. LUBIT

1
2  the A criteria.
3      Q.   Do you say why you're asking these questions
4  in the report?
5      A.   I don't think there's any require -- I don't
6  think the reasons and basis for my opinion require
7  explaining exactly why I chose certain things.  And I
8  don't really generally seeing other forensic
9  psychiatrists going through and explaining why they
10  asked the different questions they did.
11      Q.   Does the DSM say that the essential feature of
12  post-traumatic stress disorder is the development of
13  characteristic symptoms following exposure to one or
14  more traumatic events?
15      A.   I don't recall the exact wording, but probably
16  it very likely says that.
17      Q.   Symptoms that you describe under the category
18  of PTSD, could they be symptoms of any other disorder?
19      A.   Absolutely.
20      Q.   What disorders?
21      A.   I -- I can tell you specific ones that are
22  caused by various other things.
23      Q.   Was that a yes?  Did you freeze up?
24      A.   No.  I --
25      Q.   I said what disorders?

Page 147

DR. R. LUBIT

1
2      A.   I'm sorry.  I did not hear that, Counselor.
3  Well, it's not -- I think it's going to be much more
4  useful to tell me -- for me to first be told what
5  symptoms, and then I could discuss where else you'd find
6  it.
7      Q.   All right.  Let's go through your report.  I'm
8  going to go back up on Exhibit 2.  Sharing my screen.
9  We're on page 8.  It says Post-Traumatic Stress
10  Disorder.  That's the heading.  It says, "The first
11  DSM-5 criteria required to render a diagnosis of PTSD is
12  being exposed to actual or threatened death, serious
13  injury, or sexual violence.  Exposure can entail
14  directly experiencing the event, witnessing it happen to
15  another person," and you continue.  Correct?  That's the
16  first paragraph?
17      A.   Yes.  I didn't --
18      Q.   The second paragraph is, "The symptoms of PTSD
19  are grouped into four categories:  Intrusion symptoms,
20  persistent avoidance of stimuli associated with the
21  traumatic event, negative alterations in cognitions and
22  mood, marked alterations in arousal and reactivity."
23  Right?
24      A.   Yes.
25      Q.   So still you're discussing PTSD.  Right?

Page 148

DR. R. LUBIT

1
2      A.   Yes.
3      Q.   Even though you know that the event that you
4  were asked to give an opinion on doesn't qualify for
5  PTSD.  Right?
6      A.   Yes.
7      Q.   Continuing the next paragraph, "The first
8  symptom criteria is intrusion, recollections, recurrent,
9  involuntary and intrusive distressing memories of the
10  traumatic event."  And it continues.
11      Is this general information about -- I assume
12  this is criteria B of PTSD?
13      A.   Yes.
14      Q.   Okay.  Then there's a subheading, Intrusive
15  Memories.  It says, "Thoughts about what has happened,
16  being let down by various people come to mind daily."
17      Is that refer -- is that what Ms. Chase told
18  you?
19      A.   Well, I -- she did not quote DSM.
20      Q.   I said the next paragraph is -- there's a
21  heading.  It says Intrusive Memories.  Then there's two
22  bullet points.  I read the first sentence of the first
23  bullet point, which says, "Thoughts about what has
24  happened, being let down by various people come to mind
25  daily."

Page 149

DR. R. LUBIT

1
2      Is that what Ms. Chase told you?
3      A.   Yes.
4      Q.   Who were the various people that let her down?
5      A.   I can't name the specific people, but it was
6  related to 7-Eleven and also the Alorica, HireRight
7  situation and the court system.  I note that.
8      Q.   You say in that third sentence, "She feels let
9  down by the justice system and by people she trusted."
10  Right?
11      A.   Yes.
12      Q.   Who are the people she trusted?
13      A.   Trusted organizations to treat her fairly.
14      Q.   What organizations?
15      A.   HireRight, Alorica.
16      Q.   Criminal justice system?
17      A.   Police, yes.
18      Q.   Yes to the criminal justice system?
19      A.   Yes.
20      Q.   Yes to the police?
21      A.   Yes.
22      Q.   Yes to the prosecutor?
23      A.   We didn't -- we didn't specify the prosecutor.
24      Q.   Okay.  The next bullet point is, "She is
25  triggered going by 7-Eleven and feels disgusted,

MAGNA ▶
LEGAL SERVICES

Page 150

DR. R. LUBIT

1
2  depressed, disappointed, and anxious." Correct?
3      A.  I said correct.
4      Q.  Okay.  I didn't hear you.  It didn't come
5  through.  That is related to 7-Eleven.  Right?
6      A.  Particularly, yes.  That there are 7-Eleven --
7  that that store that serves as a traumatic trigger, yes.
8      Q.  The next paragraph talks about the second
9  symptom criteria, PTSD.
10          Is that the C criteria?
11     A.  Yes.
12     Q.  And then there's a couple bullet points there.
13 It says, "Megan avoids the specific 7-Eleven where the
14 problems occurred and 7-Eleven stores in general."
15 Right?
16     A.  Yes.
17     Q.  That's related to 7-Eleven.  You agree?
18     A.  Yes.
19     Q.  Okay.  The next bullet is, "She avoids
20 socializing and would rather stay home since the events
21 in question."  Right?
22     A.  Yes.
23     Q.  When you say the events in question, what are
24 the events?  Is that 7-Eleven?
25     A.  Well, it began with 7-Eleven, but that ends

Page 151

DR. R. LUBIT

1
2  the followup related issue with HireRight, Alorica.
3      Q.  What was her social life like immediately
4  before 7-Eleven?
5      A.  Somewhere in here, I -- I think maybe in the
6  next section, I note that her social life had gone down.
7  I don't recall off the top of my head.  But it's very
8  likely in the next section that I -- that I discussed
9  it.
10     Q.  Well, whether it went down or up wasn't my
11 question.
12          My question was, what was her social life like
13 before the situation with 7-Eleven?
14     A.  Then look at the next bullet point, at the
15 next -- that's the third symptom criteria.
16     Q.  All right.  I'll scroll down and let you look
17 at the third symptom criteria, and then I'll re-ask my
18 question.  I'm showing you the top of page 9.
19     A.  Here it doesn't specifically say, but I,
20 hopefully somewhere in the report, and it may have been
21 in the first section, talked about how social she was.
22     Q.  As you sit here today, can you not answer the
23 question what Ms. Chase's social life was like
24 immediately before the situation at 7-Eleven?
25     A.  Then I'll have to review my report.

Page 152

DR. R. LUBIT

1
2      Q.  I'm sorry?
3      A.  I'll have to review my report.  I want to
4  review it to see whether or not I put that in.
5          MR. NOTARISTEFANO:  Sure.  We'll take another
6  break.  How much time do you need?
7          THE WITNESS:  Three minutes.  Five.
8          MR. NOTARISTEFANO:  Okay.  It's 4:33.
9                    - - -
10         (Whereupon, a brief recess was taken.)
11                    - - -
12 BY MR. NOTARISTEFANO:
13     Q.  Okay.  It's 4:38.  We're back on the record.
14 Dr. Lubit, you had an opportunity to review your report.
15         Can you tell me how Ms. Chase's social life
16 was immediately before the 7-Eleven incident?
17     A.  Well, the issue is the change.  And if right
18 after --
19     Q.  Let me stop you right there.  Let me stop you
20 right there.
21         Can you tell me what Mrs. Chase's -- Miss
22 Chase's social life like was right -- was like
23 immediately before the situation with 7-Eleven?  Yes or
24 no?
25     A.  Let me read the para -- let me go back and

Page 153

DR. R. LUBIT

1
2  review.  So I don't get any words wrong, I want to read
3  the paragraph from the report.
4      Q.  What paragraph -- I'll bring it up.  What page
5  is it on?
6      A.  It is right after the last criteria.  I think
7  it's right above the conclusion.
8      Q.  Sharing my screen, Exhibit 2.  I'm scrolling
9  down to conclusion.  Let me know if that's what you were
10 looking at.
11     A.  Yes.  One paragraph -- the paragraph prior to
12 the conclusion, "In addition to her symptoms, a major
13 loss for Megan has been that she cannot get the job she
14 wants.  Another major loss is that she doesn't feel
15 social as she used to feel.  She used to love to go out
16 with people and family gatherings.  In addition to
17 seeing people in person much less, she spends only half
18 as much time on phone calls with friends as she used to
19 and has somewhat reduced her phone time even with her
20 kids.  She used to go on vacations camping.  She doesn't
21 like it anymore."
22     Q.  And is that what her social life was like
23 immediately before the 7-Eleven situation?
24     A.  Describes a change in her social life, and --
25 which is -- the issue is the change.  And so she's

MAGNA

LEGAL SERVICES

Page 158

DR. R. LUBIT

1  A. It wasn't specifically said, but that is what
2  she related, that things went further downhill and that
3  she felt worse, that her symptoms got significantly
4  worse after the second -- the second issue, which was
5  the HireRight, Alorica.
6  Q. That temporal connection significant for your
7  conclusions?
8  A. Yes.
9  Q. Can you agree you left it out of your report?
10  A. I didn't specifically state that as I did.
11  But if we also look back at the questions, 21 questions,
12  that gives us an idea that her symptoms significantly
13  got worse after HireRight, Alorica.
14  Q. You're talking about the Beck Depression
15  Inventory II questions?
16  A. The question -- the 21 questions, yes.
17  Q. Okay. By the way, when did you interview Ms.
18  Chase?
19  A. I'd have to go back and look at my notes and
20  my billing.
21  Q. I thought you said you didn't have notes and
22  that the notes transformed into this report. That's the
23  second time that you've mentioned --
24  A. Counselor --

Page 159

DR. R. LUBIT

1  Q. Let me finish my -- let me finish talking,
2  please. I've let you finish. That's the second time
3  you've mentioned you need to go back and look at your
4  notes. But you've maintained that your notes became the
5  report and you don't have notes.
6  Do you or do you not have notes?
7  A. I can't answer that yes or no because I can
8  explain in one sentence.
9  Q. Go ahead.
10  A. I -- I do not have notes on -- that were the
11  basis of this report. I have notes about the hours I
12  put in.
13  Q. Okay. You agree you didn't document in this
14  report the date that you interviewed Ms. Chase. Right?
15  A. That is correct.
16  Q. Did you meet with her in person or virtually?
17  A. Virtually.
18  Q. How long did you meet with her? And you can
19  estimate this if you don't know the exact time.
20  A. I'd like to look at my billing record.
21  Q. The next bullet point, still on page 9, "It is
22  harder for her to trust people. She used to give
23  everyone the benefit of the doubt." Correct?
24  A. That's what she said.

Page 160

DR. R. LUBIT

1  Q. Next bullet point, "She has a lot of anxiety
2  plus depression." That comes from her. Right?
3  A. Yes.
4  Q. Next bullet point, "The events in question
5  have adversely affected her view of the world." I'll
6  strike that. Let me ask you about the second and third
7  bullet point there. "It is harder for her to trust
8  people. She has a lot of anxiety plus depression."
9  Did you ask her when that started?
10  A. The -- with depression very clearly, the gist
11  of our understanding was that things got -- that there
12  were problems after 7-Eleven, but things got
13  significantly worse after the Alorica, HireRight. And
14  if we look at the 21 questions, that shows that with the
15  depression and various other -- and many other symptoms
16  got worse after Alorica, that she had gotten -- you
17  know, over time after 7-Eleven issues, that she had
18  recovered to a great extent, though she has not fully
19  put it behind her.
20  Q. Was she on antidepressants after 7-Eleven?
21  A. I don't recall or I don't know.
22  Q. Is she on antidepressants now?
23  A. I do not -- I'd have to relook at Kovnick's
24  report.

Page 161

DR. R. LUBIT

1  Q. And in order to get prescribed
2  antidepressants, you need to see a psychiatrist, right,
3  or a medical doctor?
4  A. No. Well, most patients with antidepressants
5  are prescribed by -- by internists and OB/GYN.
6  Q. If you reviewed her medical records, you would
7  know when she was prescribed antidepressants. Right?
8  A. Wouldn't remember. And the issue is still how
9  she's feeling and how she's doing.
10  Q. I don't understand that answer at all. It was
11  a pretty simple question. If you reviewed her medical
12  records, you would have known when she was prescribed
13  her antidepressants. Correct?
14  A. You could throw in that was a pretty simple
15  question. A lot of what you're doing today is somewhat
16  harassing, for the record. The question again, please.
17  Q. If you reviewed her medical records, you would
18  know when she was prescribed antidepressants. Correct?
19  A. I might. It could be in psychiatric records.
20  It could be in her medical records. And assuming that
21  the doctor carefully wrote it down, et cetera.
22  Q. The next bullet point, "The events in question
23  have adversely affected her view on the world. The
24  world is not what she thought it was." Correct?

MAGNA
LEGAL SERVICES

Page 162

DR. R. LUBIT

1
2   A.  Correct.
3   Q.  What did she think the world was?
4   A.  She feels that it's less fair and trustable.
5   Q.  Since when?
6   A.  Since these events.
7   Q.  What events?
8   A.  Both 7-Eleven and Alorica, HireRight.
9   Q.  Next paragraph, "The final group of symptoms
10  are marked alterations in arousal and reactivity
11  associated with the traumatic event."  And then there's
12  five bullet points.  "Her sleep time is down.  Her
13  concentration is decreased.  She has become irritable.
14  She has increased startle reaction.  She has become
15  hypervigilant."
16       Is that what that says?
17  A.  Yes.
18  Q.  What traumatic event are you referring to?
19  A.  With a small T, a combination of 7-Eleven and
20  HireRight, Alorica.
21  Q.  Next sentence, "In addition to her symptoms, a
22  major loss for Megan has been that she cannot get the
23  job she wants."
24       Is that what she told you?
25  A.  Yes.

Page 163

DR. R. LUBIT

1
2   Q.  How does she know she cannot get the job she
3   wants?  Do you know what that statement is based on?
4   A.  That she's had trouble getting jobs because of
5   the -- the mistake that was made on her background
6   report and that there were other jobs that were a
7   problem.
8   Q.  Was the background report that HireRight sent
9   to Alorica sent to other employers?
10  A.  I'm not sure I -- whether it was sent to other
11  employers or whether she didn't bother applying because
12  of it.  I had the impression that it had got --
13  specifically gotten in the way and that there were at
14  least two other jobs where it got in the way.
15  Q.  Were those from two other companies that she
16  sued?
17  A.  It was two other jobs, and I -- my impression
18  was two other companies.
19  Q.  All right.  Were there two other background
20  check, for lack of a better term, companies that
21  reported Ms. Chase's criminal history, she didn't get
22  jobs, and she sued those companies?
23  A.  Whether she sues -- is suing them or not, I
24  don't know.  But my impression was that there were two
25  other instances where it got in the way of her getting a

Page 164

DR. R. LUBIT

1
2   job she wanted.
3   Q.  And is it your understanding that all of these
4   reports were inaccurate, and that's why she didn't get
5   the job, the three jobs?
6   A.  Those details I do not know.  But it is her
7   impression that that -- those errors caused her to not
8   get them.
9   Q.  What if she has a misimpression?
10  A.  That's --
11  Q.  Does that affect any of your conclusions?
12  A.  That question is incredibly, incredibly vague.
13  Which conclusion --
14  Q.  You said that she has an impression that the
15  errors in her background reports caused her to not get
16  those jobs.
17       What if she has a misimpression about what
18  caused her to not get those jobs, would that affect any
19  of your conclusions?
20  A.  It wouldn't -- it would not affect the
21  conclusions that because of that belief, she is having
22  many symptoms that she would not otherwise have.
23  Q.  All right.  Next section is your conclusion.
24  So let's get into that now.  First sentence says, on
25  your report, Exhibit 2 page 9, "To a reasonable degree

Page 165

DR. R. LUBIT

1
2   of medical certainty, Megan is suffering from
3   generalized anxiety disorder, depression, and the
4   symptoms of PTSD, as well as betrayal trauma."  Right?
5   A.  Yes.
6   Q.  All right.  What does this phrase mean, "Megan
7   is suffering from?"
8   A.  She has these problems.
9   Q.  Are you diagnosing her with these problems?
10  A.  Diagnosed her with generalized anxiety
11  disorder.  I noted that she has depression and symptoms
12  of PTSD.  And although it is not a diagnostable category
13  in DSM, she is -- there is -- betrayal trauma is a large
14  part of the symptoms that she has.
15  Q.  Are you saying that you made one diagnosis and
16  that it's for generalized anxiety disorder?
17  A.  No.  I mean, it causes depression, NOS, though
18  she actually meets the criteria.  She has a major
19  depression.  And perhaps I should have put down
20  adjustment reaction as well as the symptoms of P -- it
21  would have been better if I had done PTS -- symptoms of
22  PTSD or maybe said generalized -- to say adjustment
23  reaction and in parenthesis, including the symptoms of
24  PTSD.  That would have been preferable.  She certainly
25  has an adjustment reaction to the stresses.  And she has

Page 166

DR. R. LUBIT

1    DR. R. LUBIT
2    betrayal trauma, although that's not a diagnostic
3    category, but it helps explain a lot of the symptoms
4    that she has.
5         Q.  I'll ask you about symptoms in a minute.
6    However you respond to my next question, I don't want
7    you to talk about symptoms.  I just want to know about
8    diagnoses.  Okay?  I will be very clear when I ask about
9    symptoms versus diagnoses.  My question was, are you
10   only diagnosing with generalized anxiety disorder?  I
11   heard multiple other things in your answer, which I
12   didn't quite understand.  I heard you say depression,
13   NOS.  I heard you say major depression.  And I heard you
14   say adjustment reaction.
15        Other than generalized anxiety disorder, are
16   you diagnosing Megan Chase with any other disorders?
17        A.  Adjustment reaction and depression.  And it's
18   not in DSM-5, so I guess I can't use it as a diagnostic
19   statement.
20        Q.  I don't know what your last sentence was
21   referring to.
22        Are you referring to depression?
23        A.  The last sentence was referring to the
24   betrayal trauma.  It isn't --
25        Q.  I want to be very clear.  I want to make sure

Page 167

DR. R. LUBIT

1    DR. R. LUBIT
2    this record is very clear.
3         Are you saying that you are diagnosing Megan
4    Chase with generalized anxiety disorder, adjustment
5    reaction, and depression, those three things?
6         A.  Yes.
7         Q.  Okay.  Let's start with adjustment reaction.
8         Do these two words, adjustment reaction,
9    appear anywhere in your report?
10        A.  No.
11        Q.  As we sit here today in this deposition, that
12   is the first time you are stating that you have
13   diagnosed Megan Chase with adjustment reaction as a
14   result of your evaluation of her.
15        Is that correct?
16        A.  First time I used those words, but it was also
17   inherent within the statement that she has the symptoms
18   of PTSD.
19        Q.  Is there anything else that's inherent in any
20   of your conclusions that's not documented in this
21   report?
22        A.  That is too vague a question to be answered.
23   And I would have to go through my entire report and read
24   very, very carefully to know what might be inherent in.
25        Q.  I asked you earlier if this report contained a

Page 168

1    DR. R. LUBIT
2    complete statement of --
3         A.  Counselor, your voice is getting louder and
4    louder.  You mentioned that about me once, so I'm
5    mentioning it about you now.
6         Q.  Okay.  And once again, you're
7    mischaracterizing what's happening.
8         A.  That is not true.
9         Q.  I asked you earlier.  I asked you earlier.  I
10   asked you -- can you please not talk over me?
11        A.  But you -- you said something that called for
12   an answer.  You said I mischaracterized, and I'm saying
13   I'm not.
14        Q.  I'm going to ask my question now.  Please wait
15   till I finish answering my question.  I asked you
16   earlier if this report contained a complete statement of
17   all of your opinions, you said yes.
18        You're now saying that adjustment reaction,
19   words that are not used anywhere in this report, is
20   inherent within this report?
21        A.  I actually said that I can --
22        MR. KIM:  Objection, outside the scope.
23        THE WITNESS:  And that's not what I said.  I
24   said that there are things that could be asked that I
25   could give an opinion on that I may not have addressed.

Page 169

1    DR. R. LUBIT
2    And probably a perfect example is that if -- you know,
3    if you have a problem with the term symptoms of
4    PTSD, the diagnostic criteria would then be adjustment
5    reaction.
6    BY MR. NOTARISTEFANO:
7         Q.  Why didn't you write in this report that you
8    were diagnosing Megan Chase with adjustment reaction?
9         A.  It would have been --
10        MR. KIM:  Objection, outside the scope.
11        THE WITNESS:  The crucial thing in forensic
12   reports is the symptoms the person has, not the specific
13   diagnoses.  And so in terms of the particular symptoms,
14   noting the symptoms that are -- can come from traumatic
15   incidents with a small T as well as a large T, I put
16   down the symptoms.  If you're pushing on the specific
17   DSM-5 diagnostic criteria they fit into, I have
18   explained that, yes, it would fit those criteria.  And
19   it probably would have been better if I had said that.
20   But the crucial issue is really the symptoms.
21   BY MR. NOTARISTEFANO:
22        Q.  What is adjustment reaction?  Is that a
23   disorder?
24        A.  Yes.
25        Q.  Is it called adjustment reaction disorder?

MAGNA
LEGAL SERVICES

Page 170

DR. R. LUBIT

```
1              DR. R. LUBIT
2       A.  It's just called adjustment reaction.
3       Q.  What is it?
4       A.  It's an adverse reaction to stress, to things
5  that have happened that leads to symptoms of either
6  emotional problems or behavior problems or both.
7            MR. KIM:  Again, objection, outside the scope.
8            MR. NOTARISTEFANO:  Okay.  Mr. Kim, when
9  you're saying objection, outside the scope, are you
10 saying that because adjustment reaction is not contained
11 in his report, that he shouldn't be permitted to testify
12 to it and it's outside the scope -- anything outside the
13 scope of his report he is not -- he should not be
14 permitted to testify to and therefore I should not be
15 able to ask him about in this deposition?
16           MR. KIM:  No, I'm saying outside the scope
17 because that's not -- diagnosis of Ms. Chase is not what
18 he was hired to do, to provide an expert testimony on.
19           MR. NOTARISTEFANO:  Okay.  And does that mean
20 that what you didn't hire him to do that he should not
21 be permitted to testify to?  Are you saying that he
22 should not be permitted to testify at trial to this
23 diagnosis of adverse reaction?
24           THE WITNESS:  Adjustment reaction.
25           MR. NOTARISTEFANO:  Adjustment reaction.
```

Page 171

DR. R. LUBIT

```
1            MR. KIM:  Yes, if you redirect and ask him
2  questions about it, yes, I will object.  In trial.
3            MR. NOTARISTEFANO:  I just want to be very
4  clear.  So your position is that what Dr. Lubit
5  diagnosed Megan Chase with that he didn't document in
6  this report, he should not be able to testify to at
7  trial.
8            MR. KIM:  That's an interesting way of putting
9  it.  I will not -- we will not ask him questions about
10 the adjustment -- adverse -- I'm sorry, adjustment
11 reaction on his direct.  If you were to ask him on
12 redirect, then we will object.
13           MR. NOTARISTEFANO:  I want to be very clear on
14 this record, because as we've seen for the last several
15 hours, Dr. Lubit doesn't answer the questions that are
16 asked.  Are you saying, Mr. Kim, that Dr. Lubit should
17 not be prohibited -- Dr. Lubit, do not interrupt what
18 I'm saying.  I'm trying to make a record right now.
19 This doesn't concern you.  Mr. Kim, are you saying that
20 Dr. Lubit should be precluded from testifying that Ms.
21 Chase has action -- adjustment reaction, excuse me, at
22 trial?
23           MR. KIM:  Andrew, I think I kind of got the
24 gist of what you said, but you froze for a good two
```

Page 172

DR. R. LUBIT

```
1            DR. R. LUBIT
2  seconds there.  So just for the record, can you just
3  repeat it for the record?
4            MR. NOTARISTEFANO:  Are you saying that Dr.
5  Lubit should be precluded from testifying that Ms. Chase
6  has an adjustment reaction disorder?
7            MR. KIM:  Yes.
8            MR. NOTARISTEFANO:  For the record, I reserve
9  all rights to re-call and re-depose Dr. Lubit after
10 researching adjustment reaction and pending any court
11 orders as I am entirely unprepared and have not
12 researched adjustment reaction.  All right.  Thank you.
13           MR. KIM:  And for the record, we will oppose
14 any such effort on your part.
15           MR. NOTARISTEFANO:  Understood.  Thank you,
16 Mr. Kim.
17 BY MR. NOTARISTEFANO:
18      Q.  All right.  My next question, I'm going to go
19 back to the top of Exhibit 2 under background
20 information.  We went over this earlier.  The second
21 paragraph states, "I was asked by Megan Chase's lawyer
22 to do a forensic psychiatric evaluation of Megan to
23 assess what emotional injuries, if any, she suffered as
24 a result of Alorica offering her a position and then
25 rescinding it because of inaccurate information about
```

Page 173

DR. R. LUBIT

```
1            DR. R. LUBIT
2  her legal history."
3       Is it your contention, Dr. Lubit, that Megan
4  Chase suffers from adjustment reaction, and that is an
5  "emotional injury" that you have "assessed her to have"
6  after your "forensic psychiatric evaluation" as a result
7  of "Alorica offering her a position and then rescinding
8  it because of inaccurate information about her legal
9  history?"
10      A.  She meets the -- she meets my understanding of
11 the criteria.  But again, the crucial thing are the
12 specific symptoms that she has, the specific deficits
13 that she has.
14           MR. NOTARISTEFANO:  Colleen, can you please
15 reread the question I just asked?
16           THE COURT REPORTER:  Sure.  One second.  Okay.
17 Sorry about that.
18              - - -
19      (Whereupon, the pertinent portion of the
20 record was read.)
21              - - -
22           THE WITNESS:  Yes.
23 BY MR. NOTARISTEFANO:
24      Q.  Going back to your conclusions, the other
25 diagnosis I think I heard you say was depression.
```

# Day 2 - Apr. 24, 2025

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

----------------------------------------X

MEGAN THERESA CHASE, as an individual,


                         PLAINTIFF,


        -against-


HIRERIGHT, LLC; and DOES 1-10 inclusive,
                         DEFENDANTS.

----------------------------------------X


                    DATE:  April 24, 2025

                    TIME:  9:02  A.M.



        VIRTUAL DEPOSITION of the
Non-Party, ROY LUBIT, taken by the
Defendant, pursuant to a Court Order and to
the Federal Rules of Civil Procedure,
before Miriam Schweke, a Notary Public of
the State of New York.



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   DEVON KING LAW FIRM, PLLC
         Attorneys for the Plaintiff
 5       MEGAN THERESA CHASE, as an individual
         2361 Nostrand Avenue, Suite 506
 6       Brooklyn, New York 11210
         BY:  JOSHUA KIM, ESQ.
 7
 8   MONTGOMERY MCCRACKEN WALKER & RHOADS LLP
         Attorneys for the Defendant
 9       HIRERIGHT, LLC; and DOES 1-10 inclusive
         1735 Market Street
10       Philadelphia, Pennsylvania 19103
         BY:  ANDREW NOTARISTEFANO, ESQ.
11
             *      *      *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    F E D E R A L  S T I P U L A T I O N S
 3
 4
 5      IT IS HEREBY STIPULATED AND AGREED by and
 6   between the counsel for the respective
 7   parties herein that the sealing, filing and
 8   certification of the within deposition be
 9   waived; that the original of the deposition
10   may be signed and sworn to by the witness
11   before anyone authorized to administer an
12   oath, with the same effect as if signed
13   before a Judge of the Court; that an
14   unsigned copy of the deposition may be used
15   with the same force and effect as if signed
16   by the witness, 30 days after service of
17   the original & 1 copy of same upon counsel
18   for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21   all objections except as to form, are
22   reserved to the time of trial.
23
24            *    *    *    *
25
```

Page 4

```
 1             R. LUBIT
 2   D R.   R O Y   L U B I T, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. NOTARISTEFANO:
 8      Q.   Please state your name for the
 9   record.
10      A.   Dr. Roy Lubit.
11      Q.   What is your address?
12      A.   2304 Huntington Drive, Suite
13   210, San Marino, California 91108.
14         MR. KIM:  I'm requesting a copy
15   of today's deposition.
16         THE VIDEOGRAPHER:  We are now
17   on the record.  This begins media
18   unit number one in the deposition of
19   Dr. Roy Lubit in the matter of the
20   Megan Theresa Chase versus HIRERIGHT
21   LLC.
22         Today is April 24th, 2025. The
23   time is 9:08 a.m., this deposition is
24   being taken virtually.  The
25   videographer is Wes Schwartz with
```

Page 5

```
 1             R. LUBIT
 2   Magna specialist services. The court
 3   reporter is Miriam Schweke, also of
 4   Magna.  Will counsel and all parties
 5   present please state their
 6   appearances and whom they represent.
 7         MR. KIM:  Joshua Kim for
 8   plaintiff.
 9         MR. NOTARISTEFANO: Andrew
10   Notaristefano for HIRERIGHT.
11         THE VIDEOGRAPHER:  Will the
12   court reporter please swear in the
13   witness?
14      Q.   The time is 9:11 a.m.
15         Good morning, Dr. Lubit.
16      A.   Good morning.
17      Q.   Dr. Lubit, since we broke from
18   your deposition last night, did you speak
19   to counsel?
20      A.   Yes.
21      Q.   When?
22      A.   Yesterday. The entire substance
23   was that I asked if he wanted me to draft
24   some questions for his cross examination of
25   your expert. He said, "Yes." And then I
```



Page 22

R. LUBIT

1
2  and you are the first lawyer who's ever
3  objected.
4         The -- I felt it was
5  significant to try to explain how big a
6  reaction she has had to this event, and the
7  purpose of forensic evaluations is to try
8  to explain to people the significance of
9  the reaction an individual has to stressful
10  event, the reaction people have to a
11  problematic event.
12     Q.   Why didn't you explain her
13  reaction and you how came to your diagnosis
14  of adjustment disorder?
15     A.   If I, as I said yesterday, and
16  that if someone has such a reaction, a
17  large enough reaction, that they have the
18  symptoms of PTSD, then they have had an
19  adjustment reaction. One could also say
20  that. Except you don't do both, so I could
21  have said adjusting reaction as it's done
22  in common usage or there's other
23  unspecified stress disorder, I think is the
24  term, or other specified stress disorder, I
25  think is the correct DSM term.

Page 23

R. LUBIT

1
2         I have on numerous occasions
3  written that someone has the, you know,
4  certain event was so significant that they
5  have the symptoms sufficient to meet the
6  criteria for PTSD. No one before has
7  objected, and so I have -- and people
8  thought it was helpful, and so I did it.
9         I didn't know that you were
10  going to basically give me a test on the
11  DSM or the exact wording and to hassle me
12  about saying a true statement which is that
13  she doesn't meet the criteria, but there's
14  sufficient symptoms that have arisen that
15  the symptoms are -- she has the symptoms of
16  PTSD, and there are other situations.
17         The whole issue of betrayal
18  trauma, people wind up often having the
19  symptoms of PTSD, and to explain to someone
20  how significant the person's reaction is
21  when there isn't a proper commonly used
22  diagnosis. I think it's a reasonable thing
23  to do.
24     Q.   Are you saying that you didn't
25  use the words "adjustment disorder" or

Page 24

R. LUBIT

1
2  describe what adjustment disorder is and
3  instead chose to write two pages of PTSD
4  because you've done it in other cases
5  before and no one has asked you about it?
6         MR. KIM:  Objection.
7     Mischaracterizes his testimony.
8         THE WITNESS:  I very clearly
9     said what I did and why I did it,
10     counsel. If you want to keep asking
11     the question, I'll answer it a few
12     more times, but at a certain point, I
13     want the court to be called about
14     this.
15     Q.   Can you please answer the
16  question I just asked?
17     A.   I was finishing what I was
18  saying, you didn't need to --
19     Q.   Can you please answer the
20  question without commentary?
21     A.   I am trying to, but you keep
22  interrupting me with the same words, and I
23  am about to call my own lawyer to come and
24  see if the court will stop your harassment.
25  It has gone on for many hours.

Page 25

R. LUBIT

1
2         The -- I think it was quite
3  obvious that what you claimed I did is not
4  what I did. I didn't do it because I could
5  do it, I did it because as I have said, if
6  someone has such a serious reaction to a
7  given event that they meet -- that it
8  causes the criteria of PTSD, it is
9  worthwhile to note that, even though you
10  can't diagnose PTSD, and I believe she's
11  had this big reaction. It comports with my
12  knowledge of betrayal trauma which I'm
13  writing on, and I thought it would be
14  informative for people who see that.
15         And to very clearly state she
16  don't meet the diagnostic criteria, and I
17  said that if someone had such a reaction to
18  something that they met PTSD criteria, they
19  would also have met the diagnostic criteria
20  for adjustment reaction.
21         However, there is the issue --
22  I didn't say this yesterday. However, there
23  is the issue that one doesn't continue to
24  diagnose it, but at a certain point, but
25  earlier in the time, one could say that

MAGNA ▶

LEGAL SERVICES

Page 26

R. LUBIT

1
2  they will have met criteria for adjustment
3  reaction. That doesn't mean that they still
4  meet it. There are problems for after six
5  months.
6       Q.   Yesterday, when you kept
7  referring to PTSD and the traumatic event,
8  you referred to it as a little T trauma; is
9  that correct?
10      A.   Yes.
11      Q.   Do you agree that PTSD does not
12  encompass little T traumas?
13      A.   I believe I specifically said
14  yesterday that big T refers to a trauma
15  which meets the A criteria of PTSD, little
16  T refers to traumas that does not meet the
17  A criteria.
18      Q.   Is that a "yes"?
19      A.   I don't know. I don't really
20  follow what you said, so I just stated
21  basically what I think.
22      Q.   Can the court reporter please
23  read back my question?
24          (Whereupon, the referred to
25      question was read back by the

Page 27

R. LUBIT

1
2  Reporter.)
3       THE WITNESS:  I just gave a
4  clear answer. I'm not quite sure what
5  you mean by "encompass" et cetera. I
6  have answered the questions very
7  clearly in few words. So making me
8  use a, yes, no, I'm not sure exactly
9  what the meaning is or how people
10 will see it, it makes no sense other
11 than to harass me.
12     Q.   If there's no big T trauma,
13 under criteria A of PTSD, symptoms are not
14 related to post-traumatic stress disorder;
15 do you agree?
16     A.   I don't understand. The
17 question is ambiguous.
18     Q.   Do you have to relate symptoms
19 to a criteria A traumatic event in order to
20 discuss them under the category of PTSD?
21     A.   I don't fully follow. It is --
22 there's no problem with saying that
23 symptoms that are also seen in -- that are
24 seen in PTSD could have been caused by
25 something that doesn't meet the A criteria.

Page 28

R. LUBIT

1
2      Q.   It sounds like what you are
3  saying is that these symptoms were caused
4  by a stressor, and that's why she had
5  adjustment disorder; is that fair?
6       A.   She no longer -- I'm going to
7  go with she had adjustment disorder, that
8  could have been used, and then I would have
9  to go check exactly what you do if it
10 continues past six months.
11      Q.   Are you saying that she does
12 not have adjustment disorder right now?
13      A.   I would want to go back and
14 double check exactly. If what's in -- if
15 there's a way around the continuous
16 adjustment disorder.
17      Q.   I just want to make sure I
18 understand your testimony. As I understand
19 your testimony --
20      A.   You're trying to basically
21 twist my words and get sound bites you can
22 use against me. You're not trying to get
23 information to understand my testimony,
24 because my testimony has been very clear,
25 and I am happy to do it, but you're looking

Page 29

R. LUBIT

1
2  for sound bites.
3       Q.   Dr. Lubit, I ask you to stop
4  --
5       A.   Can I get my own lawyer to join
6  us because this is harassing?
7       Q.   I'd ask you to stop with the
8  commentary and answer the question. I am
9  trying to understand your testimony and
10 what you said yesterday. Yesterday, you
11 said a conclusion that's not written your
12 report. I'm trying to understand it. My
13 understanding of what you said yesterday
14 was when you interviewed Ms. Chase, you
15 were diagnosing her with adjustment
16 reaction.
17      I just heard you say that she
18 no longer has it. I am trying to understand
19 which is accurate, what your diagnosis is
20 with respect to this adjustment reaction.
21 If it was previous and she no longer has
22 it, or if she had it when you interviewed
23 her. I'm trying to get clarification about
24 that. Are you able to clarify that, please?
25      A.   I was very clear. I'll do it



Page 30

R. LUBIT

1
2  again.
3         MR. KIM:  Objection. Dr. Lubit,
4  before you go on, objection. It
5  misstates his prior testimony.
6  Yesterday, when he was testifying
7  about the potential diagnosis for
8  reaction adjustment, he -- I believe
9  he didn't say that he actually
10  diagnosed her with one, simply that
11  there's a potential diagnosis that
12  could be used to explain the symptoms
13  or they could be used to understand
14  the symptoms in the context of this
15  case.
16  So to the extent that, Andrew, you
17  keep characterizing his statements
18  from yesterday as a actual clinical
19  diagnosis of reaction adjustment,
20  that misstates his testimony from
21  yesterday.
22         THE WITNESS:  I don't know what
23  else to say, because I think what I
24  have said it already so absolutely
25  clearly and it keeps getting twisted.

Page 31

R. LUBIT

1
2  As I have said, I believe it is
3  useful to point out to someone when I
4  -- it is useful when trying to
5  explain your belief about how someone
6  was harmed in a given incident, that
7  to show that the harm was such that
8  it fulfills the symptomatic criteria
9  of PTSD. Although, it does not meet
10  the causal criteria is a useful
11  thing.
12  If you look at the history of DSM,
13  there are big changes repeatedly in
14  the causal criteria. And the point of
15  the report and testimony is to try to
16  explain the impact of an event on
17  people.
18  Whether exactly what diagnostic
19  criteria it meets, isn't the issue,
20  because you're going to have a huge
21  range of harm with the same
22  diagnostic criteria. The point is to
23  explain the harm, and I have done
24  that.
25  You said before, "So you're doing it

Page 32

R. LUBIT

1
2  because you've done it before?" Of
3  course not. I did it because I
4  thought that it can help people to
5  understand that there has been a very
6  large magnitude reaction and that it
7  was traumatizing in this small T
8  sense.
9  In terms of -- and again, I did not
10  say that the criteria -- it meets the
11  criteria for one, it works for the
12  other. I did not say anything like
13  that.
14  I said that if someone has sufficient
15  symptoms as a result of an event to
16  meet PTSD criteria, they will have
17  had sufficient symptoms to diagnose
18  an adjustment reaction.
19  Now, there is a time limit problem
20  officially, there's also what happens
21  in common usage which is that people
22  use it for far more than six months.
23  And unless there's a workaround,
24  which I'd want to check with DSM,
25  it's generally after six months, you

Page 33

R. LUBIT

1
2  don't use it, you use something else.
3  But there might be a workaround, I
4  thought there had been at one point,
5  but you won't let me check the DSM.
6  Q.   Dr. Lubit, my question is -- I
7  am just going to stop you right there
8  because you've gone on for a few minutes,
9  and you have been answered my question.
10  A.   I have --
11  Q.   It is a simple question, it's a
12  simple question and the question is, are
13  you diagnosing or did you diagnose
14  Ms. Chase with having adjustment reaction
15  disorder at the time you interviewed her or
16  it was your opinion that she had it at one
17  point previous to the interview but no
18  longer has it? That's all I'm trying to
19  understand.
20  A.   That's two different questions
21  in one. Those are two different questions.
22  Q.   I'm trying to figure out your
23  opinion. And as I've heard you speak, I
24  have heard two different opinions, and I'm
25  just trying to seek clarity.



Page 34

R. LUBIT

1
2        Have you diagnosed her with
3   this adjustment reaction disorder, had she
4   had it at the time you interviewed her or
5   it's opinion that she had it before that
6   interview and no longer had it on the date
7   of the interview?
8        A.   You've asked two different
9   questions. One is about what I was thinking
10  on that day and other is about what I think
11  now. And I can explain what I think or we
12  can continue with your, you know, asking
13  questions that are not at all clear and
14  likely to lead to a misunderstanding if
15  answer is yes or no.
16       Q.   We will mark the transcript,
17  the witness refused to answer. I'm going to
18  ask another question now.
19       A.   That is absolutely false. That
20  is absolutely false.
21       Q.   I'm going to ask another
22  question now. I'm going to ask another
23  question now.
24       A.   That is not.
25       Q.   Dr. Lubit, I am going to ask

Page 35

R. LUBIT

1
2   another question now.
3        A.   That is false.
4        Q.   Dr. Lubit, I have questions
5   that I have to ask.
6        A.   I want to get a lawyer at this
7   point, because I did not refuse to answer
8   the question. You asked a question that was
9   ambiguous but I didn't understand, and that
10  actually has two different parts to it, and
11  I asked for a restatement of the question,
12  I did not refuse to answer it.
13       Q.   Okay.
14           MR. KIM:  Objection. It's
15       really hard to get a word in
16       edge-wise when there's a constant
17       question and answer and responses
18       back and forth.
19       But objection. Actually, it
20       mischaracterizes his response.
21       Dr. Lubit is absolutely correct, he
22       did not refuse to answer the
23       question. He was trying to answer the
24       question the best way he can.
25           THE WITNESS:  And I needed a

Page 36

R. LUBIT

1
2   clarification, because there's a
3   problem in the question where it was
4   two parts, and I can't say yes or no
5   when there's two different questions,
6   and I'm supposed to give one yes or
7   no to answer two different things
8   that are different.
9   And I am happy to explain what I
10  think. I have to tell you what's
11  wrong with the question, if you want,
12  but to attack me, claiming that I'm
13  refusing to answer the question is
14  absolutely false.
15       Q.   Dr. Lubit, are you going to
16  keep proceeding with this deposition or are
17  you asking to cancel it to contact a
18  lawyer?
19       A.   I wouldn't cancel it, I would
20  take a ten-minute break and call a lawyer.
21           MR. NOTARISTEFANO:  Very well,
22       it is 9:50 a.m., we will take a
23       ten-minute break and come back at
24       10:00 a.m.
25           THE VIDEOGRAPHER:  Off the

Page 37

R. LUBIT

1
2   record. The time is 9:50 a.m.
3       (Whereupon, a break was taken.)
4           THE VIDEOGRAPHER:  Going back
5       on the record, 10:00 a.m.
6        Q.   All right, Dr. Lubit, we took a
7   ten-minute break, are you prepared to
8   proceed?
9        A.   Yes, but there was a question I
10  was asked yesterday, which I should have
11  been asked again today, which I wasn't in
12  the beginning. May I state the question?
13       Q.   No, Dr. Lubit, you -- the way
14  this goes is that I ask questions, and then
15  you have to answer the questions, okay,
16  that's the way it goes. So I am going to
17  ask my next question, and if you can answer
18  it, you can answer it, and if you can't
19  answer it, you can tell us you can't answer
20  it, okay?
21       A.   I want to make a statement for
22  the record which is that I was asked
23  yesterday quite appropriately if there was
24  any reason why I could or couldn't do the
25  depo. I am exhausted, I have been working

Page 38

R. LUBIT

1
2  12-hour days, flying, deposed three times
3  now, and five work days, and I am very
4  tired. And I haven't been sleeping well, so
5  I can answer questions, but I am going to
6  be a little bit slower.
7         And I want the record to state
8  this there's an issue of my being just
9  completely exhausted, and making it harder,
10 and the harassing quality of things makes
11 it much worse.
12        MR. NOTARISTEFANO:  Mr. Kim,
13 he's your witness. The deposition was
14 noticed. It was noticed yesterday, we
15 took a lengthy break for Dr. Lubit,
16 that we had the scheduled. I know we
17 have all moved our schedules around
18 because of Dr. Lubit's schedule that
19 we were unaware of, and then we gave
20 him -- we ended early at his request
21 to begin here this morning.
22 Mr. Kim, he's your witness. I am
23 prepared to keep moving forward, but
24 he's your witness.
25        THE WITNESS:  I can keep moving

Page 39

R. LUBIT

1
2  forward, but I'm going to be slower,
3  and I would request that you stop and
4  harassing quality questions, because
5  it make this much more exhausting.
6         MR. NOTARISTEFANO:  Mr. Kim,
7  I'd ask you to instruct Dr. Lubit to
8  seize commentary and to just answer
9  the questions that are asked, and we
10 will get through this.
11        MR. KIM:  Well, Andrew, I
12 appreciate the -- I appreciate what
13 you said, but, well, I think I want
14 to make an exception here. Dr. Lubit
15 actually communicated to you on the
16 record why is -- he's having some
17 difficulty answering questions,
18 especially given a long line of
19 questions that I have a long standing
20 objection on, based on out of scope.
21 And I actually understand that he's
22 tired, I did not know that he has not
23 been sleeping well, and I thought the
24 last night's sleep actually would,
25 you know, would give him some rest,

Page 40

R. LUBIT

1
2  but it appears that it's a
3  longstanding problem for him.
4         THE WITNESS:  I can continue.
5         MR. KIM:  Yeah, I think we
6  should continue. And to the extent
7  that you're, you know, you're asking
8  me whether we should continue or not,
9  I think we will continue.
10 But Andrew, I have -- instead of, you
11 know, inserting an objection with
12 every single question and that you
13 have had throughout today's
14 deposition -- in order to make the
15 deposition a little better and go
16 quicker, I instead offer a standing
17 objection, but the standing objection
18 is not a license to continue to ask
19 questions that are outside of scope.
20 I ask respectfully that you refrain
21 from asking him questions that are
22 outside of scope. He's not here to
23 give diagnosis of Ms. Chase. He's
24 here to give testimony about
25 emotional injury that she suffered as

Page 41

R. LUBIT

1
2  a result of what happened in her
3  case, and if you can stop questioning
4  Dr. Lubit about his knowledge,
5  detailed knowledge of DSM5 and also
6  about the diagnosis that he, you
7  know, did not give, then I can make
8  the deposition go a lot more
9  smoothly.
10        MR. NOTARISTEFANO:  Your
11 objection is noted. And if we're
12 ready to continue, I'll continue.
13        MR. KIM:  Dr. Lubit?
14        THE WITNESS:  I am ready to
15 continue.
16 Q.   All right. It's 10:06 a.m.
17        Dr. Lubit, generalized anxiety
18 disorder is a disorder that is not related
19 to a specific event; is that correct?
20 A.   It's not generally seen as
21 that, but someone can develop it after
22 stresses just like depression may not --
23 may or may not be related to a specific
24 event.
25 Q.   Is Ms. Chase's generalized

**MAGNA** ▶
LEGAL SERVICES

Page 42

R. LUBIT

1
2  anxiety disorder related to a specific
3  event?
4      A.   I think that the level of
5  anxiety has substantially increased as a
6  result of the -- what happened with 7/11,
7  and then more so with what happened with
8  HIRERIGHT and Alorica.
9      Q.   By substantially increased as a
10  result of what happened with 7/11, are you
11  saying that she had generalized anxiety
12  disorder before the 7/11 incident?
13      A.   Her level of anxiety increased.
14      Q.   Did she have generalized
15  anxiety disorder before the 7/11 incident?
16      A.   Not to my knowledge. The issue
17  for me was that as I noted in my report
18  very clearly, that her -- she reported that
19  her anxiety levels increased greatly with
20  the Alorica/HIRERIGHT issues.
21      Q.   Did you ask any questions or
22  perform any tests to measure her level of
23  anxiety at any point in time?
24      A.   It's very clear in my report as
25  we discussed in detail yesterday, that when

Page 43

R. LUBIT

1
2  there were a number of bullet points and
3  the last one should not have been a bullet
4  point, it should have been a separate
5  sentence, that she did not have these
6  symptoms before.
7      Q.   Before what?
8      A.   Before the recent incidents
9  that we are here talking about.
10      Q.   Are you talking about the
11  bullet points that appear under the Beck
12  Depression Inventory 2 pages?
13      A.   I think that's where it is.
14      Q.   I am going to share my screen
15  showing you Exhibit 2, are these the bullet
16  points you're referring to, from pages 7 to
17  8 of your report?
18      A.   Yes.
19      Q.   This is before -- the bullet
20  point you're referring to it before this 19
21  or 20 which you told us yesterday were the
22  years 2019 or 2020, correct?
23      A.   Yes.
24      Q.   You've mentioned the term
25  "betrayal trauma," and it appears for the

Page 44

R. LUBIT

1
2  first time in the report in the conclusion
3  section on page 9, what is betrayal trauma?
4      A.   Betrayal trauma is trauma
5  sustained with someone who is supposed to
6  -- either when someone treats you in a way
7  that is -- I am really tired give me a
8  second. If someone is supposed to treat you
9  in a reasonable way, and that could be an
10  individual who is close to you, it could be
11  an organization that you expect will do the
12  right thing by people, and they either fail
13  to protect your interests reasonably or
14  they do things to harm you, the person then
15  can have betrayal trauma.
16      Q.   Where does the theory betrayal
17  trauma come from, when -- when was it first
18  opined on or written about?
19      A.   There were -- well, there were
20  elements about it long before the term was
21  used. I don't -- I'd have to review my
22  papers to see -- if we go back to the
23  intellectual history of it, but most of the
24  modern work was done by Jennifer Freyd and
25  her disciples.

Page 45

R. LUBIT

1
2      Q.   I am sorry, what?
3      A.   You're twirling the pen in
4  front of my face. It is dizzying.
5      Q.   Did Dr. Jennifer Freyd write
6  that betrayal trauma is based on
7  institutional betrayal?
8      A.   No, there is -- the question
9  makes no sense, but I think I can say what
10  you want to hear, what you are asking,
11  which is that there are many -- there are
12  various types of betrayal trauma, and they
13  can be betrayed by a loved one, they can
14  also be the betrayed by an institution, and
15  there are papers that I'm writing about
16  institutional betrayal.
17      Q.   So you're saying Dr. Jennifer
18  Freyd wrote that betrayal trauma can apply
19  to someone who feels betrayed by anyone,
20  not necessarily an institution or people in
21  authority?
22      A.   That's not at all what I said.
23      Q.   I am trying to understand what
24  you said. I asked you if Dr. Jennifer Freyd
25  wrote that betrayal trauma was based on

Page 46

R. LUBIT

1
2  institutional betrayal.
3      A.   I'll repeat my words. You can
4  suffer betrayal trauma from the absence of
5  a loved one, a good friend, or the actions
6  of an institution that one would expect
7  would treat you fairly.
8          I don't recall whether it was
9  written about by her or her disciples, but
10  there's literature about it, and I am also
11  writing about it.
12     Q.   Did Dr. Jennifer Freyd write
13  that betrayal trauma can be based on the
14  feeling of betrayal from a loved one or a
15  good friend?
16     A.   I don't know whether it was her
17  or one of her disciples who discussed the
18  issue of institutional betrayal.
19     Q.   My question wasn't about
20  institutional betrayal. My question was,
21  did Dr. Jennifer Freyd write that betrayal
22  trauma can be based on the feeling of
23  betrayal from a loved one or a good friend?
24     A.   There were many things written
25  by her versus her disciples, and I'm simply

Page 47

R. LUBIT

1
2  saying that I don't recall. I'm not going
3  to go and specify, I don't recall exactly
4  who wrote what, but it's within the
5  literature that began with her, and was
6  followed by her disciples where these
7  things were discussed and I have written
8  about it myself, and if you are going to
9  ask me exactly what Dr. Freyd wrote, I
10  don't want to step out and possibly make a
11  mistake, because she's not the only one who
12  wrote about it.
13     Q.   Did you document in your report
14  what literature you were relying upon when
15  you wrote your opinions with respect to
16  betrayal trauma?
17     A.   Again, that's -- I think if you
18  take a look at what I believe in my report,
19  it has citations.
20     Q.   Did you cite to the literature
21  that says that betrayal trauma can be based
22  on the feeling of the betrayal from a loved
23  one or a good friend?
24     A.   What's the difference? I want
25  to look back at my report and see what I

Page 48

R. LUBIT

1
2  wrote.
3      Q.   Are we going to take another
4  break?
5      A.   No, it's going to take one
6  minute, and there's no reason for a break.
7      Q.   Go ahead, you can look at your
8  report. I'd ask you to look at the report
9  that was provided though, the one marked as
10  Exhibit 2, that's the report in the record.
11     A.   Please resend it to me then, so
12  I don't pick up the one.
13     Q.   All right. Let take a
14  five-minute break.
15     A.   No, I object to this. I object
16  to this to continue to have breaks and then
17  claim that the timing stops, when I only
18  need a minute, and then you want another
19  five-minute break, pushing me along more
20  and more towards the end of day, this is
21  not fair. It will take me very little time
22  to find it, but whether this -- there will
23  be no difference between the one that I
24  sent in, the one that was sent -- put up
25  yesterday and the one that -- and my last

Page 49

R. LUBIT

1
2  version, it'll just take me a second.
3      Q.   Dr. Lubit, I'm not going to
4  argue with you. If you asked to see what
5  has been marked Exhibit 2, and as we went
6  through it yesterday, you don't want me
7  scrolling through it on the screen, you
8  don't have a copy of it. I mean, if you are
9  asking for a copy of it, we will --
10     A.   I have miss --
11     Q.   I am sorry?
12     A.   I have pulled up Megan Chase's
13  report.
14     Q.   Is it the Exhibit 2 that has
15  been marked?
16     A.   There will not be any changes
17  in that report on it from what -- it'll be
18  identical of the two in that area.
19         MR. KIM:  Dr. Lubit, I just
20     e-mailed you a copy of the report
21     that Andrew marked as Exhibit 2.
22     Q.   I'd ask you to look at
23  Exhibit 2 and not anything else, that's the
24  report in the record, and I don't know what
25  the other report is. I only have Exhibit 2



Page 50

R. LUBIT

1
2  and my question is what is documented in
3  Exhibit 2. So I'd ask you to please look at
4  what Mr. Kim just e-mailed you, I trust
5  that Mr. Kim e-mailed Exhibit 2.
6        MR. KIM:  For the record, I
7  emailed Dr. Lubit the same report
8  that we provided the defendant.
9        MR. NOTARISTEFANO:  Thank you,
10  I trust that you did.
11        THE WITNESS:  There are lots
12  and lots of citations. I put in
13  cations, I did not cite Jennifer
14  Freyd.
15        Q.   Question was, did you cite any
16  literature that said betrayal trauma can be
17  based on one's feeling of betrayal from a
18  loved one or a good friend? That's the
19  question.
20        A.   Okay, I did not give a citation
21  to that.
22        Q.   Did you give a citation to any
23  literature that says that betrayal trauma
24  can be based on one's feeling of betrayal
25  for situations for people that are not

Page 51

R. LUBIT

1
2  institutional as Dr. Jennifer Freyd defined
3  institutional?
4        A.   I don't fully understand the
5  question, but I did not cite, I don't think
6  -- I've looked through it. I did not -- I
7  cited a number of pieces of literature. I
8  did not cite Dr. Freyd's work or I did not
9  cite things specifically about betrayal
10  trauma.
11        Q.   I am sorry, there was a little
12  blip on my end. When you -- in the last
13  thing that you said, did you just say that
14  you did not cite to anything specific to
15  betrayal trauma?
16        A.   That's what I gathered as I
17  looked through quickly.
18        Q.   Did Dr. Jennifer Freyd write
19  that institutional betrayal is a
20  description of individual experiences, of
21  violations of trust and dependency
22  perpetuated against any member of an
23  institution in a way that does not
24  necessarily arise from an individual's less
25  privileged identity.

Page 52

R. LUBIT

1
2        A.   I couldn't follow that, and I
3  did not -- I'm not going to answer
4  questions about specific words that
5  Jennifer Freyd wrote. I would want to go
6  back and check. I see no point to it, and I
7  am writing on the issue myself, and I'm not
8  going to go out on a limb. And I don't
9  remember the specific words she used, I
10  don't remember exactly what she versus
11  disciples wrote about.
12        Q.   If you don't remember what she
13  specifically wrote, you can just answer you
14  don't remember, that's a fine answer.
15        Did Dr. Jennifer Freyd write
16  that institutional betrayal occurs when an
17  institution causes harm to an individual
18  who trusts or depends on that institution?
19        MR. KIM:  Objection. Relevance.
20  There is no relevance. What Dr. Freyd
21  -- whether Dr. Lubit can actually
22  recall what Dr. Freyd said or not at
23  any point is not relevant to any
24  issue in this case.
25        Q.   Can you answer the question

Page 53

R. LUBIT

1
2  Dr. Lubit?
3        A.   I don't recall the specific
4  words she wrote, I can't separate out of my
5  mind right now exactly what she wrote
6  versus what her disciples wrote.
7        I can talk about my beliefs
8  about it, what I am writing, but I -- it's
9  really more harassment to say, "Did this
10  person write this, did the DSM5 say exactly
11  this?"
12        Q.   Dr. Lubit, did Dr. Freyd write
13  about examples of institutional betrayal
14  including unchecked abuse in residential
15  schools, is that an example that she used?
16        A.   I don't recall.
17        MR. KIM:  Objection. Objection
18  again, relevance. That is not a test
19  of the memory of Dr. Lubit.
20        MR. NOTARISTEFANO:  Can you
21  have a standing objection on this,
22  Joshua, because I have a couple of
23  other examples I'm going to ask
24  about. I'll give you a standing
25  objection, if that's okay.

MAGNA
LEGAL SERVICES

Page 54

R. LUBIT

1
2       MR. KIM:  A couple of -- well,
3    if this turns into another hour of,
4    you know, questions about what I have
5    a standing objection about, no. I
6    think we will have to actually insert
7    objection every time. But if it's
8    just a couple, and that's five
9    minutes, sure.
10      MR. NOTARISTEFANO:  Thank you.
11   And for the record, I acknowledge a
12   standing objection to these next few
13   questions regarding examples of
14   institutional betrayal trauma that
15   Dr. Jennifer Freyd may or may not
16   have written about will be my
17   questions.
18      Q.   Dr. Lubit, did Dr. Freyd give
19   another example of institutional betrayal
20   as insufficient and/or lacking official
21   responses to sexual trauma in the military?
22      A.   I could go back to the paper
23   that I am writing, finishing up, and I
24   could give you more learned accurate
25   answers to this, very likely, because I

Page 55

R. LUBIT

1
2    discussed many things she and her disciples
3    wrote. But off the top of my head, I'm not
4    going to -- I can go back to my paper or I
5    could provide it, and it will have probably
6    a lot of information around your questions,
7    but I'm not going to risk mistaking who,
8    you know, exactly whether she or one of her
9    disciples or somebody else wrote about such
10   things. And I'm not going to by specific
11   wording you used, because it may be
12   slightly off. I can certainly tell you what
13   I think.
14      Q.   Did Dr. Jennifer Freyd write as
15   another example of institutional betrayal
16   trauma, an example being insufficient legal
17   protection and services following domestic
18   violence, such as a domestic violence
19   victim who was dependent on the protection
20   of police being let down by the law?
21      A.   I can't -- I'm not going to say
22   exactly what she wrote, I'm happy to say
23   what I think. I'm happy to go back to my
24   paper, and see if I mentioned particular
25   things to her, but it is -- the question

Page 56

R. LUBIT

1
2    about what a particular author wrote, if --
3    I can't answer yes or no, because I don't
4    want to take any risks even though I
5    believe that I've seen things about this, I
6    would want to go back and read my basic
7    report.
8          I can tell you what I think,
9    but in terms of what some author wrote,
10   it's -- the answers are going to be the
11   same. I'm not sure exactly what this person
12   wrote, that I, you know, when I have
13   written as much of what she wrote, but I
14   don't want to take a risk that your wording
15   is slightly different, et cetera.
16      Q.   Did Dr. Freyd write that
17   another example of institutional betrayal
18   trauma is elder abuse in a residential
19   setting?
20      A.   I'm not going to take a risk
21   that I might -- with yes or no, I'm going
22   say, I don't know, but it fits with my
23   understanding of betrayal trauma.
24      Q.   Is it fair to say that when
25   Jennifer Freyd wrote her paper on betrayal

Page 57

R. LUBIT

1
2    trauma, that she provided examples of when
3    a person is dependent on or trusts the
4    legal, medical or mental health system for
5    care and/or protection?
6      A.   Yes, she wrote more than a
7    paper, it's not a paper. She wrote two --
8    at least -- well, two books, unless she's
9    written another one recently, and many
10   articles, and so have her disciples.
11      Q.   Is what I just said correct or
12   incorrect?
13      A.   I do not recall exactly what
14   she covered and what her disciples covered,
15   and -- and so I am not going to answer
16   that, because I could -- I don't have a
17   specific enough memory that she said
18   exactly that. She wrote many papers and two
19   books at least.
20      Q.   If person A lies to person B,
21   and person B finds out that person A lied,
22   does person A have a right to feel betrayed
23   by person B finding out that person A lied?
24      A.   It depends on the relationship.
25      Q.   Does person B have a right to

MAGNA
LEGAL SERVICES

Page 58

R. LUBIT

1
2  feel betrayed by person A or person A lying
3  to person B?
4      A.   It depends on the relationship.
5      Q.   What does it depend on?
6      A.   I just said.
7      Q.   What kind of a relationship?
8      A.   It depends on what the lie is.
9      Q.   Can you be any more specific?
10     A.   Would you like examples?
11     Q.   You can give an example or two.
12     A.   If someone says to someone
13 else, "Oh, I like your dress," when they
14 don't really like it, and they don't even
15 know each other, that would not lead to
16 betrayal trauma.
17     Q.   Let me just stop you right
18 there, because my question was not if it
19 leads to betrayal trauma. My question was,
20 does someone have a right to feel betrayed?
21 You can continue.
22     A.   I have no idea of what it means
23 to have a right to, people can have
24 feelings, and I don't know what it means to
25 have a right to a feeling. I have no idea

Page 59

R. LUBIT

1
2  what you mean by someone having a right to
3  a feeling. If the person feels betrayed,
4  they feel betrayed, and having a right to
5  it is -- I don't understand the concept.
6      Q.   Let's go back to your report,
7  Exhibit 2, this is the bottom of page 9,
8  top of page 10, the first paragraph under
9  the conclusion paragraph. You wrote
10 "betrayal trauma is the emotional harm
11 suffered when an individual or institution
12 that someone relies on for important needs
13 (protection, emotional support, livelihood)
14 seriously violates the person's welfare or
15 trust. Betrayal that can entail acts of
16 commission (assault, humiliation, unfair
17 treatment) or acts of omission (failure to
18 render expected help). Experiences are
19 being traumatic if they overwhelm
20 individual's coping mechanisms and cause
21 enduring psychological harm." Did you write
22 that?
23     A.   Yes.
24     Q.   Is Alorica the type of
25 individual or institution that Megan Chase

Page 60

R. LUBIT

1
2  relied on for an important need?
3      A.   Are you saying Alorica now or
4  HIRERIGHT or the two together?
5      Q.   My question was Alorica. I
6  didn't mention HIRERIGHT. Please answer the
7  question I asked.
8      A.   I am not able to separate them,
9  I can explain what I think, but I can't
10 separate the two out, and...
11     Q.   Can you answer my question?
12     A.   I can't separate that -- I
13 cannot separate Alorica from HIRERIGHT.
14     Q.   Can you answer the question if
15 you combine Alorica and HIRERIGHT?
16     A.   Yes.
17     Q.   Then, please answer the
18 question combining Alorica and HIRERIGHT.
19     A.   I'd like to explain my answer,
20 but I would say, yes.
21     Q.   Why?
22     A.   Thank you for letting me
23 explain. People expect large institutions
24 to treat them fairly and appropriately. And
25 we are, in general, dependent much of the

Page 61

R. LUBIT

1
2  time on the actions of large institutions.
3  And if a large institution that has
4  significant power over our welfare or
5  getting a job that we really want, and the
6  institution behaves in very poor ways and
7  is sloppy, careless, whatever, make a
8  mistake, people sometimes feel betrayed.
9      Q.   Are you saying that potential
10 employers qualify as institutions for a
11 betrayal trauma theory?
12     A.   It's not just -- now, you've
13 separated Alorica and HIRERIGHT, and I want
14 to put it together.
15     Q.   Can you just answer the
16 question I asked, forget about Alorica and
17 HIRERIGHT, and please just answer the
18 question I asked.
19     A.   Repeat it, please?
20     Q.   Can the court reporter please
21 repeat my question?
22         (Whereupon, the referred to
23     question was read back by the
24     Reporter.)
25         THE WITNESS:  It depends on the

MAGNA
LEGAL SERVICES

Page 62

R. LUBIT

1  R. LUBIT
2  details of what they did and what
3  expectations were and the details of
4  what they did. I would say generally
5  no, but that's not what we're faced
6  with here.
7  Q.  How is the situation different
8  with Alorica and HIRERIGHT?
9  A.  Because the issue I thought
10  about is -- particularly HIRERIGHT, the
11  failure -- the mistake in the background
12  check which cost her a job that was, from
13  my understanding, is probably the best job
14  that she would have ever had, would have
15  ever had. And her attempts to speak with
16  them and correct things, she didn't get
17  called back, and that is not -- and people
18  are then reminded of how they could be
19  powerless in the face of a large
20  institution that did something that it
21  shouldn't have done, and that can shake our
22  faith in the safety in the world.
23       I need a second just to plug my
24  computer in.
25  Q.  Time is 10:34 a.m.

Page 63

R. LUBIT

1  R. LUBIT
2  THE VIDEOGRAPHER:  Going off
3  the record at 10:34.
4  (Whereupon, an off-the-record
5  discussion was held.)
6  MR. NOTARISTEFANO:  We can go
7  back on the record.
8  THE VIDEOGRAPHER:  Going back
9  on the record, 10:35.
10  Q.  Dr. Lubit, is Alorica a large
11  institution?
12  A.  I don't know the size.
13  Q.  I am sorry, I didn't hear you,
14  I can't make out what you're saying?
15  A.  I don't know the size.
16  Q.  Is HIRERIGHT a large
17  institution?
18  A.  I don't know the size.
19  Q.  Does your opinion depend upon
20  whether an institution is a large
21  institution or a different sized
22  institution?
23  A.  It's more typically with a
24  large institution, but I don't think it has
25  to be if she feels betrayed.

Page 64

R. LUBIT

1  R. LUBIT
2  Q.  Can someone experience betrayal
3  trauma from not getting a job at a small
4  family restaurant that has, say, five
5  tables in the room?
6  A.  I'd have to think about that.
7  Q.  Are employers free to hire or
8  not hire people as they see fit?
9  A.  That's a legal question.
10  MR. KIM:  Objection. Calls for
11  a legal conclusion, legal opinion,
12  outside of the scope.
13  Q.  Can you answer that question?
14  A.  It's a legal question, and I
15  don't know the laws. They can hire who they
16  want, however there are also laws about
17  discrimination, and...
18  Q.  What if someone lies on an
19  application for a position where they need
20  to be trusted, is an employer allowed to
21  take that into consideration and decide not
22  to hire someone?
23  MR. KIM:  Objection. Calls for
24  a legal opinion, outside of scope.
25  Q.  Can you answer the question?

Page 65

R. LUBIT

1  R. LUBIT
2  A.  I am just going to say I don't
3  know, it's outside my area of expertise.
4  You're asking me to give a -- to state
5  something about the law, and...
6  Q.  What if you were looking to
7  hire an associate or an assistant or
8  someone to help you out with your practice
9  and someone submitted an application that
10  had something on it that was significant to
11  you which was false, would you be in your
12  right to decline that person's application?
13  MR. KIM:  Objection. Calls for
14  a legal opinion, outside the scope.
15  THE WITNESS:  It's a legal
16  opinion, outside -- and it's -- I
17  should not be the -- and I shouldn't
18  have to answer questions that where
19  there may be laws that I am not aware
20  of.
21  Q.  Are you not willing to answer
22  the question?
23  A.  I answered the question that it
24  is -- that I don't know the answer, because
25  I am not a lawyer.

**MAGNA**
LEGAL SERVICES

Page 82

R. LUBIT

1
2  into 13 and then to the top of page 14.
3        This section is titled Impact
4  of Emotional Trauma on The Brain. Are you
5  able to correlate what you have written in
6  this section to it's impact on Ms. Chase?
7     A.   I can't say specifically what
8  impact it has had on the brain or even if
9  there is impact. The point was to show that
10 high levels of stress which can come from
11 feeling betrayed and not being able to
12 trust people as -- without great difficulty
13 can have significant impacts on the brain.
14 Can we measure it? Probably not. But to
15 ignore the fact that high stress can do
16 many destructive things would deny people a
17 fair understanding of what these sort of
18 experiences can do.
19    Q.   Does Ms. Chase have any
20 psychiatric diagnoses?
21    A.   Yes.
22    Q.   What are her psychiatric
23 diagnoses?
24    A.    Well, as I believe your doctor
25 also said general anxiety disorder. The --

Page 83

R. LUBIT

1
2  she is depressed, and I believe that her --
3  and the negative impact of what happened
4  has led her to withdraw socially
5  significantly which has all sorts of
6  additional impacts that are negative. The
7  diagnoses are not the key issue, the issue
8  is the negative impact.
9     Q.   Dr. Lubit, the last section of
10 your report is on page 17. We're showing it
11 on the screen, Exhibit 2, it says Treatment
12 Needed. And you say, "Megan will never
13 fully recover from what has been done to
14 her," is the first sentence, what are you
15 referring to, what has been done to her?
16    A.   What she believes happened.
17 First of all, it is not for me to decide
18 the facts of the facts of the case, and so
19 if the plaintiff tells me something
20 happened, I write my report based on
21 assuming that it happened. And then if it
22 turns out that it didn't happen, then -- or
23 didn't happen or it happened in a different
24 way that shouldn't -- that was actually
25 benign, it would lead to different

Page 84

R. LUBIT

1
2  conclusions. But based on the assumption
3  that there was -- based on the assumption
4  that of what she told me occurred and
5  beliefs of what occurred, I think it has
6  harmed her and the withdrawal from people
7  and the increased depression and stress are
8  very significant things, and that therapy
9  and medication that is likely to help her.
10    Q.   So my question is, I want to
11 know what you're referring to when you
12 write "what has been done to her," so let
13 me just reorient you for a second.
14 Yesterday, we talked about a lot of things
15 that had been done to Ms. Chase, her mother
16 mistreated her, she was sexually abused,
17 she was involved in a motor vehicle
18 accident, she had physical issues, the 7/11
19 issue, the Alorica/HIRERIGHT issue. There
20 are a whole host of things that one could
21 say had been quote done to Megan Chase. I
22 just want to know in this sentence, "Megan
23 will never fully recover from what has been
24 done to her." What are you referring to
25 with what has been done to her?

Page 85

R. LUBIT

1
2     A.   I am referring to the actions
3  -- the things that happened with HIRERIGHT
4  and Alorica.
5     Q.   Is that exclusive of everything
6  else that has been done to her?
7     A.   I don't understand. I don't
8  understand the question.
9     Q.   Is Megan's trauma a cumulative
10 effect of other things?
11    A.   I can say what I think and
12 explain what I think, but the words you're
13 using are -- would be ambiguous if you read
14 -- and my answers, yes or no, would lead
15 people to think -- to understand my words
16 differently. I would very much like to
17 explain exactly what I think in a couple of
18 sentences.
19    Q.   It's fine, just answer the
20 question, please.
21    A.   Does that mean I have to give a
22 yes or no, does that mean I can explain it
23 in two sentences?
24    Q.   You can answer the question
25 however you see fit, Dr. Lubit.

MAGNA
LEGAL SERVICES

Page 86

R. LUBIT

1
2    A.    Thank you. Stressful
3  destructive experiences throughout our
4  lives at the least are likely to decrease
5  someone's resistant -- resilience.
6          After I answer this question, I
7  need a break, I am -- stumbling on my words
8  right now. I'm so tired.
9    Q.    You can have a break after you
10  finished this answer. That was the rule,
11  you can take a break whenever you want, but
12  with the pending question, you have to
13  finish your answer.
14    A.    Absolutely. I just said after
15  this question.
16    Q.    Okay.
17    A.    Now, people often are able to
18  recover to varying degrees from bad
19  experiences, and they're often left so with
20  weakened resilience, and so they're likely
21  therefore to have a bigger reaction to more
22  recent stresses that would cause reaction.
23  So do those things from a childhood affect
24  her, yes, and an adult life effect her,
25  yeah, I think they all have a role in

Page 87

R. LUBIT

1
2  decreasing resilience.
3          In personal injury case, the
4  issue is to look at how are they doing
5  despite prior traumatic instances, and how
6  much change in the behavior, emotional
7  state, functioning occurred as a result of
8  a specific incident?
9          And she reports that her level
10  of depression and anxiety were affected by
11  both -- significantly, by both 7/11 and by
12  the HIRERIGHT/Alorica issue. But she also
13  says that, you know, there was time -- she
14  described it being years in between 7/11
15  and HIRERIGHT and Alorica. Whether that's
16  fact or not, I do not know, but she
17  described that there were, and that by the
18  time she got to the HIRERIGHT/Alorica
19  issue, she was doing, you know, pretty
20  well, that her depression was low, her
21  anxiety was low, and then she went
22  significantly down hill after the
23  HIRERIGHT/Alorica situation.
24    Q.    How much time do you need for
25  the break?

Page 88

R. LUBIT

1
2    A.    Let's try ten minutes.
3    Q.    We are 11:08 a.m., we'll come
4  back 11:18.
5          THE VIDEOGRAPHER:  Going off
6  the record, 11:08 a.m.
7          (Whereupon, a break was taken.)
8          THE VIDEOGRAPHER:  Going back
9  on the record, 11:20.
10          MR. KIM:  This is Joshua,
11  plaintiff's attorney for the record.
12  I note by my calculation that we have
13  53 minutes left in the deposition
14  today.
15          MR. NOTARISTEFANO:  I disagree
16  with that, while we were off the
17  record, Mr. Kim provided me his
18  calculations from this morning, and
19  he's calculating the time that we
20  went on the record to the time that I
21  began asking questions.
22  There was a lot of editorializing.
23  There was back and forth, there was
24  time taken to swear in the witness.
25  That doesn't count, and what -- when

Page 89

R. LUBIT

1
2  I stated the time and then began
3  asking questions, that's the time
4  that counts.
5  There was a lot of delay after we
6  went back on the record. So by my
7  calculations, even counting all the
8  editorializing, which should not
9  count. There's an hour and two
10  minutes left before we hit seven
11  hours.
12  So for instance right now, we went on
13  the record 11:20. It is now 11:21,
14  this one minute that Mr. Kim wanted
15  to put this information on the
16  record, and I respect that he wanted
17  to put this information on the
18  record, this should not count against
19  the seven hours.
20          It's now 11:22 and I'll begin
21  asking questions.
22    Q.    Dr. Lubit, in your last answer
23  before we took a break, you said that there
24  were times when Ms. Chase reported she was
25  doing well, before the HIRERIGHT/Alorica

Page 90

R. LUBIT
1
2  situation and after the 7/11 situation, did
3  you document that anywhere in your report?
4      A.   Yes, it's very clearly stated
5  in my report.
6      Q.   Where in your report?
7      A.   Well, the statements -- we
8  actually -- that has been asked and
9  answered, but the -- we talked about the
10  bullet points, about symptoms of anxiety,
11  and how the last bullet point shouldn't
12  have been a bullet point. It should have
13  just been a new sentence in which she had
14  told me she didn't have any symptoms prior
15  to 2019.
16          And in the report, the version
17  was supposed to go to you, but her numbers
18  on -- for her level of depression before
19  the issues with HIRERIGHT and Alorica or
20  7/11 were much, much lower than the ones
21  that she had during the problem with
22  HIRERIGHT which was very high or
23  afterwards.
24      Q.   Move to strike as anything that
25  Dr. Lubit about a different report. My

Page 91

R. LUBIT
1
2  question is about the report in the record
3  that's been provided that's Exhibit 2.
4      A.   Then, I don't know what else I
5  can say about it.
6          MR. KIM:  I disagree, he's
7  testifying from the notes that he has
8  based on the report that he has in
9  front of him, which include the notes
10  he took during the interview, so I
11  don't see why there's anything to
12  strike there.
13          MR. NOTARISTEFANO:  Okay.
14  There's a lot to respond to there.
15      Q.   First of all, Dr. Lubit,
16  Mr. Kim just said you were looking at
17  something and responding. Was that true,
18  were you looking at anything when you gave
19  that answer?
20      A.   No.
21          MR. KIM:  I mean, he was --
22  that's not what I said, that's not
23  what I said, Andrew.
24          MR. NOTARISTEFANO:  Okay. Well,
25  maybe I misinterpreted it.

Page 92

R. LUBIT
1
2      Q.   I heard Mr. Kim that you're
3  referring to notes. I heard you say several
4  times yesterday that you don't have any
5  notes from this interview. You said a
6  couple of times you need to look at your
7  noted, so just one final time, do you have
8  any notes from this interview with
9  Ms. Chase?
10      A.   When I said notes, as I
11  explained yesterday, I am referring -- I
12  said that the notes I took were then
13  written out in the report form. There were
14  no separate notes, and that I reviewed the
15  report that I had done which showed what
16  the -- what she said her state was before
17  these events happened. I don't know why --
18  what happened that the bold got -- it was
19  not in what I sent. There was some error
20  there, but I certainly had asked her about
21  -- I compared function before, during the
22  problem with Alorica, and afterwards.
23      Q.   Just to be clear, you're
24  talking about the report we don't have,
25  right, not Exhibit 2?

Page 93

R. LUBIT
1
2      A.   Well, I sent it into to
3  Mr. Kim.
4      Q.   Dr. Lubit, I just want to know
5  what your answer is based on. Are you
6  talking about the report that is not
7  Exhibit 2?
8      A.   It is based on the report and
9  my recollection.
10      Q.   When you say "it is based on
11  the report," are you talking about the
12  report that came after Exhibit 2?
13      A.   After?
14      Q.   The report that's not
15  Exhibit 2?
16      A.   Yes, it's based on my
17  recollection and on the report that I
18  sent in.
19      Q.   Move to strike anything about
20  -- anything Dr. Lubit has testifying to
21  about a report that we don't have. My
22  question was based solely on Exhibit 2,
23  where in Exhibit 2 is it documented that
24  Ms. Chase was doing better after 7/11 and
25  before the HIRERIGHT/Alorica situation?

MAGNA
LEGAL SERVICES

Page 94

R. LUBIT

1
2        If I understand you correctly,
3    with respect to the questions of the Beck
4    Depression test, it's left out of
5    Exhibit 2; is that true?
6        A.   Yes.
7        Q.   In your conclusion, the
8    sentence that I read which is "Megan will
9    never fully recover from what has been done
10   to her." How do you reconcile that with her
11   response in the Beck Depression Inventory 2
12   questions that she no longer feels that she
13   is being punished?
14       A.   Some symptoms of depression get
15   better, and that one particular symptom
16   goes away doesn't mean that all of the
17   symptoms go away.
18       Q.   I am going to share me screen
19   and show Exhibit 2 again. We are back at
20   the beginning of the Beck's Depression
21   Inventory 2 questions. Current scores in
22   magenta, the worst she felt after Alorica
23   in blue. Just thinking about your
24   conclusion on page 17 that "Megan will
25   never fully recover from what that has been

Page 95

R. LUBIT

1
2    done to her." If what has been done to her
3    refers to Alorica, then the blue would be
4    our benchmark, and then we can see where
5    she got after that in magenta; is that
6    fair?
7        A.   Yes.
8        Q.   The first question, sadness, do
9    you agree she became less sad?
10       A.   Yes.
11       Q.   Pessimism, you agree she became
12   less pessimistic?
13       A.   Yes.
14       Q.   Failure, you agree she became
15   -- she felt less of a failure?
16       A.   Yes.
17       Q.   Pleasure, you agree her
18   inability to experience pleasure became
19   less extreme?
20       A.   Yes.
21       Q.   Guilty feelings are the same.
22       A.   Yes.
23       Q.   Punishment feelings, she went
24   from feeling as though she was being
25   punished and not feeling punished at all?

Page 96

R. LUBIT

1
2        A.   Yes.
3        Q.   False confidence is about the
4    same?
5        A.   Yes.
6        Q.   Blaming herself for things,
7    self criticalness got better?
8        A.   Yes.
9        Q.   Suicidal thoughts, she never
10   had?
11       A.   Correct.
12       Q.   She cries less now?
13       A.   Yes.
14       Q.   Agitation was the same?
15       A.   Yes.
16       Q.   Loss of interest, she got
17   better?
18       A.   Yes.
19       Q.   Indecisiveness, she got better?
20       A.   Yes.
21       Q.   Worthlessness, she no longer
22   feels worthless?
23       A.   Correct.
24       Q.   Loss of energy, she has a
25   little more energy?

Page 97

R. LUBIT

1
2        A.   Yes.
3        Q.   Changes in sleep pattern, her
4    sleep got better?
5        A.   Yes.
6        Q.   Irritability, she's less
7    irritable?
8        A.   Yes.
9        Q.   She went from having no
10   appetite to craving fruit all the time?
11       A.   Yes.
12       Q.   Concentration difficulty, she
13   concentrates better?
14       A.   Better, yes.
15       Q.   What were you saying?
16       A.   Better than at the height of
17   the symptoms while it was very actively
18   happening.
19       Q.   Tiredness or fatigue, she feels
20   less tired or fatigues now?
21       A.   Yes.
22       Q.   Loss of interest in sex, that
23   is the one here that went down, she now
24   says she has lost all interest in sex?
25       A.   Yes.



Page 98

R. LUBIT

1
2    Q.    Does that indicate to you that
3  she is recovering?
4    A.    She has certainly recovered to
5  a significant extent, but that does not
6  mean that in terms of those depression
7  symptoms, but she still has very high
8  scores, pretty high scores for anxiety, and
9  there are other impacts that are not part
10 of those two sets of questions. There's
11 withdrawal from people which itself becomes
12 a -- often on a downward cycle where the
13 individual withdraws people, the individual
14 then feels -- and it can be very, very hard
15 to come back. What I am saying I do not
16 believe that all of the things are going to
17 go away.
18    Q.    That's due to Alorica and
19 HIRERIGHT, not anything else?
20    A.    I think that just the
21 Alorica/HIRERIGHT, she is not going to have
22 a completely recovery.
23    Q.    Before we would took our break,
24 I asked you if what has been done to her
25 and all of her symptoms are a result of

Page 99

R. LUBIT

1
2  Alorica/HIRERIGHT, and you started talking
3  about how she become less resilient, right,
4  does this mean that because
5  Alorica/HIRERIGHT was the last institution
6  to cause stress to Ms. Chase, that she's
7  entitled to recover all of her emotional
8  damages for everything that's been done to
9  her from Alorica or HIRERIGHT?
10    MR. KIM:  Objection. Calls for
11    legal conclusion.
12    THE WITNESS:  It's legal
13    conclusion, there's the concept of
14    the eggshell plaintiff, and so I
15    don't know what the specific law is
16    in the location or what case law
17    there is, but that's completely a
18    legal issue.
19    Q.    Your statement that "Megan will
20 never fully recover from what has been done
21 to her," is that based on the eggshell
22 plaintiff theory, that all these things
23 have been done to her, and then Alorica and
24 HIRERIGHT put her over the edge, and she'll
25 now never recover from everything?

Page 100

R. LUBIT

1
2    A.    I really don't understand the
3  question.
4    MR. KIM:  Again, on the
5    eggshell plaintiff theory, that's a
6    legal opinion. He's not here to opine
7    on that.
8    Q.    It was the words he used. I am
9  trying to understand his conclusion, I am
10 just trying to understand his conclusion.
11    MR. KIM:  Yeah, he was actually
12    saying it's a legal issue and he
13    couldn't explain his answer because
14    it's a legal issue. Maybe it's like
15    the actual plaintiff's stuff, and
16    then you asked him about it,
17    precisely on the topic that you said
18    he cannot answer.
19    Q.    You can't answer --
20    MR. KIM:  Because he's not a
21    lawyer.
22    Q.    Are you saying you that can't
23 answer whether Megan's symptoms are solely
24 causely related to HIRERIGHT and Alorica or
25 if they're a combination of the other

Page 101

R. LUBIT

1
2  things that happened to her in the past?
3    MR. KIM:  Objection. Compound.
4    Objection. Misstates the prior
5    testimony.
6    THE WITNESS:  I have said it
7    very clearly. I'll say it again that
8    prior events decrease her resilience,
9    and that when one looks at doing
10    forensic evaluation, besides noting
11    those events and how I believe that
12    the HIRERIGHT situation led her to
13    have symptoms, and I don't think she
14    will fully recover from the impact of
15    the HIRERIGHT/Alorica situation.
16    Q.    Is that irrespective of
17 everything else that happened to her in the
18 past?
19    A.    I have no idea what you mean by
20 that.
21    Q.    If she lived a perfect life and
22 had no previous traumas or stresses, do you
23 think that she would be in the
24 psychological state with the symptoms that
25 she has now based solely on the

Page 102

R. LUBIT

1
2   Alorica/HIRERIGHT situation?
3       A.   If there had been no problems
4   at all in the past, then -- and biology was
5   okay, then the impact of the
6   Alorica/HIRERIGHT would have been much,
7   much less.
8       Q.   The previous stressors and
9   trauma that Ms. Chase experienced in her
10  life contribute to the symptoms that she
11  has today after the Alorica/HIRERIGHT
12  situation?
13      A.   Yes, both in terms of decreased
14  resilience and in terms of, you know,
15  having -- I don't think she was functioning
16  -- I doubt she was functioning, you know,
17  perfectly healthfully beforehand.
18          And so I think some -- so one
19  does one's best counsel to look at how she
20  was doing before the most recent stress,
21  but I was -- I think it's reasonable to
22  assume that problems of the past have left
23  some detriment in the functioning that the
24  decreased resilience had a very big impact.
25          I think that many people if

Page 103

R. LUBIT

1
2   they're, you know, who are very strong
3   psychologically and have had good lives
4   would not have had much impact at all from
5   what happened with HIRERIGHT and Alorica.
6       Q.   Going back to Exhibit 2. Back
7   on treatment needed, you write that "Megan
8   needs weekly psychotherapy for two years."
9   Is that correct?
10      A.   Yes.
11      Q.   If she is never going to fully
12  recover, why does she need it for two years
13  and not for the rest of her life?
14      A.   Because I think she's not
15  likely to get a huge amount of benefit
16  after that. I think that she could get
17  significant benefits by a course of
18  therapy, I don't think it's needed for the
19  rest of her life. It will be a very
20  diminishing returns after that.
21      Q.   The next sentence is, "She
22  needs to see a psychiatrist for
23  medications."
24      A.   Yes.
25      Q.   What medication would you

Page 104

R. LUBIT

1
2   prescribe her?
3       A.   I would take a look at what
4   she's been on, and if some of them worked,
5   if they didn't work would all effect the
6   choice. And the first sets of
7   antidepressant someone goes on has only a
8   one third likelihood of successfully -- of
9   seriously decreasing symptoms.
10          Another third can be helped by
11  a combination of medications or change of
12  medications, and then you have another
13  third that's considered to be resistant,
14  and they often need to get to much more
15  expensive medications or treatments.
16          And I can't tell what she's
17  going to need. That's why I put in six
18  months of monthly visits as there are
19  likely to be medication changes during that
20  time, and then once it's stabilized, she
21  can be seen, you know, four times a year.
22      Q.   On the bottom of this treatment
23  needed section, you write, "Megan needs a
24  gym membership and counseled by a
25  nutritionist." Correct, did you write that?

Page 105

R. LUBIT

1
2       A.   Yes.
3       Q.   Do you know if Ms. Chase had
4   ever been a member of a gym before or
5   exercised?
6       A.   No, I do not, no.
7       Q.   Did you discuss exercising
8   other having a gym membership with her?
9       A.   I don't believe so. It's not
10  standard to tell someone your
11  recommendations. And getting exercise which
12  would be easier for people if they have a
13  gym membership, would significantly help
14  with -- can significantly help with
15  depression and anxiety symptoms.
16      Q.   Do you know if she would go to
17  the gym if she had a gym membership?
18      A.   I am not a fortune teller.
19          MR. KIM:  Objection. Relevance.
20      Q.   You didn't ask her, I take it?
21      A.   I don't recall discussing that.
22      Q.   You also wrote that "Megan
23  needs counseling by a nutritionist." Did
24  you ask Ms. Chase if she ever had
25  counseling by a nutritionist before?

MAGNA
LEGAL SERVICES

Page 118

R. LUBIT

1
2    Q.    Right. You previously talked
3    about how you define emotional injury, and
4    just to kind of read off some of what you
5    said, "Negative alteration in how someone
6    feels about themselves or symptoms that
7    impair enjoyment of life or social
8    functioning or ability to work," and you
9    said also a bunch of others, you know,
10   emotional injury types as well. And I am
11   not going to list them all, but, is there
12   an objective way to provide an absolute
13   number in a numeric scale to measure
14   emotional injury of the type we are
15   discussing here?
16       A.    Not at all, but you haven't
17   asked this, but there's something else I'd
18   like to say that may be helpful.
19       Q.    Sure. Go ahead, Dr. Lubit?
20          MR. NOTARISTEFANO:  Objection.
21       THE WITNESS:  When I gave two
22       grand rounds in Cincinnati, and then
23       was offered a faculty slot in the
24       past few months, when I -- and on the
25       paper that I am writing about,

Page 119

R. LUBIT

1
2    forensic evaluations of these sort
3    problems, the title was not a lecture
4    on PTSD and the article is not going
5    to say PTSD in the title. What I
6    write and what I bill my lectures as
7    is, you know, emotional trauma,
8    impacts of emotional trauma, not
9    impact of PTSD.
10      Q.    Right. And is it because DSM5
11   definition of PTSD with capital T is too
12   limiting for your purpose?
13      A.    Absolutely.
14          MR. NOTARISTEFANO:  Objection.
15   Leading.
16          THE WITNESS:  I think I
17      actually said this before that there
18      are many, many important things that
19      would be useful to know that are not
20      in the DSM5 criteria. That there are
21      more things and more good questions
22      in Beck, and research have shown them
23      to be important in the assessment of
24      depression. But beyond, that there
25      are other things that impacts which

Page 120

R. LUBIT

1
2       go beyond any diagnosis that I know,
3       but are the result of emotional
4       trauma and can vary adversely affect
5       an individual's life, such as a
6       degree from withdrawal from people.
7       Q.    Right. So if there's no
8    absolute numeric scale by which to quantify
9    a degree of emotional injury, then how do
10   you go about measuring the change that can
11   occur because of an incident?
12      A.    One can ask about symptoms
13   beforehand, and symptoms afterwards, which
14   is what I did.
15          MR. NOTARISTEFANO:  Objection.
16   Move to strike.
17      Q.    Go ahead, Dr. Lubit.
18      A.    You can ask about functioning
19   and their emotional state and how they're
20   feeling, and how it effects there life.
21      Q.    Right. I think we will have to
22   address this objection that Andrew said,
23   but in a much more open way here.
24          Dr. Lubit, you previously
25   testified that you don't take separate

Page 121

R. LUBIT

1
2    notes, but rather that you take notes
3    during an interview and you turn those
4    notes into a report within the same
5    document. Is that an accurate way of
6    describing what you testified to?
7       A.    Yes. That is the way I always
8    do it now, because it saves a huge amount
9    of time from having separate notes, and
10   then having to copy it over again.
11      Q.    I understand. So Exhibit 2,
12   which is the report that Andrew was showing
13   you, that do not include information about
14   Ms. Chase's psychological conditions prior
15   to the events in 7/11 and Alorica and
16   HIRERIGHT. That Exhibit 2 report, does the
17   report contain notes you took during the
18   interview with Ms. Chase?
19      A.    It's all -- all of it was based
20   on my notes which I then turned into
21   paragraphs, and so yeah, they -- the report
22   basically are my notes.
23      Q.    Right.
24      A.    That's what I refer to when I
25   answer questions, when I want to remember

MAGNA ▶
LEGAL SERVICES

Page 122

```
1              R. LUBIT
2   exactly what I saw and found.
3       Q.   What we have been referring to
4   as the report, that is not Exhibit 2, and
5   that we did not provide to defendant's
6   counsel, does that report also contain
7   notes from the interview you've taken with
8   Ms. Chase?
9       MR. NOTARISTEFANO:  Objection.
10   And if you can just let me have a
11   standing objection on any questions
12   you're going to going ask about the
13   report that was not provided, please.
14       MR. KIM:  Sure.
15       MR. NOTARISTEFANO:  Thank you.
16       THE WITNESS:  I mean, it was
17   there was information that I gathered
18   from Ms. Chase about how she was
19   functioning previously, and for
20   anxiety questions, I specifically
21   noted that she said that doesn't have
22   this. And in the version that I had,
23   it also stated by using bold what she
24   said her symptoms were like prior to
25   the problems we're here talking
```

Page 123

```
1              R. LUBIT
2   about.
3   I don't know what happened. It's
4   meaningless, I really need -- one
5   desperately needs to state how the
6   person's functioning before, and I
7   don't know why or what happened that
8   those things got cut out or that you
9   were sent a report that had somehow
10   -- that stuff was not there.
11       Q.   Yeah, I am going to ask
12   something stupid, but --
13       MR. NOTARISTEFANO:  For the
14   record, I withdraw my objection on
15   the previous question.
16       Q.   Did you, Dr. Lubit,
17   intentionally refrain from providing the
18   other report to plaintiff's counsel or
19   defendant's counsel?
20       A.   Absolutely not. I mean, the
21   other rep -- first of all, I have integrity
22   and I care very much about my reputation
23   and I have gone against people that hired
24   me, I turned down a lot of cases. My
25   reputation is crucial to my work, and I
```

Page 124

```
1              R. LUBIT
2   don't leave anything out. I often put into
3   reports things that are not helpful to the
4   people that hired me, and lawyers sometimes
5   want me to cut it out and I don't.
6       And again, I clearly wanted
7   people -- any one on this report to know
8   what I learned from her about how she was
9   she was doing beforehand. Without that,
10   it's very hard to -- without specifically
11   asking about how the person was functioning
12   before, one is at a very -- you can't
13   really explain or say how that someone has
14   been injured, because --
15       Q.   Right.
16       A.   -- because they may have had
17   those symptoms beforehand.
18       Q.   Did you, Dr. Lubit, ask
19   question about her psychological state
20   prior to the incident during your interview
21   with her?
22       A.   Absolutely.
23       Q.   Do you recall what her
24   responses were to your questions about
25   that?
```

Page 125

```
1              R. LUBIT
2       A.   Well, with all the things that
3   are listed under -- I mean, I asked her all
4   the questions that I asked about her
5   current functioning, and she reported that
6   her symptoms were much, much less prior to
7   HIRERIGHT and Alorica issue.
8       Q.   So?
9       MR. NOTARISTEFANO:  Move to
10   strike and I think, I said it, but --
11   I know I said it. It was a very
12   confusing answer. To the extent that
13   any of his answers are based on
14   things that are not documented in his
15   report that are in this other report
16   that was not provided, I object and
17   move to strike every piece of his
18   testimony with respect to that, thank
19   you.
20       Q.   Without referring to the notes,
21   that were not provided to plaintiff's
22   counsel or the defendant's counsel, do you
23   recall what her responses were in terms of
24   her state, psychological state, prior to
25   the incidents with 7/11 or Alorica and
```

Page 126

```
1              R. LUBIT
2    HIRERIGHT?
3          MR. NOTARISTEFANO:  I believe
4      my objection covers this question,
5      for the record.
6          THE WITNESS:  Her symptoms were
7      much, much less.
8      Q.   So you recall that without
9    referring to --
10     A.   Yes.
11     Q.   -- any additional notes,
12   correct?
13     A.   Yes. Be careful about the use
14   the word "notes," because it is really my
15   report.
16     Q.   Correct. It's hard to, you
17   know, use one or the other with perfect
18   accuracy, I find, because your notes were
19   turned into a report.
20     A.   Yes.
21     Q.   So we kind of go back and forth
22   on that. I haven't found a good word to
23   describe the document here.
24     A.   Note/report.
25     Q.   Sure. Dr. Lubit, your expert
```

Page 127

```
1              R. LUBIT
2    opinions that were provided in Exhibit 2
3    report, were they also based on your
4    recollection of her psychological state as
5    described to you during the interview with
6    her?
7      A.   Yes.
8      Q.   "Her," in here, I mean
9    Ms. Chase.
10     A.   Yes.
11     Q.   Did any of the details you read
12   in Dr. Kovnick's rebuttal report change
13   your expert opinion?
14     A.   I read it carefully, and I
15   thought about it, and I did think there
16   were some actually value in PAI on this
17   case, because it spoke about her feelings
18   about people and that, you know, the anger
19   at people -- I don't remember the exact
20   word she used now, but she had felt that
21   people had wronged her and treated for
22   badly. And that certainly would be very
23   consistent with betrayal trauma. And she --
24   you put that in combination with her
25   telling me how fearful she was about what
```

Page 128

```
1              R. LUBIT
2    was going to happen, applying for new jobs,
3    you put that together with her reports to
4    me that she became much less social and
5    that all, you know, after these particular
6    events, that all fits together with the
7    picture that the HIRERIGHT/Alorica
8    situation did her substantial damage.
9          MR. NOTARISTEFANO:  Just want
10     to put in an objection here and move
11     to strike that. I didn't want to
12     interrupt, and if I could have a
13     standing objection to any questions
14     and answers pertaining to
15     Dr. Kovnick's report, I'd appreciate
16     it, because Dr. Lubit did not issue a
17     rebuttal report in this case.
18         MR. KIM:  Sure.
19         MR. NOTARISTEFANO:  Thank you.
20     Q.   Dr. Lubit, just to clarify, so
21   your testimony just now is that reading the
22   report confirmed your expert opinion that
23   changed, that's what it sounded like?
24     A.   It reinforced it.
25     Q.   It reinforced it, thank you.
```

Page 129

```
1              R. LUBIT
2    Reinforced it.
3      A.   Those statements about her
4    anger and her feelings about people which
5    seemed to be a very big driving force in
6    depression and anxiety symptoms, which are
7    totally in line with the issue that she
8    felt betrayed. She has an institutional
9    betray -- institutional betrayal, and it
10   effected her functioning in general as
11   along with the theories of shattered
12   assumptions, which I mentioned yesterday.
13     Q.   Right. And speaking of that
14   belief of betrayal, whether that belief
15   about betrayal is in fact accurate, is
16   there a question for a forensic report or
17   is there a question for the court?
18     A.   Question for the court.
19         MR. NOTARISTEFANO:  Objection.
20         THE WITNESS:  And if I thought
21     that something was absolutely
22     ridiculous to have that reaction, I
23     would know that, but it is for the
24     court to determine the truth and
25     accuracy of statements about symptoms
```

MAGNA
LEGAL SERVICES