# EXHIBIT 3
## Raquel Fox Deposition
## (Nov. 20, 2024)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

Case No. 1:23-cv-00107-HCN-JCB

_____

RULE 30(b)(6) VIDEOTAPE DEPOSITION OF:
RAQUEL FOX - November 20, 2024
Alorica, Inc.
(via RemoteDepo)

_____

MEGAN THERESA CHASE,

Plaintiff,

v.

HIRERIGHT, LLC,

Defendant.

_____


          PURSUANT TO NOTICE, the Rule 30(b)(6)
videotape deposition of RAQUEL FOX, Alorica, Inc., was
taken on behalf of the Defendant in Atlanta, Georgia,
by remote videoconference, on November 20, 2024, at
8:30 a.m. MST, before Gail Obermeyer, Registered
Professional Reporter and Notary Public within
Colorado, appearing remotely from Castle Rock,
Colorado.



## Page 2

REMOTE APPEARANCES

For the Plaintiff:
DEVIN FOK, ESQ.
DHF Law, P.C.
2304 Huntington Drive, Suite 210
San Marino, California 91108
Email: devin@devinfoklaw.com

For the Defendant:

JOHN G. PAPIANOU, ESQ.
Montgomery McCracken Walker & Rhoads, LLP
1735 Market Street
Philadelphia, Pennsylvania 19103
Email: jpapianou@mmwr.com

For the Deponent:
DANIELLE EVANS, ESQ.
Alorica, Inc.
5161 California Avenue, Suite 100
Irvine, California 92617
Email: danielle.evans@alorica.com

Also Present (Remotely):

Amaris Aker, Remote Video Technician
Rachel McCardell

## Page 3

INDEX

EXAMINATION OF RAQUEL FOX:                    PAGE
November 20, 2024

By Mr. Fok                                35

By Mr. Papianou                          5, 86

By Ms. Evans                              --

INITIAL
DEPOSITION EXHIBITS:            REFERENCE

(Exhibits provided electronically to the court reporter.)

Exhibit 1  Subpoena to Testify at a              10
           Deposition in a Civil Action to
           Alorica, Inc., 10/18/24

Exhibit 2  Offer Letter to Megan Bauman from     12
           Alorica, Inc., 9/21/21

Exhibit 3  HireRight, LLC Complete Report        21
           pertaining to Megan Theresa Chase,
           9/29/21, requested by Alorica

Exhibit 4  Criminal Disclosures, undated         26

Exhibit 5  Application pertaining to             31
           Megan Chase, created 9/21/21

## Page 4

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

*   *   *   *   *

THE VIDEOGRAPHER: We are now on the record. This begins videotape No. 1 in the deposition of Raquel Fox in the matter of Megan Theresa Chase versus HireRight, LLC, in the United States District Court, for the District of Utah, Case No. 1:23-cv-00107-HCN-JCB. Today is November 20th, 2024, and the time is 8:30 a.m.

This deposition is being taken remotely at the request of Montgomery McCracken Walker & Rhoads. The videographer is Amaris Aker of Magna Legal Services, and the court reporter is Gail Obermeyer of Magna Legal Services. Will counsel and all parties present state their appearances and whom they represent.

MR. PAPIANOU: John Papianou, counsel for HireRight.

MR. FOK: Devin H. Fok, counsel for the plaintiff.

MS. EVANS: Danielle Evans, in-house counsel for Alorica and representing Raquel Fox.

THE VIDEOGRAPHER: Will the court reporter

## Page 5

please swear in the witness.

THE REPORTER: And Ms. Fox is on mute. Okay. Ms. Fox, do you swear or affirm that your testimony in this matter will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

THE REPORTER: Thank you.

RAQUEL FOX,
having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. PAPIANOU:

Q. Good morning, Ms. Fox. My name is John Papianou. You may have just heard, I represent the defendant in this case, HireRight. I'll be taking your deposition. And, Mr. Fok, who introduced himself a little while ago as counsel for plaintiff, may ask you some questions after I've finished.

Let me just start with a simple question. What is -- what is your full name?

A. Raquel Maria Fox.

Q. Have you ever been deposed before?

A. Yes, once, back in 2011.

Q. Okay. I'll -- I'll be brief here. I just want to give you a little bit of the ground rules for a




Page 14

```
 1        Q.  And what is that entity?
 2        A.  The -- our client in this particular
 3   instance was Goldman Sachs.
 4        Q.  Okay.  So looking at this offer letter, am
 5   I correct that the position was for $31,200 per year?
 6        A.  That is what the offer letter says, yes.
 7        Q.  Okay.  And do you see where it says,
 8   "Introductory Period"?
 9             MR. PAPIANOU:  Rachel, if you scroll down
10   a little bit, you'll probably get to that point.
11        A.  Yes, I do see that.
12        Q.  (BY MR. PAPIANOU)  Okay.  And am I correct
13   that this is essentially communicating to the offeree
14   here, Ms. Chase, that there's a 90-day probationary
15   period?
16        A.  Correct.
17        Q.  Do you -- do you happen to know
18   approximately what percentage of customer service
19   agents make it past that 90-day probation period?
20        A.  In 2021, I would be guessing, but I could
21   give you an insight as to what our current 90-day
22   survival rate is.
23        Q.  What is the -- what is the current 90-day
24   survival rate?
25        A.  Right now, we're seeing attrition around
```

Page 15

```
 1   12 percent for 90 days.
 2        Q.  Okay.  And would you say that that's -- do
 3   you have any insight as to whether or not that -- the
 4   current 90-day attrition rate is materially different
 5   than it would have been in 2021?
 6        A.  I know it's much improved; so our
 7   attrition rate is a lot lower.  I -- I believe we did
 8   discuss a number.  I think we can provide that later.
 9   I just don't have it off the top of my head.
10        Q.  And maybe are you talking about the --
11   approximately how long folks in this position remain in
12   it after the 90-day probation period?
13        A.  Or, more so, the attrition rate in 2021.
14        Q.  Okay.  And so you have that number, you're
15   saying you just don't remember it right now?
16        A.  Correct.  I know we -- we looked at it.  I
17   could -- I would be guessing, off the top of my head,
18   but I know we -- we did provide a number.  I just am
19   not --
20             MS. EVANS:  Counsel, if I may.  Perhaps
21   after a break Ms. Fox will be able to tell you.
22             MR. PAPIANOU:  Yeah, that's okay, yeah;
23   because I don't want you to guess, Ms. Fox.
24        Q.  (BY MR. PAPIANOU)  Okay.  And, I'm sorry,
25   I think you said you didn't know -- correct me if I'm
```

Page 16

```
 1   wrong, but you don't know -- after the 90-day probation
 2   period, do you have any sense as to how many --
 3   approximately how many -- approximately how long CASA
 4   personnel remain in the position following the 90-day
 5   probation period?
 6        A.  I would be speculating on that actual
 7   number in 2021.
 8        Q.  Okay.  Do you know what it is today?
 9        A.  At present, our general attrition rate is
10   10 percent; wherein, the zero to 90-day survival rate
11   is 12 percent.  So it does improve at that junction.
12        Q.  Okay.  And this offer, correct, was
13   contingent --
14             MR. PAPIANOU:  If you'd scroll down a
15   little bit, Rachel.
16        Q.  (BY MR. PAPIANOU)  There's a -- you see
17   the heading that says, "Offer Contingent upon Required
18   Documents and Verifications"?
19        A.  Yes.
20        Q.  Okay.  And one of the contingencies we see
21   is that the applicant here, Ms. Chase, is required
22   to -- and you see this in the first line -- to
23   truthfully and accurately complete, sign, and return a
24   series of documents, correct?
25        A.  Correct.
```

Page 17

```
 1        Q.  And one of those documents is an
 2   "Application for Employment," correct?
 3        A.  Correct.
 4        Q.  Another is --
 5             MR. FOK:  Objection as to this whole line
 6   of questioning.  Objection as to the form.
 7        Q.  (BY MR. PAPIANOU)  Another -- another
 8   document that must be truthfully and accurately
 9   completed is acceptance of "Offer Letter"?
10        A.  Correct.
11        Q.  Okay.  And another document that must be
12   truthfully and accurately completed is the execution of
13   "Alorica's Agreement to Protect Company Information";
14   is that correct?
15        A.  Correct.
16        Q.  Another one is the execution of "Alorica's
17   Arbitration Agreement," correct?
18        A.  Correct.
19             MR. FOK:  Same objection to this whole
20   line of questioning.
21        Q.  (BY MR. PAPIANOU)  It's also -- am I
22   correct it's also dependent on successful completion of
23   a background check, right, correct?
24        A.  It's not in the bullet point, but after
25   the "Additionally," it's stated there, yes.
```



Page 18

1    Q.   Okay.  Now, I notice that this offer
2    letter --
3         MR. PAPIANOU:  Rachel, if you'd scroll
4    down to the bottom.
5         Q.  (BY MR. PAPIANOU)  -- is -- is not signed.
6    Do you see that?
7         A.   There is not a wet signature present.
8         Q.   Do you happen to know if Ms. Chase ever
9    signed and returned this form to Alorica?
10        A.   The process in 2021 was an electronic
11   signature, so her signature wouldn't necessarily appear
12   as a wet signed -- signed signature.  So this was
13   electronically agreed to.
14        Q.   Do you know, sitting here right now,
15   whether Ms. Chase electronically accepted this offer
16   letter?
17        A.   Yes, she did.
18        Q.   Now, did -- did Ms. Chase ever end up
19   working for Alorica?
20        A.   She did not transition into an Alorica
21   employee and remained a candidate.
22        Q.   And what happened?
23        A.   As part of her post-offer acceptance, we
24   do initiate background screening and completion of
25   several documents associated with the hiring process.

Page 19

1    When we were evaluating the outcome of that process, we
2    identified an inaccuracy in one of the questionnaires
3    that she completed, and that prevented her from moving
4    forward.
5         Q.   We'll look at some documents later, but do
6    you recall what was the inaccuracy that led to her not
7    getting a job at Alorica?
8         A.   It's a response to a questionnaire
9    required by this line of business to answer information
10   or details regarding their criminal history.  It's
11   generically called the criminal questionnaire.
12        Q.   And -- and -- and her failure to
13   accurately answer that questionnaire is the reason
14   Alorica did not hire her?
15        A.   Correct.
16        Q.   Is it fair to say that Alorica has a
17   policy -- well, strike that.
18        We looked at the -- I think you pointed
19   out -- where is it?  Okay, yeah.  You see the heading
20   in the offer letter where it says, "Offer Contingent
21   upon Required Documents and Verifications"?
22        A.   I believe we'll have to scroll down on the
23   screen.  Correct, I see it.
24        Q.   Okay.  And do you see the phrase there,
25   ". . . you will be required to truthfully and

Page 20

1    accurately complete, sign and return the
2    following . . ."?  Do you see that language?
3         A.   Correct.
4         Q.   Is it fair to say that Alorica has a
5    policy when it comes to applicants who do not
6    truthfully and accurately report their criminal
7    history?
8         MR. FOK:  Objection as to form.
9         Q.  (BY MR. PAPIANOU)  You can answer the
10   question.
11        A.   I'm going to have you rephrase the
12   question.
13        Q.   Well, let me ask you, does Alorica have a
14   policy when it comes to applicants who do not
15   truthfully and accurately report their criminal
16   history?
17        A.   Every position has different requirements.
18   So the questionnaire that Ms. Chase completed is not
19   required of everybody.
20        Q.   Well, what if -- what if we talk
21   specifically about the position Ms. Chase applied for.
22   Is there an expectation -- well, strike that.  Strike
23   that.
24        I want to show you a document -- I'd like
25   to show you a document that Alorica produced in this

Page 21

1    litigation.
2         MR. PAPIANOU:  And, Rachel, I think you
3    saved it as "Alorica production."
4         MS. McCARDELL:  That was the full set.
5    What are you looking for?
6         MR. PAPIANOU:  Yeah.  I think you saved it
7    in the G drive as "Alorica production."  And the --
8    Court Reporter, what -- this is Exhibit 3?
9         THE REPORTER:  Correct.
10        MR. PAPIANOU:  Okay.  We'll mark this as
11   Exhibit 3.
12        (Deposition Exhibit 3, remotely introduced
13   and provided electronically to the court reporter.)
14        Q.  (BY MR. PAPIANOU)  And, Ms. Fox, take a
15   moment -- and Rachel can scroll down -- and just let me
16   know if you recognize this document.
17        A.   (Deponent examined document.)  So I
18   recognize the document as being the returned file,
19   Megan Chase's pre-employment background check.
20        THE REPORTER:  I'm sorry.  Megan Chase's
21   what?
22        THE DEPONENT:  Pre-employment background
23   check.
24        THE REPORTER:  Okay.  If you could just
25   keep your voice up at the end.  You kind of trail off a

6  (Pages 18 to 21)





Page 22

1    little bit, for me at least, at the end.
2         THE DEPONENT:  Oh, yes.  Apologies.
3         THE REPORTER:  No problem.
4         Q.  (BY MR. PAPIANOU)  And could you -- you
5    said you recognize the document as Ms. Chase's
6    pre-employment file, did you say, or report?
7         A.  Background check.
8         Q.  Background check.  Okay.  I take it
9    Alorica stores these reports somewhere in its files,
10   digitally or otherwise?
11        A.  HireRight stores these within their system
12   for us.
13        Q.  And is this the report that Alorica
14   reviewed in determining whether to hire Ms. Chase?
15        MS. EVANS:  Objection, form.
16        A.  I understand Ms. Chase, at some point,
17   disputed some content of her background check, and this
18   is the final version returned to us.
19        MR. PAPIANOU:  Okay.  Could you scroll --
20   Rachel, could you scroll down to page 17 of this
21   document.
22        Q.  (BY MR. PAPIANOU)  And this -- Ms. Fox, do
23   you see this -- the header there?  It says, "COURT
24   RECORDS."
25        A.  Correct.

Page 23

1         Q.  And then there's like a -- the second
2    yellow flag underneath there, it says, "Complete -
3    Court Record Found."  Do you see that?
4         A.  I do.
5         MR. PAPIANOU:  If we scroll down --
6    Rachel, scroll down to page 18.
7         Q.  (BY MR. PAPIANOU)  And toward the bottom,
8    it's like No. 7, do you see that?  And, Ms. Fox, do you
9    see it says, "Complete - Court Record Found," to the
10   right there?
11        A.  I do see that.
12        Q.  Okay.  If you scroll down a little bit to
13   the very bottom of the page, you see it says case
14   number ending in -609?
15        A.  Correct.
16        Q.  And this was -- this is reporting an
17   offense for retail theft.  Do you see that?
18        A.  I do.
19        Q.  And it has a disposition of "Dismissed,"
20   correct?
21        A.  Correct.
22        Q.  If we -- if we scroll down, keep scrolling
23   down to page 23 of this document, you see a new number,
24   "24."  Do you see that?
25        A.  I do.

Page 24

1         Q.  Yeah.  It says another "Complete - Court
2    Record Found."  Do you see that?
3         A.  I do.
4         Q.  And if we scroll down a little bit, this
5    is case ending in -366.  Do you see that?
6         A.  I do.
7         Q.  And we have here an offense for "Drive On
8    Denied License."  Do you see that?
9         A.  I do see that.
10        Q.  And the severity of that's a misdemeanor.
11   Do you see that?
12        A.  Correct.
13        Q.  And what's the disposition of that
14   offense?
15        A.  The disposition reads, "Guilty."
16        Q.  Okay.  And if we just scroll down a little
17   bit to Case No. 2, you'll see a case number ending in
18   -1476.  Do you see that?
19        A.  I do.
20        Q.  And here, we have a misdemeanor offense
21   for "No Proof of Insurance"; is that right?
22        A.  That's what it reads, yes.
23        Q.  And the disposition is listed as "Guilty,"
24   correct?
25        A.  That's what it says.

Page 25

1         Q.  If we scroll down to Case No. 3, ending in
2    -242, do you see that?
3         A.  I do.
4         Q.  We have a misdemeanor offense for
5    "Contempt of Court" this time.  Do you see that?
6         A.  I do.
7         Q.  And the disposition there is "Guilty,"
8    correct?
9         A.  It reads, "Guilty," correct.
10        Q.  Scroll down a little bit, Case No. 4, this
11   is a case number ending in -052.  Do you see that?
12        A.  I do.
13        Q.  And here, we have a misdemeanor offense
14   for "No Proof of Insurance," correct?
15        A.  That's what it reads.
16        Q.  And the disposition is "Guilty," correct?
17        A.  That's what it says.
18        Q.  Okay.  Now, I want to show you -- you
19   testified earlier that Ms. Chase did not accurately
20   report her conviction history.  Do you recall that
21   testimony?
22        A.  I do.
23        MR. PAPIANOU:  Rachel, could you pull up
24   the document, I think, that's labeled "Disclosure."
25        Q.  (BY MR. PAPIANOU)  Ms. Fox, do you -- do





Page 26

1  you recognize this document?
2      MR. PAPIANOU:  And let's mark this as
3  Exhibit 4.
4      (Deposition Exhibit 4, remotely introduced
5  and provided electronically to the court reporter.)
6      A.  I do recognize the document.
7      Q.  (BY MR. PAPIANOU)  And -- and what is this
8  document that's been marked as Exhibit 4?
9      A.  The position -- this specific position
10  that Megan Chase had applied for requires the
11  completion of this questionnaire.  It has four
12  sections.  One of the sections is "Criminal
13  Disclosures," "Compliance Disclosures," and then I
14  believe there's a regulatory and employment.
15      Q.  And this document reflects Ms. Chase's
16  answers to these disclosures?
17      A.  Could you scroll up?  Yes, this is the
18  document that Ms. Chase completed.
19      Q.  Let's go to question 1.  Do you see that
20  there?  There's an asterisk next to it.
21      A.  Yes, I do see that.
22      Q.  And -- and could you just read the
23  question.
24      A.  "Have you ever been convicted of, or
25  pleaded (sic) guilty or nolo contendere ('no contest')

Page 27

1  to, a criminal offense (felony, misdemeanor or
2  equivalent) in any court?  This field is mandatory."
3      Q.  And the next sentence -- okay.  And what
4  was Ms. Chase's answer?
5      A.  Her response was, "No."
6      Q.  From Alorica's perspective, is that a
7  truthful and accurate response to the question?
8      A.  There is a discrepancy between the
9  information reported and her response.
10      Q.  Okay.  And we -- not to, like, belabor the
11  point, but we just saw a consumer report that listed,
12  like, a half-dozen or so misdemeanor convictions,
13  correct?
14      A.  Correct.
15      MR. FOK:  Objection, misstates the
16  evidence.
17      MR. PAPIANOU:  Maybe it was four or five,
18  but it speaks for itself.
19      MR. FOK:  Objection.  The document speaks
20  for itself.  Please stop misrepresenting the
21  evidence.
22      Q.  (BY MR. PAPIANOU)  What action did Alorica
23  take as a result of Ms. Chase's answer to this
24  question?
25      A.  We review the document as a whole -- so it

Page 28

1  would be the responses to all of the questions
2  contained within the questionnaire -- and create an
3  individualized assessment process, based on the
4  results, other documents completed, and make a
5  determination as to whether or not we will move forward
6  with start of employment.
7      Q.  And what was the ultimate determination
8  that Alorica made with respect to Ms. Chase, based
9  on --
10      A.  That we would not move forward with
11  employment.
12      Q.  I wanted to ask you a question about --
13      MR. PAPIANOU:  If we can go back to,
14  Rachel, the -- the consumer report that Alorica
15  produced.  And if you can scroll down to page 9.
16      MS. EVANS:  Do you mind showing page 2,
17  first, so we can --
18      MR. PAPIANOU:  Oh, yeah, of course.  Yeah,
19  yeah, yeah, whatever you need.
20      MS. EVANS:  Thank you.
21      MR. PAPIANOU:  Scroll down a little bit.
22  Yeah.  I want to show the green.
23      Q.  (BY MR. PAPIANOU)  Do you see those green
24  comments there, "Reviewer's Comments"?
25      A.  I do.

Page 29

1      Q.  Do you see the second comment where it
2  says, "Comments from Alorica.  "Adjudicated by," I'll
3  say, "Jan Bunagan"?
4      A.  I do see the comments.
5      Q.  Do you -- do you know who that is, Jan
6  Bunagan?
7      A.  We have a central team that reviews these
8  background checks in a queue, so she would have been
9  one of the employees on this team working on the
10  adjudication of the background check reports.  Yes, I
11  am familiar with Jan.  She's no longer employed with
12  Alorica.
13      Q.  And am I correct that this document
14  reflects that on October 5th she set an adjudication
15  status of "Pending - Potential Conflict"?
16      A.  Correct.  That's what it says.
17      Q.  And underneath, it says, "Report Level:
18  Non-disclosure."  Do you see that?
19      A.  Correct.
20      Q.  What does that mean?
21      A.  The response or the comment indicated
22  there is that she identified the inaccuracy of the
23  contents of the background report, in comparison to the
24  responses to the questionnaire, and flagged it
25  accordingly.



Page 30

1      Q.   On the Alorica side, once Jan does that,
2  can you just describe for us what happens internally at
3  Alorica?
4      A.   Sure.  "Pending - Potential Conflict"
5  typically indicates that we initiate our pre-adverse,
6  adverse, action letter process; which is how Ms. Chase
7  received notification of the results of her background
8  check.  It also indicates to our recruitment team that
9  there's not enough information at that point in time to
10 start their employment, this individual's employment;
11 that a subsequent process does have to take place, in
12 order for us to ensure that the background check
13 satisfies -- or the background check process, as a
14 whole, satisfies the requirements to start the role.
15     Q.   And -- and here, you testified the
16 ultimate determination by Alorica was not to hire her,
17 correct, Ms. Chase?
18     A.   Correct.
19     Q.   Do you happen to recall when Alorica made
20 its decision to not hire Ms. Chase?
21     A.   I don't have the date exactly.
22     Q.   I think I can show you a document that
23 might answer the question.
24          MR. PAPIANOU:  Rachel, can you pull up the
25 document -- I think it's labeled "Application."

Page 31

1          Q.   (BY MR. PAPIANOU)  And, Ms. Fox, does
2  this --
3          MR. PAPIANOU:  And I'll mark this document
4  as -- what are we on, Exhibit 5 or 6?
5          THE REPORTER:  We are on 6 (sic).
6          MR. PAPIANOU:  Okay.  I marked the
7  consumer reporter --
8          THE REPORTER:  I'm sorry.  I'm sorry.  We
9  are on 5.  We are on 5.  I apologize.
10         MR. PAPIANOU:  Oh, I'm getting an echo.
11 Are other people getting an echo now?
12         THE REPORTER:  Yes.
13         MR. FOK:  Yes.
14         THE REPORTER:  And I'll start again.  We
15 are on Exhibit 5.
16         (Deposition Exhibit 5, remotely introduced
17 and provided electronically to the court reporter.)
18     Q.   (BY MR. PAPIANOU)  Ms. Fox, do you
19 recognize the document that I'm showing you that we've
20 marked as Exhibit 5?
21     A.   Yes, I do recognize it.
22     Q.   How do you recognize it?
23     A.   I was involved in pulling this document
24 from our archive system.
25     Q.   Okay.  And what -- what is this document?

Page 32

1      A.   It's an extract of her employment
2  application and requisition activity within our
3  applicant tracking system.
4          MR. PAPIANOU:  Rachel, could you scroll
5  down to page 14 of this document.  Yeah, just scroll
6  down a little more.  Yeah, that's -- that's fine.
7      Q.   (BY MR. PAPIANOU)  Does this -- does this
8  document refresh your recollection as to when
9  Ms. Chase's conditional offer of employment was
10 rescinded?
11     A.   This document demonstrates that we
12 rescinded her offer within our system on 10 -- on
13 October 21st, 2021.
14     Q.   And we saw earlier that Jan Bunagan
15 adjudicated the report on October 5th.  Is that -- is
16 that reflected in this document?
17     A.   You will likely have to scroll up for me
18 to make that determination -- or scroll down.  Sorry.
19 I forget that the -- the timestamps are organized
20 from -- differently than mine typically defaults to.
21     Q.   Actually, let me ask a different question,
22 then.  Just below the October 21 entry that we were
23 looking at on page 14 --
24          MR. PAPIANOU:  Go back up to that, Rachel.
25     Q.   (BY MR. PAPIANOU)  -- underneath, you see

Page 33

1  an October 5th entry.  Do you see that?
2      A.   I do.
3      Q.   What does that entry reflect?
4      A.   A change in the adjudication result
5  typically means the label of the outcome of the
6  background check, from an adjudication standpoint.  In
7  this particular case, it was likely transitioning to --
8  from a review status to that pending potential
9  conflict.
10     Q.   I see.  And so in that way, there is a
11 connection to what Jan did on October 5th?
12     A.   Correct.  The background check system
13 would have fed changes and updates into our applicant
14 tracking system.
15     Q.   I see.  Okay.  And if you -- actually, the
16 line -- do you see the line above where it says,
17 "Offer 1 - Rescinded"?  It's another October 21 entry,
18 a minute later, basically.
19     A.   Yes.
20     Q.   And it says -- there, it says, "Failed
21 background check."  Do you see that?
22     A.   I do.
23     Q.   And what does that reflect?
24     A.   It typically would indicate that the
25 outcome of the evaluation or individualized assessment



Page 38

1    MR. PAPIANOU:  Same objection.
2    MS. EVANS:  Objection, incomplete
3 hypothetical.
4    A.   Different positions have different
5 requirements.
6    Q.   (BY MR. FOK) Ms. Chase applied to be a
7 customer service agent for one of Alorica's clients,
8 right?
9    A.   That is correct.
10    Q.   Is -- is Alorica a staffing agency?
11    A.   Alorica is not a staffing agency.
12    Q.   Okay.  So is it Goldman Sachs?  Is that
13 the client?
14    A.   That is the project that was -- she
15 applied for, correct.
16    Q.   Does Goldman Sachs provide Alorica with
17 any type of criminal records criteria for what type of
18 people may be -- may serve as a customer service agent
19 for Goldman Sachs?
20    MR. PAPIANOU:  Objection; relevance,
21 beyond the scope of the deposition notice.
22    MS. EVANS:  Objection, same.
23    A.   Contractually, we are provided with all of
24 our clients' requirements of staffing personnel,
25 supplier personnel, pre-employment screening, in

Page 39

1 addition to many other requirements needed for the
2 position that we staff for.
3    MR. FOK:  Ms. Court Reporter, can you read
4 back my question, please?
5    THE REPORTER:  Yes.
6    (The last question was read back as
7 follows:  "Does Goldman Sachs provide Alorica with any
8 type of criminal records criteria for what type of
9 people may serve as a customer service agent for
10 Goldman Sachs?")
11    Q.   (BY MR. FOK) Can you answer my question,
12 please.
13    MR. PAPIANOU:  Same objection.
14    MS. EVANS:  Objection.  Can you identify
15 what portion of the subpoena -- or the notice of
16 deposition this topic is in?
17    MR. FOK:  We had a meeting to confer about
18 this.  And I'm not here to answer your questions,
19 Ms. Evans.  Are you instructing your client not to
20 answer the question?
21    MS. EVANS:  Objection, asked and answered.
22    MR. FOK:  I don't believe I got an answer.
23    Q.   (BY MR. FOK) Well, Ms. Fox, what was --
24 what was the answer?
25    MS. EVANS:  No.  Just because you didn't

Page 40

1 like the answer, doesn't mean there wasn't an answer.
2 If you want the court reporter to read it back, she can
3 read back the witness's answer.
4    MR. FOK:  Please read back the witness's
5 answer.
6    (The last answer was read back as follows:
7 "Contractually, we are provided with all of our
8 clients' requirements of staffing personnel, supplier
9 personnel, pre-employment screening, in addition to
10 many other requirements needed for the position that we
11 staff for.")
12    Q.   (BY MR. FOK) I don't understand your
13 answer.  I'm talking about criminal records criteria.
14 Does Goldman Sachs provide Alorica with a -- with their
15 own criminal records criteria?
16    MR. PAPIANOU:  Same objections; also,
17 vague.
18    Q.   (BY MR. FOK) Ms. Fox?
19    A.   We have received, as part of our
20 contracts, expectations of our pre-employment screening
21 process that also include criminal record searches and
22 criteria that may exclude assignment from their line of
23 business.
24    Q.   Are you -- okay.  Are you familiar with
25 what their criteria is?

Page 41

1    A.   I am generally familiar with their
2 criteria.  Specific response -- specific details may --
3 may be a little vague on my end.
4    Q.   Okay.  So they did provide -- so they did
5 provide Alorica with a copy of their criteria, criminal
6 records I'm talking about, and Alorica has a copy of
7 it, yes?
8    MS. EVANS:  Objection, misstates the
9 testimony.
10    A.   As part of the requirements, we do receive
11 the scope of the background check, the questionnaires
12 that must be completed, and criteria that may
13 disqualify an individual, based on the responses to
14 their line of business.
15    Q.   (BY MR. FOK) Okay.  Do you recall whether
16 their line of business specifically stated that anybody
17 who has been convicted of driving with a denied license
18 cannot be hired?
19    MR. PAPIANOU:  Objection; relevance,
20 beyond the scope of the deposition notice.
21    A.   Their evaluation criteria expects that we
22 review and analyze the responses to the questionnaire,
23 the results of the background check, and ensure that it
24 meets the requirements that they outline (inaudible).
25    Q.   (BY MR. FOK) Exactly.  I'm talking about



Page 42

1  their -- correct. I'm talking about their -- their --
2  the requirements that they outline. Did they -- did
3  they have a requirement that says, anybody who has been
4  convicted of driving on a suspended license cannot be
5  hired?
6        MR. PAPIANOU: Same -- same objections.
7        A. They have an expectation that we review
8  the results of the background check, the responses to
9  the questionnaire, and evaluate that individual to
10 determine whether or not they meet the requirements of
11 the position.
12       Q. (BY MR. FOK) Ms. Fox, can you please
13 answer my question. Do they have a specific
14 requirement that says anybody who has been -- who --
15 who has been convicted of driving with a denied license
16 cannot be hired?
17       MS. EVANS: Objection, asked and
18 answered.
19       MR. PAPIANOU: Same objection; harassing
20 the witness.
21       A. I do not believe a moving violation
22 disqualifies somebody from employment or assignment to
23 this particular role.
24       Q. (BY MR. FOK) What about driving without
25 insurance?

Page 43

1        MS. EVANS: Objection, incomplete
2  question.
3        MR. PAPIANOU: Same objections.
4        A. Can you repeat the question?
5        Q. (BY MR. FOK) Sure. Same as, you know,
6  the -- the -- my last question, but this question is
7  for a different kind of conviction. Does Goldman Sachs
8  have any requirement that says anybody who has been
9  found to have driven without insurance cannot be hired?
10       A. The expectation is that we review the
11 results of the background check and the responses to
12 the questionnaire. I do not believe a driving without
13 insurance disqualifies -- conviction solely
14 disqualifies an individual from assignment to this line
15 of business.
16       Q. What about contempt of court? Is there --
17 does Goldman Sachs have any requirement that says
18 anybody who was been convicted of contempt of court
19 cannot be hired?
20       MR. PAPIANOU: Objection; form,
21 relevance.
22       A. This is where we get into the details of
23 their requirements and criteria. I believe this goes
24 into an additional evaluation process with -- with
25 security personnel of the client, to make a

Page 44

1  determination that this sole conviction would or would
2  not disqualify somebody from placement on their line of
3  business.
4        Q. (BY MR. FOK) So did this ever go through
5  that process?
6        A. It did not.
7        Q. Why not?
8        A. The determination made to not move forward
9  with Ms. Chase was an inaccuracy on the questionnaire
10 response. So it did not require further escalation, as
11 the inaccuracy or not answering truthfully on the
12 questionnaire resulted in her not moving forward and
13 placement on the line of business.
14       Q. What's the inaccuracy?
15       MR. PAPIANOU: Objection, asked and
16 answered.
17       A. There is a portion of the questionnaire
18 that's presented for this line of business that,
19 post-contingent offer, individuals are required to
20 complete. Specifically under the "Criminal
21 Disclosure," there are three questions that were
22 answered with "No," in comparison to the results of the
23 background check, proved to lead -- or identified an
24 inaccuracy in the response to the questionnaire.
25       Q. (BY MR. FOK) We're talking about -- can

Page 45

1  you see what's on my screen?
2        MS. EVANS: I have difficulty. Is it
3  possible to have just the exhibit shown?
4        MR. FOK: Yeah. Hold on a second. Let
5  me -- let me fix that for you guys. Okay. Sorry.
6        Q. (BY MR. FOK) Ms. Fox, are we talking
7  about the -- the criminal disclosures? Are we talking
8  about the document that's labeled "Criminal
9  Disclosures"? You know, when you were referring to it
10 as the questionnaire, is this what you're talking
11 about?
12       A. It's just very small on my screen.
13       Q. I'm trying to magnify it for you. Is this
14 better?
15       A. Yes, that's better. That is the
16 supplemental questionnaire that I'm referring to, where
17 it's labeled "Criminal Disclosures," yes.
18       Q. Was this something that Goldman Sachs
19 mandated, or is this something that Alorica mandated?
20       MR. PAPIANOU: Objection, relevance.
21       A. This is a requirement unique to this
22 position.
23       Q. (BY MR. FOK) So Goldman Sachs mandated
24 this?
25       A. Correct.

12 (Pages 42 to 45)



Page 46

1     Q.  Okay.  How do you know this is completed
2  by my client, Ms. Morgan -- Ms. Chase?
3     A.  It is -- I assisted in pulling this
4  document from the retention -- our archive retention,
5  these questionnaires, and it's the file associated with
6  her applicant file.
7     Q.  Okay.  So if there's a discrepancy between
8  this answer and what was found on the background check
9  report, is that automatically disqualifying?
10    A.  For assignment to this position, yes.
11    Q.  Okay.  What constitutes a criminal
12 offense?
13          MS. EVANS:  Objection.
14          MR. PAPIANOU:  Objection, relevance.
15    A.  Your -- your question is vague to me, so
16 I'm -- I'm unsure how to answer this.  We look at the
17 responses as how they're defined in each numbered
18 question, as they're clearly stated there.
19    Q.  (BY MR. FOK)  Okay.  So let's take a look
20 at No. 1.  What is a -- it says, "Have you ever been
21 convicted of, or plead guilty or nolo contendere ('no
22 contest') to, a criminal offense -- do you see
23 that? -- "in any court"?
24    A.  Correct.  I do see how it's written there.
25    Q.  So what does that mean, criminal offense?

Page 47

1          MS. EVANS:  Objection.
2          MR. PAPIANOU:  Same objection.
3     A.  A docketed item on a court docket within
4  the jurisdiction as -- labeled as a misdemeanor,
5  felony, or equivalent.
6     Q.  (BY MR. FOK)  What about driving -- what
7  about a driving offense, like you said earlier?  Is
8  that a criminal offense?
9          MS. EVANS:  Objection; incomplete
10 hypothetical, outside the scope of the notice of
11 deposition.
12          MR. PAPIANOU:  Same objections; also,
13 relevance.
14    A.  Different jurisdictions qualify and
15 quantify their violations or criminal offenses as
16 different levels.  So it really depends on the
17 jurisdiction.
18    Q.  (BY MR. FOK)  For Utah, is that a criminal
19 offense?
20          MS. EVANS:  Mr. Fok, I'm going to instruct
21 the witness not to answer any legal -- questions
22 seeking a legal conclusion or that are outside the
23 notice of deposition --
24          MR. FOK:  I'm not asking her to render.
25 I'm asking her about her job.  It's her job.  She's --

Page 48

1     Q.  (BY MR. FOK)  Ms. -- Ms. Fox, is your job
2  to -- you manage a team that -- that adjudicates
3  whether somebody passed a background check or not,
4  right?
5          MS. EVANS:  Objection, misstates the
6  testimony.
7          MR. PAPIANOU:  Same objection.
8     A.  In my current role and in my employment
9  history within Alorica, yes, I have managed that team.
10    Q.  (BY MR. FOK)  And part of their job is to
11 look at whether there's a discrepancy between criminal
12 disclosures like this and what is found on the
13 background check report, correct?
14    A.  Correct.
15    Q.  And it's your job to -- you know, it's
16 your job to make sure that they're doing their job
17 correctly, correct?
18          MR. PAPIANOU:  Objection, beyond the scope
19 of the deposition notice.
20    A.  My job responsibilities include to make
21 sure that they -- the individuals are equipped to
22 perform the duties of their job.
23    Q.  (BY MR. FOK)  So -- so as part of your --
24 as part of the duties of making sure that they're doing
25 their job correctly, you have to understand what has

Page 49

1  been written in the documents that Alorica provides
2  those applicants, so that they can be followed by your
3  employees -- by Alorica employees correctly, correct?
4          MS. EVANS:  Objection, outside the scope
5  of the notice.
6          MR. PAPIANOU:  Same objection.
7          MS. EVANS:  If you know, you can answer;
8  if you don't, you don't have to.
9     A.  It is my responsibility to understand this
10 document.
11    Q.  (BY MR. FOK)  Okay.  So what does -- does
12 a criminal offense in this document cover a traffic
13 offense?
14          MR. PAPIANOU:  Objection, form; also,
15 asked and answered.
16    A.  It is not subject to my interpretation.
17 It is subject to how information is docketed within
18 juris -- criminal jurisdictions or the jurisdictions
19 that are searched as part of the criminal -- or the
20 background check portion of the report.  I don't
21 think -- I should say, I'm not making that
22 determination when evaluating the results of a
23 background check.  We review the information as it's
24 reported.
25    Q.  (BY MR. FOK)  Okay.  I mean, so do you

13  (Pages 46 to 49)



Page 50

1   have an understanding, right -- I mean, you're --
2   Alorica is asking applicants to answer this truthfully,
3   right?  Yes?
4        A.   Correct.
5        Q.   So how can -- if -- if -- if what you say
6   is that you can only answer this question if you know
7   how the court dockets their -- their -- their -- their
8   records, how would it -- how would a layperson -- how
9   would a normal applicant be able to answer this
10  question?
11       MR. PAPIANOU:  Objection; form, outside
12  the scope of the deposition notice, relevance.
13       A.   Would a violation of the law be considered
14  a criminal offense?  Disclosing something on this
15  document does not automatically prohibit you from
16  placement in the role.  So if I were completing this
17  document as an applicant, I would take that into
18  consideration, if I had history associated with that
19  question that I'm reading.
20       Q.   (BY MR. FOK)  So far as you're aware,
21  have -- has anybody who has answered -- if somebody
22  applies with only traffic offenses, for example,
23  driving with a suspended license or driving with a
24  denied license, and they said no to this question, do
25  you recall any instances where they actually passed the

Page 51

1   background check?
2        MR. PAPIANOU:  Objection --
3        MS. EVANS:  Objection, incomplete
4   hypothetical.  I'm going to instruct the witness not to
5   answer, because it exceeds the scope of the notice.
6   And that's not a designated topic for Alorica to
7   provide testimony today.
8        MR. PAPIANOU:  I'm also objecting to the
9   form as well.  Devin, you keep talking about traffic
10  and driving offenses.  Are you talking about the
11  misdemeanor convictions that are reflected on the
12  report?
13       MR. FOK:  Stop, stop, stop.  That's not --
14       MR. PAPIANOU:  I'm just trying --
15       MR. FOK:  -- an objection.  Stop -- stop
16  trying to coach the witness.  I know what you're doing,
17  John.  Stop.
18       MR. PAPIANOU:  I don't -- objection, form.
19       MR. FOK:  Stop.  You want me to call the
20  judge right now?
21       MR. PAPIANOU:  Objection, form.
22       Q.   (BY MR. FOK)  Ms. Fox, are you aware of
23  any instances where somebody disclosed no to this
24  question and was still hired, if they only had a
25  driving offense?

Page 52

1        MS. EVANS:  Objection; incomplete
2   hypothetical, exceeds the scope of the notice of
3   deposition.  And Alorica did not provide a witness to
4   testify to such incomplete hypotheticals.
5        MR. PAPIANOU:  Same objections, also to
6   the form of the question.
7        Q.   (BY MR. FOK)  Ms. Fox, can you answer the
8   question?
9        MS. EVANS:  So the witness is instructed
10  not to answer that question.  She's appearing as a
11  corporate representative.  This is a 30(b)(6)
12  deposition.
13       MR. FOK:  Can -- can I call the judge?
14  Let's call the judge.
15       MR. PAPIANOU:  Go ahead.
16       Q.   (BY MR. FOK)  Ms. Fox, are you -- are you
17  not going to answer that question on the basis of your
18  attorney's objection?
19       A.   Correct.
20       Q.   Okay.
21       MS. EVANS:  Due to the witness being
22  available now, I would encourage counsel for both
23  parties to conclude as much of this deposition as
24  possible.  There's other portions on that criminal
25  disclosure that may be -- merit questioning; or if

Page 53

1   you're concluding it to contact the court, just let us
2   know.
3        MR. FOK:  I'm not concluding anything.  So
4   we're talking about topic 1, Alorica's employment
5   applicant hiring criteria, hiring practices, and hiring
6   eligibility and requirements.  You are refusing -- this
7   is an agreed-to topic.  You are refusing to allow your
8   client --
9        MS. EVANS:  Would you please put the
10  notice up so I can see the actual language.  I think
11  you read only a portion of it.
12       MR. FOK:  Okay.  Let's do that.
13       MS. EVANS:  Perhaps Rachel has the marked
14  exhibit.
15       MR. FOK:  Well, we're talking about --
16  this is something that I was on a phone call with you
17  for, meeting confer, and we talked about --
18       MS. EVANS:  I would like to see the notice
19  of deposition, if you're wanting to talk about the
20  language on the notice.  It was marked as an exhibit
21  here.
22       MR. FOK:  Can you see, Ms. Evans?  Is this
23  too small for you?
24       MS. EVANS:  It's a little bit small, but I
25  would draw your attention to the last --

14  (Pages 50 to 53)



Page 58

1    attorney's instruction?
2         A.  Yes.
3             MR. FOK:  Can we go off the record,
4    please.
5             THE VIDEOGRAPHER:  We are now off the
6    record.  The time is 9:58 a.m.
7         (Discussion off the record.)
8             THE VIDEOGRAPHER:  We are back on the
9    record at 10:00 a.m.
10            MR. FOK:  So since -- you know, while we
11   were -- while we were off the record, I called the
12   judge.  And I think everybody heard the fact that it
13   just went to voicemail.  So, unfortunately, the judge
14   is not available.
15            And is your -- your objection remains,
16   Ms. Evans; that you're going to refuse to let your
17   client testify as to whether for the position that my
18   client applied for, at the time that she applied for
19   it, that if she -- if, you know, applicants had a
20   driving offense, would that have been disqualifying?
21   You're going to -- you're going to stand on your
22   objection and -- and refuse to allow your witness to
23   answer; is that right?
24            MS. EVANS:  That's incorrect.  The
25   transcript will show that you've asked that question,

Page 59

1    and the witness has answered at least twice.
2             MR. PAPIANOU:  Same response.
3             MS. EVANS:  Other questions -- other
4    questions have been incomplete hypotheticals or outside
5    the scope of the notice of deposition.
6             MR. FOK:  Just because you think your
7    witness has answered a question, doesn't mean the
8    witness has answered a question.  So you're refusing to
9    let the witness answer --
10            MS. EVANS:  No.
11            MR. FOK:  -- my question, based on the
12   objection --
13            MS. EVANS:  You're --
14            MR. FOK:  Hold on.
15            (Multiple people speaking at the same
16   time.)
17            THE REPORTER:  One at a time, one at a
18   time.
19            MR. FOK:  Please let me finish.  You're
20   refusing to let your -- the witness answer the
21   question, based on your objection that it's asked and
22   answered?  Is that it?
23            MS. EVANS:  You've exceeded the notice of
24   deposition.  The witness has answered the questions
25   multiple times.  You say that I'm the one not

Page 60

1    interpreting something, when I think it's actually
2    yourself that's not liking the witness's answer and
3    attempting to harass and be argumentative and
4    aggressive to the witness, which is unnecessary.
5             And I've encouraged you to continue the
6    questions on the entire document, to understand the
7    witness's testimony and Alorica's process.  She's here
8    as a corporate representative.  You've asked for her
9    personal knowledge outside of the notice of deposition
10   topics, and that's not going to be allowed.  We've
11   allowed a whole bunch of those questions to go forward
12   already.
13        Q.  (BY MR. FOK)  Ms. Fox, if an applicant
14   applied for the same position that my client applied
15   for, at the time that she applied for it, and if the
16   applicant only had driving on a denied license, would
17   that have been automatically disqualifying, if her
18   answer to the question -- to the criminal disclosure
19   question No. 1 is no, that she's never been convicted
20   or pled guilty to a criminal offense?
21            MR. PAPIANOU:  Objection; asked and
22   answered, relevance, incomplete hypothetical.
23        A.  We would have the same obligation to
24   review the results of the background check, the
25   responses to the questionnaire.  If we identified that

Page 61

1    first response in -- as a no, and the background check
2    revealed misdemeanor, felony, or equivalent conviction,
3    there would be an inaccuracy identified, and it would
4    prevent us from moving forward in the hiring process.
5         Q.  (BY MR. FOK)  So a misdemeanor conviction
6    of any kind, you said?
7         A.  That is how --
8             MS. EVANS:  Objection, misstates the
9    testimony.
10        A.  That is how the question is written.
11        Q.  (BY MR. FOK)  Okay.  So do you do any --
12   I'm sorry.  Does Alorica -- did Alorica do any
13   independent investigation, other than looking at the
14   background check report?  For example, if -- is it --
15   is it Alorica's process and procedure with respect to
16   this position at the time that -- at the time frame
17   that my client applied for this position, is Alorica's
18   business practice, is it to do any type of
19   investigation, independent investigation, or just to
20   look at the background check report?
21            MS. EVANS:  Objection; compound question,
22   incomplete hypothetical.
23            MR. PAPIANOU:  Same objections.
24        A.  Alorica would review the documents
25   associated with her employment application, the

16  (Pages 58 to 61)



Page 62

```
 1   documents required to sign post-contingent offer
 2   acceptance, related questionnaires or client-specific
 3   procedure -- policies and procedures, and evaluate --
 4   conduct an individualized assessment as a whole.  We do
 5   not -- at that time, we didn't -- we would not contract
 6   another background check or another investigation into
 7   the applicant's pre-employment file.
 8        Q.  (BY MR. FOK)  So they would just only look
 9   at the HireRight -- whatever is reported by HireRight,
10   correct?
11             MS. EVANS:  Objection.
12             MR. PAPIANOU:  Same objection, form.
13        A.  Our hiring practices also include, when
14   necessary, a questionnaire to the individual, an
15   individualized assessment, to determine circumstance
16   and scenario, severity, any rehabilitation occurring
17   post-conviction reported, just to obtain additional
18   details related to that.  Mrs. Chase's background
19   check, in comparison, did not lead us to take those
20   additional steps, as it was the inaccuracy flagged.  We
21   review the background check and the responses and
22   create that comparison to remain -- or to create that
23   evaluation process, if it satisfies the requirements of
24   the position.
25        Q.  (BY MR. FOK)  I'm more talking about court
```

Page 63

```
 1   records, in general.  Once the -- HireRight, you know,
 2   discloses the results of the background check, it's not
 3   Alorica's normal practice to independently verify those
 4   results by going to the courthouse, correct?
 5        A.  Not as our standard operating procedure
 6   and our routine pre-employment screening process.
 7        Q.  This would not be done for anybody who was
 8   applying to her position, at the time that she applied
 9   to it, correct?
10        A.  Not as our standard course of business or
11   in our routine recruiting processes, no.
12        Q.  So part of the -- part of the
13   determination as to whether there's a discrepancy is
14   relying on what is reported by HireRight, in comparison
15   with what's disclosed, correct, by the -- by the -- by
16   the applicant?
17        A.  Correct; the responses to the
18   questionnaire, the documents completed post-contingent
19   offer acceptance, the results of the pre-employment
20   screening.
21        Q.  If HireRight did not disclose that she has
22   any record, even if she did not -- even if Ms. Chase
23   did not, you know, volunteer any -- I'm sorry.  Let
24   me -- let me rephrase the question.
25             If HireRight came back with no court
```

Page 64

```
 1   record found of any kind, right, and Ms. Chase answered
 2   no to, you know, the question that we looked at, No. 1,
 3   that she has no criminal convictions, then there would
 4   be no basis for -- then there would be no basis for
 5   Alorica to determine that she has failed a background
 6   check, correct?
 7             MR. PAPIANOU:  Objection; relevance,
 8   hypothetical.
 9        A.  It's not that she failed a background
10   check, it's the inaccuracy of the response.  So if the
11   pre-employment background check reveals no information
12   reported, no records found, if the questionnaire has no
13   affirmative responses, those few pieces would align and
14   it wouldn't be the basis of not moving forward in the
15   hiring process.
16        Q.  (BY MR. FOK)  Right.  Chances are she
17   would be moved forward, correct?
18        A.  There would be no discrepancy, so it would
19   not prevent us from moving forward.
20        Q.  You said it was not -- the reason why she
21   was not hired, it was not because she failed her
22   background, right?  You remember -- you remember that?
23   You just testified to that earlier.
24        A.  That's correct.
25        Q.  Let me show you something.
```

Page 65

```
 1             MR. FOK:  John, what did -- can
 2   you refresh my memory.  What exhibit is this that you
 3   have marked (indicating)?
 4             THE REPORTER:  It's Exhibit 3.
 5             MR. PAPIANOU:  Thank you, Gail.
 6             MR. FOK:  Exhibit 3.  Thank you.  I
 7   appreciate it.
 8        Q.  (BY MR. FOK)  Ms. -- Ms. Fox, we're
 9   looking at Exhibit 3 right now.  Are you familiar with
10   this document?
11        A.  I am.
12        Q.  And on the entry next to 10/21/2021, do
13   you see that?
14        A.  Correct.
15        Q.  It says, "Failed background check."  Do
16   you see that?
17        A.  The "Failed background check" is a
18   disposition code that's a seated value within our
19   applicant tracking system.  We do notate, as seen in a
20   previous document, the reason why her -- the background
21   check process, as a whole, was flagged.  And it's due
22   to the nondisclosure note that was added on 10/5.
23        Q.  Where -- where does it say that?  You said
24   a previous document.  Which document are we talking
25   about?
```

MAGNA
LEGAL SERVICES

Page 66

1    A.  It was the pre-employment background check
2  file that Alorica provided.
3    Q.  Is it this (indicating)?
4    A.  The document that you are reviewing now is
5  an application extract from our applicant tracking
6  system.  Although the two processes are integrated,
7  they're not the same.  The pre-employment file, the
8  application file, is what you're looking at now.  What
9  we were reviewing before with the other attorney was
10 the actual copy of the pre-employment background check
11 extracted from the HireRight systems.
12   Q.  So which one are you -- which document are
13 you saying that reflects that it was because of
14 discrepancy and not because of the failed background
15 check?
16   MR. PAPIANOU:  Objection, asked and
17 answered.
18   A.  It is the pre-employment background check
19 file, the HireRight file.  What you're going through is
20 just the extract from the applicant tracking system,
21 their application.
22   Q.  (BY MR. FOK)  Are you talking about the
23 report here, this (indicating)?
24   A.  Yes, uh-huh, correct.
25   Q.  So is -- here, it says, Adjudication

Page 67

1  Status:  Does not meet company standards guidelines.
2  Is this what you're talking about?
3    A.  If you scroll further down, there was an
4  annotation that was highlighted by the previous
5  attorney, correct.
6    Q.  So we're looking at --
7    MR. FOK:  Ms. Evans, can you remind me
8  again -- I should have taken better notes, I'm sorry --
9  what exhibit this is?
10   MS. EVANS:  I'm not marking exhibits.
11   MR. FOK:  Okay.  Mr. Papianou, what --
12 what exhibit is this?
13   MR. PAPIANOU:  Gail, do you know?  I don't
14 know.  I don't remember.  Sorry.
15   MR. FOK:  You don't recall marking this.
16 Okay.  So --
17   MR. PAPIANOU:  I marked it, I just don't
18 know what number it was.  I didn't previously mark
19 them.
20   MR. FOK:  So let's -- let the record
21 reflect that we're looking at the HireRight report
22 that's been previously marked, although we don't know
23 what exhibit it is.
24   Q.  (BY MR. FOK)  And there's a -- there's a
25 comment in the color green right now that we're looking

Page 68

1  at.  It says, "Adjudicated by Jan Bunagan."  Is that --
2  is that the one that you're talking about, Ms. --
3  Ms. Fox?
4    A.  Correct.  These individuals are part of
5  our adjudication team that review background checks and
6  help us conduct the individualized assessments.
7    Q.  I see.  And this was adjudicated
8  October 5th, 2021?
9    A.  Correct.  So the adjudication that you
10 see, the second note of comments, there is a comment --
11 an additional comment made that says, "Non-disclosure;
12 criminal check flagged."
13   Q.  Okay.  So let's take a look -- let's take
14 a look to see what was not disclosed, where it
15 triggered the flag.  Again, I'm looking through the
16 background check report.  Is a theft -- should the
17 theft conviction -- should the retail theft, should
18 this have been disclosed?
19   A.  It should have, yes.
20   Q.  So by -- by not disclosing this, this
21 caused her to -- to fail the background check, at least
22 in part?
23   MS. EVANS:  Objection to form.
24   MR. PAPIANOU:  Same objection.
25   A.  There is no failure of the background

Page 69

1  check.  The nondisclosure of this, based on the
2  information as a whole included and how the
3  questionnaire -- the criminal questionnaire that she is
4  required to complete is written and specifically
5  notated, this information should have been answered in
6  part 3 or part 2.  I'm sorry.  I forget how they're
7  answered.  But the questionnaire clearly states that an
8  offense resulting in a plea in advance, should have
9  been disclosed as well.
10   Q.  (BY MR. FOK)  Okay.  So part -- so let's
11 go back to the questionnaire.  You said part 2 and 3.
12 Are you talking about -- I'm sorry.  Let me see.
13 Part 2, "Have you ever agreed to enter a pre-trial
14 diversion or other similar program in connection with a
15 prosecution of any criminal offense . . . in any
16 court?"  That's what you're talking about?
17   A.  Correct.  And I think I'll call your
18 attention to the note underneath that, where it says,
19 "Pretrial diversion programs are known by different
20 names in different jurisdictions (including, but not
21 limited to plea in abeyance . . .)," et cetera.
22   Q.  Do you know what gives Alorica legal right
23 to ask to obtain this kind of information?
24   MR. PAPIANOU:  Objection, beyond the scope
25 of the deposition notice.



Page 70

1    A.  Can you rephrase your question?
2    Q.  (BY MR. FOK)  Do you know what gives
3  Alorica the legal right to obtain this kind of
4  information?
5    A.  We -- I'll ask you to better define what
6  information you're asking about.  Is it the responses
7  to the questionnaire, or is it something else?
8    Q.  What gives Alorica legal right to obtain
9  any information related to criminal cases that has
10  resulted in deferred prosecution, or withheld
11  sentencing, or pretrial diversion; you know, the
12  information covered by question No. 2?
13    MS. EVANS:  Objection, exceeds the scope
14  of the notice --
15    MR. PAPIANOU:  Same objection.
16    MS. EVANS:  -- and seeks a legal
17  opinion.
18    A.  I'm not an attorney.
19    Q.  (BY MR. FOK) So you don't know?
20    A.  I would be speculating a legal point of
21  view.
22    Q.  Without speculating -- you don't know,
23  without speculating, correct, yes?
24    A.  I'm aware that background checks report
25  criminal records that oftentimes lead to

Page 71

1  non-convictions and these other court-appointed program
2  dispositions that exist.
3    Q.  Do you know why is it that -- there's no
4  time limitation on that question, right; the question
5  we talked about, "Have you ever been" -- without regard
6  for any kind of time limitation, if they've been
7  convicted, let's say, of a misdemeanor when they were a
8  juvenile, they're still required to disclosure that
9  information?
10    MS. EVANS:  Objection; incomplete
11  hypothetical, exceeds the notice of deposition
12  topics.
13    MR. PAPIANOU:  Same objections.
14    A.  I will reference the statement listed in
15  the last sentence of the first paragraph, "Please note
16  that the questions below have no time limit and
17  disclosure is required regardless of the date of the
18  incident, or the jurisdiction where it occurred."
19    Q.  (BY MR. FOK) Okay.  So if the -- if the
20  person got a misdemeanor for driving with a suspended
21  license at 17, she's still required to disclose this?
22    MR. PAPIANOU:  Objection, asked and
23  answered.
24    A.  My response remains the same.  I would
25  reference you to the -- the last sentence; that there

Page 72

1  is no time limitation and that disclosure is required,
2  regardless of the date of the incident.
3    Q.  (BY MR. FOK)  So -- so that's a yes, she's
4  required to disclose it?
5    MS. EVANS:  Objection, asked and
6  answered.
7    MR. PAPIANOU:  Same objection.
8    A.  I do not see it detailed to make a
9  distinction -- the distinction that you're asking me to
10  make.
11    Q.  (BY MR. FOK)  Meaning -- so, yes, she's --
12  if she was convicted at 17, she's -- based on -- based
13  on your understanding of the second -- the last
14  sentence of the first paragraph, then she has to
15  disclose, right?
16    MR. PAPIANOU:  Same objections.
17    A.  Disclosure would be -- I would -- that
18  criminal conviction would be -- would be required to be
19  disclosed.
20    Q.  (BY MR. FOK)  And if she doesn't
21  require -- if she doesn't disclose it and she did -- in
22  fact, was convicted of driving with a suspended license
23  at 17, then she could be disqualified from this job,
24  correct?
25    MR. PAPIANOU:  Objection, asked and

Page 73

1  answered.
2    MS. EVANS:  Objection; incomplete
3  hypothetical, exceeds the scope of the notice.
4    A.  We would be required to conduct an
5  evaluation process, an individual assessment process;
6  reviewing the background check file, the responses to
7  the questionnaire, the requirements of the position, to
8  make a determination whether or not to move forward in
9  the hiring process.
10    Q.  (BY MR. FOK)  So it's not -- so is it or
11  is it not an automatic disqualification?
12    MR. PAPIANOU:  Objection, asked and
13  answered.
14    A.  If they would have disclosed a misdemeanor
15  conviction for driving without a license at 17?  I'm
16  trying to remember what you were quoting before.
17    Q.  (BY MR. FOK)  If they did not disclose
18  driving with a suspended license at 17, if she said no
19  to question No. 1, right, if she said no and then --
20  and then it was disclosed on a HireRight report that
21  she was convicted of driving with a suspended license,
22  okay, so -- is it or is it not -- is she automatically
23  disqualified or not?
24    MS. EVANS:  Objection; incomplete
25  hypothetical, incomplete timeline.



Page 74

1    MR. PAPIANOU: Also, I'm going to object
2  relevance and asked and answered.
3    Q. (BY MR. FOK) I'm talking about for the
4  position -- you know, for the same position that my
5  client applied for, at the time that she applied for
6  it.
7    MS. EVANS: And is the individual now 18?
8  Like, that's an incomplete hypothetical. I'm having
9  trouble following the question.
10    MR. FOK: The -- the -- okay. The
11  individual is now the age of my client.
12    MS. EVANS: I have no idea how old your
13  client is.
14    MR. FOK: She was born in '75. So let's
15  say at the time she applied for it she was, what, 46.
16    A. Can you ask your question again? I'm --
17  I'm trying to follow exactly what you're saying.
18    Q. (BY MR. FOK) Sure. No problem. If
19  somebody was convicted of driving with a suspended
20  license at 17, she's now applying for a job -- for the
21  same job that my client applied to -- applied for, at
22  the time that she applied for it, she's now 46, since
23  she does not -- she did not disclose that she was
24  convicted of the same misdemeanor, driving with a
25  suspended license, is she now automatically

Page 75

1  disqualified from employment?
2    MR. PAPIANOU: Objection, asked and
3  answered.
4    A. And you're calling out that the background
5  check does, in fact, report the misdemeanor, driving
6  without --
7    Q. (BY MR. FOK) Yes.
8    A. It would be flagged for an inaccuracy and
9  evaluated through our assessment process; does it meet
10  the requirements of the position, was -- was that
11  information answered appropriately on the
12  questionnaire, and flagged accordingly.
13    Q. So -- so you're telling me that it
14  would -- there would be additional processes, steps, to
15  analyze whether -- it would not be automatic
16  disqualification. Is that what you're telling me?
17    MR. PAPIANOU: Objection.
18    A. I'm saying everybody is -- goes --
19  undergoes the same evaluation process.
20    Q. (BY MR. FOK) So is -- it's the same
21  evaluation process -- you know, a process that will
22  result in automatic disqualification, or is that a
23  process that would not result in automatic
24  disqualification, such that you would look into the
25  circumstances of why the -- the question was not

Page 76

1  disclosed?
2    MS. EVANS: Objection, compound
3  question.
4    MR. PAPIANOU: Also, objection,
5  relevance.
6    A. Based on the limited information in the
7  scenario that you provided me, if she answered no, the
8  misdemeanor came back reported, it would be identified
9  as an inaccuracy. And based on the limited information
10  that you shared with me, it is likely that we would not
11  move forward in the hiring process.
12    Q. (BY MR. FOK) So you -- so it's -- so you
13  would -- so your understanding of Alorica's procedure
14  is that Alorica would automatically disqualify consumer
15  for a driving offense that happened decades ago, if she
16  answered no on the disclosure?
17    MS. EVANS: Objection; misstates the
18  testimony, incomplete hypothetical, exceeds the scope
19  of the notice of deposition topics.
20    MR. PAPIANOU: Same objections; also,
21  relevance.
22    A. The position that Ms. Chase applied for
23  required the completion of this questionnaire.
24    Q. (BY MR. FOK) So she would be denied,
25  according to you, automatically, even for a driving

Page 77

1  conviction that occurred decades ago and she answered
2  no?
3    MS. EVANS: Objection, misstates the
4  testimony. I'd also like to request a break pretty
5  soon for personal reasons.
6    Q. (BY MR. FOK) Ms. Fox?
7    MR. PAPIANOU: Asked and answered.
8    A. We would be required to conduct the
9  evaluation process of the results of the background
10  check, the responses to the questionnaire, and apply
11  the consistent determination.
12    Q. (BY MR. FOK) And that current
13  determination would be a -- would be a denying
14  employment determination?
15    MS. EVANS: Objection --
16    A. If the inaccuracy is identified in the
17  responses of the disclosure, we would not be able to
18  move forward in the hiring process.
19    MR. FOK: Okay. Ms. -- Ms. Evans, if you
20  want to take a break for personal reasons, you are
21  welcome to right now, if you want me to go off the
22  record.
23    MS. EVANS: If you're at a point -- we're
24  almost to the time to take the regular break, so
25  whichever is easier. I just wanted to let you know.



Page 78

```
 1          MR. FOK:  I'm sorry.  A regular break?
 2   Meaning, is there a regularly scheduled break?  I don't
 3   understand.
 4          MS. EVANS:  When I'm involved in
 5   depositions, usually you allow the witness a break
 6   about every hour.
 7          MR. FOK:  Okay.  That's okay.  I don't --
 8   that's fine with me.  I don't have any objection to
 9   that.  If you guys want to take a break, I'm happy to.
10          MS. EVANS:  Yeah; just like three to five
11   minutes.
12          MR. FOK:  We'll come back at 9:30.  Is
13   that okay?  Well, 12:30 your time, I think, maybe.
14          MR. PAPIANOU:  See you then, guys; five
15   minutes.
16          MR. FOK:  Okay.  All right.
17          MR. PAPIANOU:  We can go off the record
18   now, yeah.
19          THE VIDEOGRAPHER:  We are now off the
20   record.  The time is 10:25 a.m.
21          (Recess, 10:25 a.m. to 10:33 a.m. MST.)
22          THE VIDEOGRAPHER:  We are back on the
23   record at 10:33 a.m.
24      Q.   (BY MR. FOK)  So, Ms. Fox, are you telling
25   me that there's -- once there's been a determination
```

Page 79

```
 1   that there is no -- that there's a discrepancy between
 2   the answer and what's reported in the background check
 3   report, then there would be no individualized
 4   assessment needed as to -- as to the crime and the
 5   duties to be performed by the job?
 6          MS. EVANS:  Objection, misstates the prior
 7   testimony.
 8          MR. PAPIANOU:  Same objection.
 9      A.   Can you restate your question, please?
10      Q.   (BY MR. FOK)  Yeah.  Since you testified
11   that it's -- you know, if there's -- if there's a
12   determination that -- of discrepancy, right, between
13   what's reported and what's answered in the disclosure,
14   right, that it's automatically disqualifying, you said,
15   right?  Right?  I'm not -- I don't -- if I'm mistaken,
16   please let me know.  Right?
17      A.   If the responses to the questionnaire, in
18   comparison to the background check, are inaccurate,
19   then it would prevent an individual from moving forward
20   in the hiring process for this position.
21      Q.   That means there would be no
22   individualized assessment as to whether the conviction
23   had any correlation with the duty -- duties to be
24   performed at the job, correct?
25          MR. PAPIANOU:  Objection, form.
```

Page 80

```
 1      A.   The hindrance in moving forward in the
 2   hiring process would be not answering correctly or
 3   accurately.  So there would be no further consideration
 4   or evaluation at that point, because the item that
 5   prevented us from moving forward is the inaccurate
 6   response to the question.
 7      Q.   (BY MR. FOK)  Okay.  And to answer the
 8   question truthfully, somebody would have to know
 9   whether a traffic conviction is similar -- it
10   constitutes a criminal offense, right?
11          MR. PAPIANOU:  Objection; relevance, form,
12   incomplete hypothetical.
13      A.   We would review the information --
14          MR. PAPIANOU:  Actually, I would say, also
15   calls for speculation.  Excuse me.
16          THE DEPONENT:  That's fine.
17      Q.   (BY MR. FOK)  Go ahead, Ms. Fox.
18      A.   We would review the information, as it's
19   returned to us on the background check report, and make
20   a determination whether that information -- if the
21   questionnaire was answered accurately.
22      Q.   So if Ms. Megan Chase only had -- I
23   think -- I think you said, correct me if I'm wrong, if
24   Megan Chase only had a driving on a denied license, you
25   would determine that to be a criminal conviction, and
```

Page 81

```
 1   that would still be disqualifying, you said, right?
 2          MS. EVANS:  Objection; misstates the
 3   testimony, incomplete hypothetical.  Mrs. Chase's
 4   report has been marked as an exhibit here.
 5          MR. PAPIANOU:  Same objections; also,
 6   asked and answered.
 7      Q.   (BY MR. FOK)  I'm sorry.  Am I wrong?
 8      A.   You're asking me to speculate whether
 9   information was reported or not reported on
10   Mrs. Chase's background check and whether or not that
11   adjustment would have -- would have changed our
12   employment determination.  My response to that is, the
13   information that was reported back to us, her responses
14   to the questionnaire, that is what actually prevented
15   us from moving forward in the hiring process with
16   Ms. Chase.
17      Q.   So if she -- if she only had a driving
18   with a denied license conviction, and then she answered
19   no on the disclosure form, that would still be
20   disqualifying.  Is that what you're saying?
21          MR. PAPIANOU:  Objection --
22          MS. EVANS:  Objection; incomplete
23   hypothetical, seeks speculation, asked and answered.
24          MR. PAPIANOU:  Same objections.
25      A.   We would be required to review the report
```

MAGNA ▶
LEGAL SERVICES

Page 82

1   and the responses to the questionnaire. If it's
2   answered inaccurately, then, yes, that would prevent
3   her from moving forward.
4       Q. (BY MR. FOK) Is that an -- if she
5   answered no and she only had a driving -- driving with
6   a denied license, is that an inaccurate answer?
7       MS. EVANS: I'm sorry. We've gone over
8   this quite a few times. The witness has answered
9   that's not what took place. The report is marked as an
10  exhibit here. Please stop asking incomplete
11  hypotheticals seeking speculation. You know that's
12  improper for a deposition.
13      Q. (BY MR. FOK) You said if it's -- if it's
14  answered inaccurately, right? So would that make it an
15  inaccurate answer?
16      MS. EVANS: Objection; incomplete
17  hypothetical, asked and answered, exceeds the scope of
18  the notice of deposition. I'm instructing the witness
19  not to answer.
20      Q. (BY MR. FOK) Are you not going to answer
21  the question?
22      MR. PAPIANOU: I just want to note for the
23  record she has answered the question, like, six
24  times.
25      Q. (BY MR. FOK) Ms. Fox?

Page 83

1       A. I will follow the advice of my
2   representation.
3       Q. Okay. Looking at the offer letter, she
4   was -- let's go back to the offer letter.
5       THE REPORTER: And that was Exhibit 2.
6       MR. FOK: Exhibit 2. Thank you very much.
7   Sorry about that.
8       Q. (BY MR. FOK) Let's go to Exhibit 2.
9   Ms. Fox, if you look at the effective date of this
10  offer letter, Exhibit 2, it says, ". . . your
11  anticipated start date is set for Monday, October 11,
12  2021." Do you see that?
13      A. I do. That's what it reads.
14      Q. She was never allowed to start on
15  October 11, 2021, correct?
16      A. Ms. Chase did not transition into an
17  Alorica employee.
18      Q. Meaning, she never worked a single day for
19  Alorica, correct?
20      A. Correct. She did not start employment.
21      Q. So she never started on October 11, 2021,
22  correct?
23      A. Correct.
24      Q. Do you know when she was notified to not
25  start employment at -- on 10/20/21 -- November --

Page 84

1   October 11, 2021? Do you know how many days before her
2   scheduled date was she notified that she was not
3   allowed to start?
4       A. I -- I don't know how it was -- when or
5   how it was communicated to her to not start that day --
6   that anticipated day of employment. I do know she
7   received a copy of her background check report and then
8   disputed an item on her background check. And we
9   received an update to that background check file and
10  that she viewed it. So those timestamps are available
11  for those.
12      Q. I'm not asking about any of that. I'm
13  just asking, do you know when she was notified that she
14  would not be allowed to start?
15      A. I don't know.
16      Q. Is it reflected anywhere in the records,
17  when she was not allowed to start? Do you know?
18      A. It may be. I haven't memorized the
19  timestamps of that application file, exactly. If it
20  was -- some recruitment team members notate their
21  interactions as part of the history with their
22  candidates. We did review prior that she -- the offer
23  was tagged as being rescinded. I do not know if that
24  was the same date that the communication to the
25  candidate took place.

Page 85

1       Q. Okay. So let's take a look at it. I
2   think this is Exhibit 3 again. So it says, "Offer
3   rescinded." It was October 21st, 2021. Do you see
4   that?
5       A. I do see that. That's what it reads.
6       Q. Obviously, it's before -- it was rescinded
7   before October 21, 2021, right?
8       MS. EVANS: Objection; misstates the
9   document, misstates the testimony.
10      Q. (BY MR. FOK) Ms. Fox?
11      A. I don't know how it was communicated,
12  outside of the record -- the electronic record marking
13  the offer rescinded. I don't know when we communicated
14  that to the individual.
15      Q. Would it have been communicated before --
16  when she was told not to start, on October 11, 2021?
17      A. There is an assumption to be made here
18  that since she never converted into an Alorica
19  employee, she did not start employment; so she did not
20  start, as you stated, on that date. And at some point,
21  someone let her know not to start employment.
22      Q. Looking at -- looking at the entries in
23  front of me -- looking at the entries on my screen -- I
24  think this is, again, Exhibit 3 -- can you tell me,
25  looking through these entries, when she would have been

22  (Pages 82 to 85)

