# EXHIBIT 4

# (J. Kovnick Report, Apr. 3, 2025)

# Jeffrey A. Kovnick, M.D.

**Offices in Salt Lake C ty, Utah and Ketchum, Idaho**

**Ph: 801-910-5822    Email: jkovnick@gmail.com**

**Forensic psychiatry    Child and adolescent psychiatry    Adult psychiatry**

---

# Forensic Report

Case:                 Megan Theresa Chase v HireRight LLC
Case #:               1:23-CV-00107
Venue:                United States District Court for the District of Utah
Interviewee:          Megan Chase
DOB:                  ███████████
Evaluator             Jefrey Kovnick, MD
Date of interview:    March 4, 2025
Date of report        April 2, 2025

## REFERRAL

I was retained by Mr. John Papanou, Mr. Andrew Notaristefano, and Ms. Leah Tedford of the law firm Montgomery McCracken Walker & Rhoads in Philadelphia PA. These attorneys represent HireRight, Inc. in a suit brought by Ms. Megan Chase for violation of various sections of the United States Fair Credit Reporting Act (FCRA). I was asked to see Ms. Chase as part of this lawsuit and opine on any psychiatric condition that she may currently have. In addition, I was asked to discuss if any such conditions have any etiologic relationship to a background check performed by HireRight on Ms. Chase in September 2021. Finally, I was asked to review the Forensic evaluation performed by plaintiff expert Roy Lubit, MD, Ph.D. and comment on this evaluation. I am being paid $600/hour for all work. I charge my hourly rates for depositions for the number of hours I am asked to reserve that day. Trial testimony is paid at 10 hours/day.

## STATEMENT OF NON-CONFIDENTIALITY

At the start of my interview with Ms. Chase, I introduced myself and indicated that I was hired by attorneys for the defense to evaluate her in conjunction with her case against HireRight. I

1

disclosed that the interview and my report would not be confidential, that is, that anything she told me could and likely would go into my report. I told her that I would be providing my report to the law firm that hired me, and it was my understanding that this report would most likely be provided to the court and possibly used in conjunction with the lawsuit. As my interview with Ms. Chase was via Zoom I asked her if she was alone, and she replied that she was. I told her that she was allowed to take breaks as she saw fit. I told Ms. Chase that while I was a psychiatrist, I could not and would not be her psychiatrist nor would I be providing her treatment suggestions. Finally, I told Ms. Chase that if I became aware of any child or elder abuse, that I was required to report this.

## SOURCES OF INFORMATION

1. Interview of Ms. Megan Chase by Jeffrey Kovnick, MD via Zoom on March 4, 2024.
2. Psychological testing of Megan Chase by Jeffrey Kovnick, MD on March 4, 2024, via Zoom.
3. Complaint for case 1:23-CV-00107 in the United States District Court for the District of Utah.
4. Plaintiff responses to defendant's first set of interrogatories, requests for production of documents, and requests for admission
5. Standard Protective Order for this case
6. Deposition (including exhibits 1-14) of Ms. Megan Chase on August 9, 2024
7. Deposition (including exhibits 1-5) of Ms. Raquel Fox, senior director of talent acquisition for Alorica, Inc., on November 20, 2024
8. Forensic Psychiatric Evaluation by Roy Lubit, MD, PhD, dated January 27, 2025

## EXAMINATION

### Details of Current Case

The current case is related to Ms. Chase applying for a job at Alorica.[1] Her job would have been working from home and answering phones for Goldman Sachs and taking calls related to credit card fraud.[2] Goldman Sachs outsourced this job to Alorica.[3] Ms. Chase contends that Alorica "rescinded" their job offer due to the initial incorrect background check report that was run by HireRight.[4] HireRight fixed the report, but Ms. Chase still did not get the job.[5] Ms. Chase did not

---

[1] *See* Compl. ¶¶ 2-3.

[2] *See* Transcript of Plaintiff Megan Chase Deposition ("Pltf. Dep. Tr.") ¶¶ 97:3-98:5; Transcript of Raquel Fox Deposition ("Alorica Dep. Tr.") ¶¶ 13:3-14:3.

[3] *See* Alorica Dep. Tr. ¶¶ 13:3-14:3.
[4] *See* Compl. ¶ 12; Expert Report of Dr. Roy Lubit ("Lubit Report") at 4.

[5] *See* Alorica Dep. Tr. ¶¶ 84:6-11; Pltf. Dep. Tr. ¶¶ 114:11-115:10.

get the job due to lying on her application paperwork.[6] They had asked if she had ever agreed to a plea in abeyance and she said indicated that she had not.[7]

## Personal Background Information

Ms. Megan Chase was born February 2, 1975, in California and moved with her family to Ogden UT around age 11. Her parents divorced when Ms. Chase was 4 years old. She stayed in contact with her father until his death in 1996. Ms. Chase's mother remarried, and she was then raised by her mom and stepfather. She had a good relationship with her stepdad who died several years ago. Ms. Chase has 3 biological siblings (2 brothers and a sister). She is close with the brothers but distant from her sister. She has a stepsister with whom she is not in contact and has a stepbrother who is deceased  Ms. Chase reported to me that she has a good relationship with her mother. She stated, "I was the black sheep of the family. I don't know why, but it's not like that now, it's different. We're close but not as close as I'd like." Notably, Ms. Chase reported to Dr. Lubit that her mother was alcoholic, abusive, and treated her very poorly.[8]

Ms. Chase was married from age 17-21 to her first husband. She then had a relationship from 1998-2006. She then married again in 2008. She and her husband were only together for the first 3 years of the relationship. She was unable to formally divorce him after they broke up. He died in 2019.

Ms. Chase currently lives in West Haven UT with her long-term partner of 12 years and her partner's father. She has 3 children, a son aged 32 and 2 daughters ages 31 and 27. She reports that her partner had been very ill for most of 2024, and she needed to stay home, take care for him, and help him get to appointments.

Ms. Chase received her GED in 1997. She has been to several post-secondary educational institutions. She reported to me that she attended Stevens Henager for 9 months and did not finish requirements to get her certified medical assistant degree/certificate. She also reported attending Colorado Christian University and studied criminal justice but withdrew after 1 year. She also went to National University for an "associate of paralegal" degree but dropped out after 2 weeks. Finally, she attended the University of Phoenix for a few years attempting to get a "Bachelor of Social Work" degree but did not finish. She has not been in the military.

## Past Medical History Reported By Ms. Chase
Surgeries:
- Partial hysterectomy (age 23)
- Coccyx removal (1999)

---

[6] *See* Alorica Dep. Tr. ¶¶ 26:9-29:5; 44:8-13.

[7] *See id.*

[8] *See* Lubit Report at 2.

- Total hip replacement (2013)
- Removal of cysts from her left wrist (2023)

Medical:

- Fibromyalgia (diagnosed 2008)
- Around 2019, she reports that an ER doctor told her she might have Chronic Fatigue Syndrome
- Asthma (for the past 2 years).
- RSV early 2025
- Torn right rotator cuff for which she will be getting surgery March 17, 2025. This has been painful for at least several months.

Medications

- Lexapro 30mg (depression) for past several months
- BuSpar 10mg 2-3X/day (anxiety) for 1.5 years
- Tezspire injection for asthma
- Estrogen pills
- Past use of Hydroxyzine for anxiety around 2-3 years ago and before taking BuSpar
- Past use of "many antidepressants" for depression since first getting depressed in her late teens. She reports that either they don't work, or she gets unbearable side effects.

**Past Psychiatric History Reported by Ms. Chase**

- Depression: This started in her late teens after she had her second child. She has been on antidepressants on and off since then. Depression significantly worsened in about 2019 after the issue with 7-11.
- Anxiety: Ms. Chase reported this started around 2019, after she was charged with retail theft (this was in August 2016).
- Sleep problems: Ms. Chase reported that she has been on various sleep medications since about 2019.

**Family History Reported by Ms. Chase**

ADHD in both brothers
PTSD and depression on 1 brother
Sister may have depression
Mom with history of alcoholism (per Dr. Lubit's report)

**Trauma History Reported by Ms. Chase**

- Sexual abuse age 2 or 3 years old by a female babysitter. Ms. Chase recalls what happened but does not think this has affected her all that much. She commented on how she does not understand how a person could be abusive to a child.
- Emotional trauma of becoming pregnant at age 17 (10th grade).
- Motor vehicle accidents

4

- - 6 years old: very scary. This was very disturbing.
    - 17 years old – Ms. Chase reports not having been affected very much at all.
- 7-11 incident. Ms. Chase reported in detail an incident where she was employed around 8 years ago at 7-11. A co-worker accused her of stealing money from the till. Ms. Chase denied doing this but acknowledged not paying for a pack of cigarettes. She reported that being accused of stealing when she did not do so was extremely traumatic. Ms. Chase reported that only later did she find out that the owners were embezzling and tried to make her take the blame for missing money. Ms. Chase was upset that when she was getting accused, a more senior employee grabbed her from behind and manhandled her. She reported being frustrated that police officers who were patrons in the store at the time did not intervene.

**Legal History Reported by Ms. Chase**
- 2016: In the above noted 7-11 incident, Ms. Chase was initially convicted of 2nd degree misdemeanor retail theft. She appealed and the charge was reduced to an infraction through a plea in abeyance and she had to pay $200. The charges were later dismissed. Ms. Chase reports being told that the misdemeanor conviction would not show up on her record.
- In April and May of 2003, Ms. Chase was cited for not having insurance on the vehicle she was driving. These appear to have been Class B Misdemeanors (or equivalent). Besides paying fines on both, she was ordered to spend 20 days in jail for one of the incidents. Ms. Chase reported in her deposition that there was only one of these charges and that she spent 10 days in jail. Additionally, she reported these were infractions, not Misdemeanors
- Contempt of court for not appearing in court as a witness.
- 2006: driving on an expired license. Discovery indicates this was a Class C Misdemeanor.

- As a plaintiff, Ms. Chase has been involved in 3 suits. The other two are similar to this current one and involved background checks. One of the two is ongoing and the other one settled out of court.

**Occupational History Reported by Ms. Chase**
Ms. Chase had difficulty providing any sort of detail about her occupational history. She reported working at different jobs including welding, machine operator, cleaning an Airbnb, food service, patient care assistant, home health care, babysitting, live-in night manager at an assisted living center, telemarketing, retail sales, dancer, loading FedEx trucks, and student supervisor. She reports that some jobs have required background checks, and some have not but was not able to be more specific.

Ms. Chase reported that since the incident at 7-11, there have been 5 positions she has applied for that required background checks. In 3 of 5 (2 others including this case) background reports

initially came back showing the retail theft. She has pursued litigation related to each of these 3. Ms. Chase has quit many jobs for a variety of reasons including feeling she was being treated unfairly, conflict with others, bad fit, internet connectivity issues, and reported (in her deposition) that apart from 7-11, she was never laid off.

Ms. Chase has had a number of jobs since the incident with Alorica and HireRight. One job was with Sykes. SimpliSafe hired Sykes to outsource some of their call center work. Ms. Chase indicated in her deposition that she started work for Sykes around October 6, 2021. She was unsure of the date when I spoke with her but thought it was around October 17, 2021  In her employment application to Alorica, Ms. Chase reported that her current employer at the time was Sykes, and that she started working for them in July 2021.

Other employment Ms. Chase has had since not getting hired by Alorica was with WMT Wireless selling phones (worked there 1 day), home care, cleaning, babysitting, and loading FedEx trucks. Her most recent job was with Job Corps where she was a "student advocate" (supervising students). She left that job over a year ago in order to care for her partner who was ill and needed caretaking. He is now better. Earlier this year  Ms. Chase had RSV and reports not being able to work

I note that Ms  Chase reported on her Alorica application that she had a gap in her employment between December 2019 and June 2021 due to surgery. In her deposition, she did not recall writing this on the application or being out of work for surgery during that span of time.


**Mental Status**

Ms. Chase appears to be a well-developed thin woman who appears her stated age. Her clothing was appropriate. Ms. Chase was late for the interview and needed to be contacted by her attorney who informed her of the correct time. Ms. Chase reported to me that she thought it was to start one hour later than it was actually scheduled. Ms. Chase's speech was of normal rate and tone with no articulation problems or dysfluencies. Her form of thought was linear coherent, and goal-directed, but she did get confused with dates. I needed to have her clarify dates a number of times, specifically when asking about job-related issues. Content of thought was significant for no delusional speech or content. Ms. Chase's memory was inconsistent. Her forward digit span was six and her backward digit span was four. Both suggest working memory in the average range. Her short-term memory was poor. She was able to repeat 3 words immediately but after 5 minutes would not even venture a guess when asked to recall the words. This could potentially also reflect inattention. Ms. Chase's ability to think abstractly was literal and concrete as evidenced by her interpretation of proverbs or description of how two objects (such as a table and chair) are similar. Insight based on historical evidence is somewhat limited.

With regard to symptoms of anxiety, Ms. Chase described her predominant mood as anxious (75-85% of the days or 5-6 days/week). She feels anxious 25% of the hours in those days. Her

6

mood is "neutral" most evenings (25% of her waking hours). She is sad 50% of the days and this just "comes and goes " She is occasionally irritable and reported that this is situation dependent. She sleeps poorly and reports this is a lifelong affliction. She stated, "I've always been up and down, up and down…." She denies getting nightmares. She reports an appetite that has been higher than usual for the past "couple of years" but her weight stays within 5 pounds. She has low energy and is "always tired." Her self-esteem is low, and she attributes that to getting older. She has felt a lack of hope in recent years  She reports no significant difficulties with concentration  She had one suicide attempt in her early 20's when several people she was close to died. She denies current or recent suicidal ideation

With regard to symptoms of anxiety, Ms. Chase reports being anxious most days of the week for 25% of the day. She has felt this way since at least 2019. She feels restless, sleeps poorly, has occasional irritability, and frequent fatigue  It is difficult to tell if she has muscle aches related to anxiety as she has fibromyalgia. She denies any particular difficulty with concentration.

As noted above, Ms. Chase has been involved in several traumas that would qualify for the "A Criterion" of Post-Traumatic Stress Disorder (PTSD) as outlined in the DSM 5-TR[9] (sexual abuse at age 2 or 3, motor vehicle accident age 6 and motor vehicle accident age 17). The A Criterion involves "exposure to actual or threatened death, serious injury, or sexual violence"[10] in a number of specific ways outlined in the DSM 5-TR. It appears that the accident at age 6 was the most impactful. There are other criteria for PTSD from categories B-H as outlined in the DSM 5-TR as will be discussed below. Ms. Chase reports feeling anxious driving and wanting to be the driver whenever possible. She does not avoid motor vehicles, however. She does not have nightmares or dissociative reactions related to this (or any) trauma. I did not explore if she had PTSD symptoms related to this accident that occurred when she was a child as it is beyond the scope of this evaluation; however, I did not see evidence that she would meet Criterion D ("Negative alterations in cognitions and mood associated with the traumatic events…) or E (Marked alterations in arousal and reactivity associated with the traumatic event(s)… for PTSD. However, further evaluation would be necessary to know for certain.

Ms. Chase did not report any psychosis, mania, or symptoms of Obsessive Compulsive Disorder

## **PSYCHOMETRIC TESTING**

### **Personality Assessment Inventory**

The PAI-2 is a 344-question self-administered multiscale inventory that provides an overview of psychopathology, personality, and treatment considerations. The PAI-2 is composed of 4 validity scales, 11 clinical scales (with multiple subscales), 5 treatment scales, and 2

---

[9] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev ).
[10] *See id.*

7

interpersonal scales. The mean on each scale is 50T with a standard deviation of 10T. A score of 60T represents a person who lies at approximately the 84th percentile in terms of experiencing symptoms or problems of a particular type. A score of 70T generally represents a score about the 96th percentile. A score at the 70T level is considered quite unusual in the general population and is typically considered to be clinically significant.

Shaded portions below are quoted directly from the PAI Interpretive Report. **[Bold text added to emphasize key points]:**

### PAI: Validity

The PAI-2 contains several validity scales designed to point out factors that could distort testing results. These factors include failing to properly complete test items carelessness, difficulty with reading, confusion, exaggeration, defensiveness, and malingering.

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing  Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items is within acceptable limits.

Also evaluated is the extent to which [Ms. Chase] attended appropriately and responded consistently to the content of test items. [Ms. Chase's] scores on these scales suggest that she did attend to item content in responding to PAI items; however, there appears to have been some inconsistent responses to similar items, and this inconsistency could affect test results. Thus, the **interpretive hypotheses that follow in this report should be reviewed cautiously.**

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. The scores for these indicators fall in the normal range, suggesting that [**Ms. Chase] answered in a reasonably forthright manner** and did not attempt to present an unrealistic or inaccurate impression that was either more negative or more positive than the clinical picture would warrant.

### PAI: Clinical Features

The PAI clinical profile is marked by **significant elevations across a number of different scales,** indicating a broad range of clinical features and increasing the possibility of multiple diagnoses. The configuration of the clinical scales suggests a person with **prominent depression and hostility**. [Ms. Chase] may be experiencing an **embittered pessimism,** with many of the negative circumstances occurring in her life attributed to the shortcomings of others, and she sees little hope that she can change these circumstances. Her heightened sensitivity in social interactions has led to

significant withdrawal and probably serves as a formidable obstacle to the development of close relationships. Although she appears to harbor considerable anger and resentment, this anger is as much directed at herself as it is directed at others.

[Ms. Chase] reports a number of difficulties consistent with a **significant depressive experience**. She is likely to be plagued by thoughts of worthlessness, hopelessness, and personal failure. She admits openly to feelings of sadness, a loss of interest in normal activities, and a loss of sense of pleasure in things that were previously enjoyed. She is likely to show a disturbance in sleep pattern, a decrease in level of energy and sexual interest, and a loss of appetite and/or weight. Psychomotor slowing might also be expected.

[Ms. Chase's] self-description indicates **significant suspiciousness and hostility in her relations with others**. She is likely to be a hypervigilant individual who often questions and mistrusts the motives of those around her. She is extremely sensitive in her interactions with others and likely harbors strong **feelings of resentment** as a result of perceived slights and insults  Although she may not describe herself as unduly suspicious, others are likely to view her as somewhat hostile and unforgiving. Working relationships with others are likely to be very strained, despite any efforts by others to demonstrate support and assistance.

[Ms. Chase] indicates that she is experiencing a **discomforting level of anxiety and tension.** The primary manifestations of the [Ms. Chase's] anxiety appear to be in the affective and physiological areas. Affectively, she feels a great deal of tension, has difficulty relaxing, and likely experiences fatigue as a result of high perceived stress. Overt physical signs of tension and stress, such as sweaty palms, trembling hands, complaints of irregular heartbeats, and shortness of breath are also present. In contrast, she does not report high levels of the cognitive symptoms of anxiety, such as excessive worry, negative expectancies, concentration problems, and diminished attention span.

[Ms. Chase] indicates some concerns about physical functioning and health matters in general  She reports particular problems with the frequent occurrence of various minor physical symptoms (such as headaches, pain, or gastrointestinal problems) and has vague complaints of ill health and fatigue. Her physical symptoms are often accompanied by some depression and anxiety.

[Ms. Chase] indicates that she occasionally experiences, or may experience to a mild degree, maladaptive behavior patterns aimed at controlling anxiety

[Ms. Chase] describes herself as a **socially isolated individual who has few interpersonal relationships that could be described as close and warm.** She may have difficulty interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships. Her social isolation and detachment may serve to decrease a sense of discomfort that interpersonal contact fosters.

9

According to [Ms. Chase's] self-report, she describes NO significant problems in the following areas: antisocial behavior  problems with empathy; extreme moodiness and impulsivity; unusually elevated mood or heightened activity. Also, she reports NO significant problems with alcohol or drug abuse or dependence.

## PAI: Self–Concept

The self-concept of [Ms  Chase] appears to involve a rather **negative self-evaluation.** She is likely to be self-critical, not handling setbacks very well and blaming herself for past failures and lost opportunities. She may inwardly be more troubled by self-doubt and misgivings about her adequacy than is apparent on the surface. She may tend to play down her successes as a result and probably sees such accomplishments as heavily depending on the efforts or good will of others.

## PAI: Interpersonal and Social Environment

[Ms. Chase's] i**nterpersonal style seems best characterized as warm, friendly, and sympathetic**. She particularly values harmonious relationships and derives much of her satisfaction from these relationships. Because of the premium placed upon harmony, she is likely to be uncomfortable with interpersonal confrontation or conflict, and she will tend to shun controversy. She is probably quick to forgive others and will readily give others a second chance.

In considering the social environment of [Ms  Chase] with respect to perceived stressors and the availability of social supports with which to deal with these stressors, her responses indicate that both her recent level of stress and her perceived level of social support are about average in comparison to normal adults. The reasonably low stress environment and the intact social support system are both favorable prognostic signs for future adjustment.

## PAI: Treatment Considerations

Treatment considerations involve issues that can be important elements in case management and treatment planning  Interpretation is provided for three general areas relevant to treatment: behaviors that may serve as potential treatment complications, motivation for treatment, and aspects of [Ms. Chase's] clinical picture that may complicate treatment efforts

With respect to suicidal ideation, [Ms. Chase] is not reporting distress from thoughts of self-harm.

With respect to anger management, [Ms. Chase] describes herself as a very meek and unassertive person who has difficulty standing up for herself, even when assertiveness

10

is warranted. Thus, **she may have some difficulty in the appropriate expression of anger.**

[Ms. Chase's] interest in and **motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting**. However, her level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings. Her responses suggest that she is satisfied with herself as she is, that she is not experiencing marked distress, and that, as a result, **she sees little need for changes in her behavior.** However, [Ms. Chase] does report a number of strengths that are positive indications for a relatively smooth treatment process, if she were willing to make a commitment to treatment.

If treatment were to be considered for this individual, particular areas of attention or concern in the early stages of treatment could include: She may have initial difficulty in placing trust in a treating professional as part of her more general problems in close relationships.

### PAI: Diagnostic Considerations

Below are DSM-5 diagnostic possibilities suggested by the configuration of PAI scale scores. The following are advanced as hypotheses. All available sources of information should be considered prior to establishing final diagnoses.

| Diagnostic Considerations | | |
|---|---|---|
| DSM-5 code | ICD-10 code | Diagnosis |
| 296.20 | F32.9 | Major depressive disorder, single episode, unspecified |
| Rule Out | | |
| DSM-5 code | ICD-10 code | Diagnosis |
| 301.89 | F60.89 | Other specified personality disorder with mixed borderline, paranoid, obsessive-compulsive features |

## FORENSIC OPINION

### FORMULATION

Ms. Megan Chase is a 50-year-old woman who is involved in a lawsuit against HireRight involving an FCRA claim wherein she alleges they violated their statutory obligations to provide her with her full employment report file, ensure that the information in the file was up to date, and assure accuracy of the information in the file.[11]

---

[11] *See generally* Compl.

Ms. Chase has struggled in many aspects of her life. Discovery suggests Ms. Chase had a difficult childhood. She was raised by an alcoholic mother who treated her poorly and sustained two significant traumas by the age of 6 years old, both of which seems to have impacted her in various ways over the years. She had children at a very young age, developing symptoms of depression in her early 20's and later anxiety. She has had a series of seemingly unfulfilling relationships (at least until meeting her current partner), started various schools without finishing any and incurred debt in the process. She has been afflicted with various medical problems and has never been able to maintain steady employment for a sustained period of time. She seems to be a kind, well-meaning woman who has experienced a series of difficult circumstances over the years  She has tried to get treatment for her long-standing psychiatric problems, but for reasons that remain unclear, treatment has never been successful. Adding to her burden is the fibromyalgia and possibly chronic fatigue syndrome has made her daily life a struggle.

The incidents that took place in relation to Ms. Chase's employment at a 7-11 store were a significant turning point for her. Since this incident, Ms. Chase seems to have continued working at the same sorts of jobs as prior to her employment at 7-11. Since that employment, Ms. Chase's mood has become increasingly sad, anxious, and embittered. She reports having tried various medications to seek relief, but per her statements during my evaluation, none have been helpful. While I do not have access to Ms. Chase's medical records, I suspect she may not have had consistent treatment or has not been able to stick through successive medication trials in order to find a medication that provided lasting benefit  Furthermore, Ms. Chase has not engaged in psychotherapy.

In 2021, Ms. Chase was denied employment at Alorica for being dishonest on an employment application. It appears that she does not accept this is the reason for her not being hired. Instead, she sued HireRight, the company that provided the pre-employment background check, for reasons outlined in the complaint.

As part of the lawsuit, Ms. Chase's attorneys hired a psychiatrist (Dr. Lubit) to provide an opinion about her condition which they may plan to use as part of a damages claim. Dr. Lubit opined that Ms. Chase has PTSD, anxiety, and depression directly attributable to the circumstances related to not being hired by Alorica. In a subsequent section of this report, I will discuss Dr. Lubit's evaluation and explain why his opinions are inaccurate.

Psychiatric diagnosis is made in accordance with guidelines set forth in the book, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5TR). This manual, published by the American Psychiatric Association, is the standard classification system that psychiatrists use to define and diagnose mental disorders. While some mental health professionals may not strictly adhere to the DSM5-TR and integrate other theories into their diagnostic assessments, this is not typical by any means  The leading researchers and clinicians in the world developed the DSM5-TR. As noted in the preface to the 5th Edition, "DSM is intended to serve as a practical, functional, and flexible guide for organizing information that can aid in the accurate diagnosis and treatment of mental disorders." Furthermore, "The criteria

are concise and explicit and intended to facilitate an objective assessment of symptom presentations in a variety of clinical settings…."[12] I will be using the DSM5-TR in this report when determining if Ms. Chase meets criteria for any psychiatric diagnosis.

It is my opinion that Ms. Chase does **not** have PTSD as a result of anything that happened related to her employment situation at 7-11 or as a result of her not getting hired at Alorica. While she may have symptoms of PTSD due to events that arose in her childhood, that assessment is beyond the scope of my report. However, I can say unequivocally that it is not possible for Ms. Chase to have PTSD as a result of events that have transpired in the past 8-9 years. PTSD is a diagnosis that is made by applying criteria from 8 categories labeled A-H. One must meet criteria from each of A-H to qualify for the diagnosis. If a person does not meet the A criterion, there is no need to probe further to see if the person might meet the other criteria needed for diagnosis. The A Criterion is:

> Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways.
> 1. Directly experiencing the traumatic event.
> 2. Witnessing, in person, the event(s) as it occurred to others.
> 3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend  the event(s) must have been violent or accidental.
> 4  Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains, police officers repeatedly exposed to details of child abuse).

As noted in the DSM, "The essential feature of posttraumatic stress disorder (PTSD) is the development of characteristic symptoms following exposure to one or more traumatic events. The clinical presentation of PTSD varies."[13] This means that while different people have different responses to the index trauma, and a variety of combinations of symptoms from the B-D criteria can be present for a diagnosis, it is essential for a person to meet the "A Criterion" in order to be diagnosed with PTSD. The DSM goes on to provide many examples of such criteria, including exposure to war, "actual or threatened physical assault where the threat is realistic and imminent,[14] kidnapping, torture, natural disasters, motor vehicle accidents, life-threatening medical emergencies, and a variety of sexual traumas. As can be seen, being accused of embezzlement, being grabbed from behind by a coworker, losing one's job, or being denied employment for any reason  even assuming everything Ms. Chase is claiming in her FCRA litigation is true, would not approach meeting the definition for trauma as outlined in Criterion A for PTSD. Serious legitimate trauma is necessary for one to be diagnosed with PTSD. Ms. Chase did not experience such a trauma in relation to her employment at 7-11 or in relation to her application to Alorica.

---

[12] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.).
[13] *Id*
[14] *Id*

It is my opinion that Ms. Chase has symptoms consistent with Generalized Anxiety Disorder. She meets the "A Criterion" of "excessive anxiety and worry occurring more days than not for at least 6 months about a number of events or activities. I believe that her worry is global. She meets the "B Criterion" in that she finds it difficult to control her worry. She also meets the "C Criterion" in that she has restlessness, fatigue, sleep disturbance, and irritability associated with the anxiety. She meets the D Criterion (the symptoms cause clinically significant distress) and the E Criterion (the symptoms are not attributable to the effects of a substance of another medical condition). I did consider that there is overlap between symptoms of Generalized Anxiety Disorder and Fibromyalgia but still believe she would meet this criterion. Finally, she met the F Criterion (the disorder is not better explained by another mental disorder)  According to Ms  Chase, this anxiety seems to have started around the time of her leaving employment from 7-11. She was put on a variety of antidepressants around this time. These meds are generally also used for anxiety. She does report that her anxiety increased after the incident with Alorica as she attributes this to perseveration over her privacy being invaded. Ms  Chase reports that she was put on two specific anti-anxiety medications since then that time. However, I do not have access to medical and pharmacy records that would corroborate Ms. Chase's recollection and report of her medication history.

I also believe that Ms. Chase meets diagnostic criteria for Unspecified Depressive Disorder. This category "applies to presentations in which symptoms characteristic of a depressive disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the depressive disorders diagnostic class and do not meet criteria for adjustment disorder with depressed mood or adjustment disorder with mixed anxious and depressed mood "[15] Ms. Chase has a sad mood that comes and goes for half the days of the week. She also has anhedonia (decreased interest in activities that previously had been enjoyable), fatigue, low appetite, insomnia, low self-esteem, and some hopelessness. Despite these symptoms, they do not meet diagnostic criteria for Major Depression or Persistent Depressive Disorder (aka Dysthymia) due to the number, strength, and/or frequency/persistence of the symptoms involved. However, since the symptoms have been longstanding and cause her significant distress, I believe it is appropriate to give the diagnosis of Unspecified Depressive Disorder. Ms. Chase's low mood has been present to a greater or lesser extent for much of her adult life and has been more frequent and bothersome since the incident related to her 7-11 employment.

I have taken note that the PAI suggested the diagnosis of Major Depression, however as the testing interpretation states, diagnoses provided through testing are hypotheses only and clinicians should consider all sources of information when coming to a final diagnostic conclusion. While I considered the presence of a Major Depressive Disorder, as noted above the particular constellation and strength of her symptoms do not rise to the level of a Major Depressive Disorder. Additionally, there is overlap between symptoms of Generalized Anxiety

---

[15] *Id*

Disorder, various depressive disorders, fibromyalgia, and chronic fatigue syndrome. For example, fatigue, low energy, and insomnia are common of all these disorders. When coming to a diagnosis of any depressive disorder, potential co-occurring symptoms and disorders must be considered so as not to conflate symptoms of a Depressive Disorder with those related to a different condition.

I have noted that there are some inconsistencies in Ms. Chase's statements versus what is contained in the discovery in this case. For example, Ms. Chase had written on her application to Alorica that she was working for Sykes for several months before applying to Alorica, whereas she told me and testified in her deposition that she started working for Sykes after HireRight prepared a background report about her and she was denied employment at Alorica. In addition, Ms. Chase wrote on her Alorica application that she was not employed for 1.5 years due to issues relating to surgery, whereas this does not appear to be accurate. Finally, I have taken note of discrepancies between what Ms. Chase reported to me as her legal history versus what was reported in discovery.

Therefore, psychiatric diagnoses will be:

F41.1        Generalized Anxiety Disorder
F32A        Unspecified Depressive Disorder


## ANALYSIS OF DR. LUBIT'S REPORT

I respectfully disagree with the diagnoses, rigor, analysis, and conclusions reached by Dr. Lubit.

### Psychometric Testing

Dr. Lubit used the Beck Depression Inventory (BDI-2) and the Generalized Anxiety Disorder-7 (GAD-7) for his psychometric testing [16] These are typically **not considered appropriate** for testing in forensic cases for two reasons. First, they are self-report tests and subject to self-report bias. In other words, it is very obvious that these are tests that measure depression or anxiety. Thus, a person can feign or exaggerate symptoms to seem depressed or anxious. This may occur for a variety of reasons, including when secondary gain is a possibility  Secondary gain is the direct or indirect benefit a person may receive due to having a disability, disease, disorder, or symptoms. This could include monetary benefit. If present, this gain can be conscious or unconscious.

Second, these types of tests do not discriminate against other reasons for the presence of specific symptoms. For example, many of the BDI-2 questions could relate to symptoms in fibromyalgia, PTSD, or Generalized Anxiety Disorder (among others). The GAD-7 test items also overlap a great deal with other disorders and the questions do not accurately reflect the

---

[16] *See* Lubit Report at 4-8.

time course or specific symptoms required for a diagnosis of Generalized Anxiety Disorder. Finally  there are no validity scales or indices embedded in either the BDI-2 or the GAD-7. Validity indices are a crucial tool in psychometric testing for forensic examinations. These indices or scales help the examiner detect malingering, response bias, inconsistency of responding, exaggeration, and other issues that may call into question the truthfulness or effort of the examinee. Clearly, when secondary gain is at issue, doing tests that incorporate validity indices is crucial. Dr. Lubit did not do such testing.

## Rigor

Dr. Lubit's opinions are not based on rigorous analysis for the following reasons.

Dr. Lubit's questions to Ms. Chase were not comprehensive. He did not address her medical history. If he had done so, he would have discovered her diagnoses of fibromyalgia and chronic fatigue syndrome. These disorders contain multiple symptoms which overlap with mood and anxiety disorders. It is important to consider all potential reasons a person may have a symptom (besides psychiatric conditions) when narrowing down reasons for a symptom when formulating a psychiatric diagnosis

Dr. Lubit frequently referenced anxiety and depression in his report on Ms. Chase but did not take a longitudinal history of her symptoms.[17] This might lead a lay person to conclude that he was diagnosing her with an anxiety disorder or a depressive disorder. As a result, there is nothing in his report acknowledging that she was depressed her entire adult life and anxious since the 7-11 incident (which predated Ms. Chase's Alorica job application by several years).

Additionally, while Dr. Lubit diagnosed Ms. Chase with Generalized Anxiety Disorder, he did not describe what symptoms he used to substantiate that diagnosis.[18] Indeed, apart from giving Ms. Chase the GAD-7 test to fill out (the limitations of which I have detailed above), I do not see anywhere in Dr. Lubit's report that he queried her directly about anxiety.[19] Furthermore, it is my understanding that Dr. Lubit has no notes from his interview of Ms. Chase. In any case, the symptoms that Dr  Lubit copied from the GAD-7 are not enough to qualify Ms  Chase for a Generalized Anxiety Disorder Diagnosis despite his contention that she meets criteria for this disorder. Finally, the authors of the GAD-7 test note in their initial publication introducing the GAD-7, "the GAD-7 provides only probable diagnoses that should be confirmed by further evaluation."[20]

---

[17] *See generally* Lubit Report.

[18] *See id.* at 9.

[19] *See generally id.*

[20] Spitzer RL, Kroenke K, Williams JBW, Löwe B. A Brief Measure for Assessing Generalized Anxiety Disorder: The GAD-7. *Arch Intern Med*. 2006;166(10):1092–1097. doi:10.1001/archinte.166.10.1092

In his "conclusion" section, Dr. Lubit stated that to a reasonable degree of medical certainty, Ms. Chase is "suffering from…depression… "[21] The DSM5-TR does not include such a diagnosis in its list of diagnoses. There are quite a few types of Depressive Disorders that could be diagnosed, but without specifying which disorder he is referring to, Dr. Lubit's statement that Ms. Chase suffers from "depression" means nothing in terms of psychiatric diagnosis. Additionally, as with the issue of anxiety noted above, I see nothing in the report indicating that Dr. Lubit asked Ms. Chase about symptoms of depression. The only place symptoms could have been drawn from is the self-report BDI-2 questionnaire she filled out. And, as noted above, using this type of questionnaire is not considered rigorous in a forensic context due to the self-report bias and lack of validity index for the BDI-2. Finally, the BDI-2 was **not** meant to be the sole tool for making a diagnosis. As Dr. Beck and colleagues noted in their journal article introducing the BDI2, the test is for screening only and not to be used as the sole measure for diagnosis.[22]

Dr. Lubit reported that Ms. Chase has the symptoms of PTSD.[23] This statement is misleading. She may have some symptoms found in persons who actually have PTSD, but this disorder should not be even considered for Ms. Chase because the incidents related to this case do not in any way represent a trauma that would qualify for a PTSD diagnosis. Dr. Lubit even states, "Megan cannot be diagnosed with PTSD as a result of the actions of Alorica because the actions did not constitute a threat of serious physical injury or sexual violence."[24] But then he states, "Nevertheless, she has sufficient symptoms of PTSD to fulfill the symptomatic criteria."[25] This may lead someone not in the mental health field to think that Ms. Chase has the disorder when she clearly cannot. In fact, even if a person has every single one of the B-H Criteria symptoms of PTSD but has not experienced a trauma (the A Criterion), then by definition they cannot have PTSD. The name of the disorder itself should make that explicitly clear  To have **Posttraumatic** Stress Disorder, a person must have been exposed to a significant trauma in the first place. As I said above, not getting a job or being accused of stealing in no way qualifies for a trauma for psychiatric diagnostic purposes. The theory of "betrayal trauma" is just that, a theory. The medical commun ty does not consider this a trauma for DSM 5-TR purposes  Indeed, based on Dr. Lubit's very specific wording, it is clear that he knows that Ms. Chase does not qualify for a diagnosis of PTSD. As Dr. Lubit stated, "Megan cannot be diagnosed with PTSD as a result of the actions of Alorica because the actions did not constitute a threat of serious physical injury or sexual violence…."[26]

Because Ms. Chase has not been exposed to a trauma related to this case, and Dr. Lubit did not conclude that she meets the "A Criterion" for PTSD, one cannot conclude that Ms. Chase

---

[21] *See* Lubit Report at 9.

[22] Beck, A T., Steer, R.A. & Brown, G. (1996). Beck depression inventory-II. Psychological Assessment.

[23] *See* Lubit Report at 9.

[24] *See id.*

[25] *See id.*

[26] *See id.*

has PTSD. Any conclusion to the contrary is not medically supported nor would it be generally accepted in the medical community.

## Analysis

Dr. Lubit spends many pages speaking of "betrayal trauma," a concept developed by Jennifer Freyd, PhD.[27] He applies it to Ms. Chase's experience with Alorica. But in his report, Dr. Lubit is specifically referring to Dr Freyd's concept of "institutional betrayal." In Dr. Freyd's 2014 paper[28] (written with Carly Smith) on Betrayal Trauma,[29] she states, "Institutional betrayal is a description of individual experiences of violations of trust and dependency perpetrated against any member of an institution in a way that does not necessarily arise from an individual's less-privileged identity."[30] Furthermore "Institutional betrayal occurs when an institution causes harm to an individual who trusts or depends upon that institution "[31] Examples she gives include "unchecked abuse in residential schools" (the person is a resident of and dependent on the school); "insufficient and/or lacking official responses to sexual trauma in the military" (the person is a member of the military and subject to its laws); "systemic difficulties in services provision for veterans with chronic health issues" (the person is a veteran of the military and dependent on the VA for health care); "insufficient legal protection and services following domestic violence" (the domestic violence victim is dependent on the protection of the police as set down in law); and "elder abuse in residential care settings" (the elder person is in residential care and dependent on the home for their safety and security). In each of these situations, the person is dependent on or trusts the legal, medical, or mental health system for care and/or protection. These are the sorts of institutions and experiences Dr Freyd is referr ng to when she describes the concept of an individual experiencing institutional betrayal.

In his report, Dr. Lubit states, "Megan experienced betrayal trauma when Alorica offered her a position, and then took it back based on false information and then failed to quickly rectify it. In the aftermath she could not obtain a job in which companies did background checks. She could not do the work she expected to do and wanted to do and instead had to look for and settle for less desirable positions. In addition, an individual suffers harm when their reputation is attacked, especially when it is online for endless numbers of people to see."[32] Respectfully, Dr. Lubit is misunderstanding not only betrayal trauma, but also the facts of Ms. Chase's life.

First off, this case is against HireRight, not Alorica. Whether Ms. Chase has any belief that Alorica has "betrayed" her is irrelevant to this case.

---

[27] *See id.* at 9-11.

[28] Smith, C. P., & Freyd, J. J. (2014). Institutional betrayal. *American Psychologist*, *69*(6), 575.

[30] *Id.*

[31] *Id.* at 578.
[32] *See* Lubit Report at 10.

Second, HireRight is not the sort of "institution" that betrayal trauma refers to. This is a company performing background checks, not an institution or system that she might assume should offer her protection or provide safety.

Third, even if betrayal trauma were relevant here (which it is not), this is a psychological concept not a diagnosis. It has nothing to do with any diagnosis that Dr. Lubit is purporting to give.

Fourth, Dr. Lubit stated that Ms. Chase couldn't get a job for a company that did background checks in the aftermath of not getting hired by Alorica. This is inaccurate because Ms. Chase stated that she started working for Sykes after the issue related to HireRight. She reported that Sykes ran a background check on her.

And finally, Dr Lubit is engaging in hyperbole when saying that Ms. Chase suffered harm when her reputation was maligned online "for endless numbers of people to see." There is no evidence of who the "endless numbers of people" are. In fact, very few people are looking at the results of the background reports. And furthermore, HireRight did not put any report "online" for anyone to see. HireRight simply gathered already-public court record information for Alorica to review. Instead, it is Ms. Chase who has sued multiple background check companies and made background check reports and her criminal history publicly available in those lawsuits In summary, the concept of betrayal trauma is not a psychiatric diagnosis, is one of countless theories of behavior, and in no way is even relevant to this specific case.

Finally, Dr. Lubit spends quite some time discussing how trauma, especially "betrayal trauma" and trauma in general impacts the nervous system. Leaving out whether his scientific analysis is accurate, I contend that it is not relevant for the case at hand. In his report, Dr. Lubit has not shown that Ms. Chase is suffering from any sort of psychiatric diagnosis. Therefore, whatever medical mechanisms he is explaining appear irrelevant to the case at hand.

### Dr. Lubit's Conclusions Are Incorrect and Irrelevant

I respectfully contend that for these reasons, Dr. Lubit's conclusions are not relevant to the case. I have explained how he has not shown evidence that Ms. Chase suffers from any psychiatric diagnosis. Furthermore, I have explained how betrayal trauma is not a psychiatric diagnosis and also not a theory that would apply in Ms. Chase's case. And I have noted that Dr. Lubit agrees that Ms. Chase does not meet the generally accepted medical criteria for a diagnosis of PTSD.

Additionally, Dr. Lubit is making conclusions based on Ms. Chase's response to the incidents occurring at her 7-11 employment in 2016, which has nothing to do with HireRight's report and Alorica's denial of her application in 2021. Furthermore, Dr. Lubit misunderstands who the defendant is. He is attributing damage to Ms. Chase because Alorica did not offer her a job. This case centers on the actions of HireRight, not Alorica.

Furthermore, D. Lubit makes no etiological conclusion that Ms. Chase's diagnoses (which I
disagree with) are causally related to any conduct of HireRight.

## <u>SUMMARY OF OPINION</u>

I contend with a reasonable degree of medical certainty that Ms. Chase has Generalized
Anxiety Disorder and Unspecified Depressive Disorder. Her symptoms of depression have been
present since her early 20's. Her symptoms of anxiety have been present since about 2018. The
development of all these predates the issues related to HireRight. I also believe with a
reasonable degree of medical certainty that Ms. Chase does not have PTSD that would be
attributed to the issues related to the case against HireRight. In fact, it is not possible for her to
have this diagnosis at all since the trauma she contends to have experienced in relation to
HireRight (or even 7-11) is not a trauma that would qualify for a diagnosis of PTSD.

Thank you for the opportunity to assist in this matter. If any other records become available to
me, I reserve the right to amend this opinion.

Sincerely,

Jeff A Kovnick, MD.

Jeffrey Kovnick, MD

Board Certified
- Psychiatry (American Board of Psychiatry and Neurology-ABPN)
- Child and Adolescent Psychiatry (ABPN)
- Forensic Psychiatry (ABPN).

# CURRICULUM VITAE

## JEFFREY ARNOLD KOVNICK, M.D., M.S.

**Board Certified in Adult Psychiatry**
**Board Certified in Child and Adolescent Psychiatry**
**Board Certified in Forensic Psychiatry**

Telephone:          801-910-5822
Email               jeffkovnick@parkdietzandassociates.com
Citizenship:        U.S.A.

## CURRENT RESPONSIBILITIES

**1996 - Current: Forensic Psychiatry Practice**

- Associate: Park Dietz and Associates (since 2023)
- Civil, criminal, and workplace related evaluations
- Expert witness and attorney consultation
- Referrals taken from courts, attorneys, employers, or insurance companies.

**1996 - Current: Clinical Outpatient Psychiatry practice**

- Adult Psychiatry
- Child and Adolescent Psychiatry

## PREVIOUS RESPONSIBILITIES

**1999 — 2021   Vista Treatment Centers**

- Medical Director – Vista programs (Salt Lake City and environs)
  - Vista Adolescent Residential Treatment Center
  - Vista @ Dimple Dell Canyon -- Adolescent RTC
  - Vista Sage -- Adolescent RTC
  - Vista Counseling Services (Adult Intensive Outpatient)

**1999 — 2006  Consultant, State of Utah**

- Division of Youth Corrections
  - Psychiatrist for long term secure youth centers across Utah for adjudicated youth (delinquency and sexual offenders)
  - Consultant to multiple programs and group homes for at risk youth

- Division of Child and Family Services (DCFS)
  - Psychiatrist for youth in DCFS custody (statewide contract)
  - Youth experiencing sexual abuse, physical abuse, and neglect

**1998 — 1999  Davis Behavioral Health (Community Mental Health)**

- Medical Director - Latency age residential treatment unit, Lakeview Hospital
- Child, adolescent, and adult clinical psychiatry

**1996 — 1999  Assistant Professor of Psychiatry**
University of Utah School of Medicine
Salt Lake City, UT

- Forensic responsibilities
  - Director, Forensic Evaluation and Consultation Service, University of Utah
  - Course Director: Forensic Child Psychiatry and Adult Forensic Psychiatry

- Clinical Psychiatric Responsibilities
  - Medical Director - University of Utah Neuropsychiatric Institute, Adolescent Services (Now called Huntsman Mental Health Institute)
  - Medical Director – Observation and Assessment Unit, University of Utah Neuropsychiatric Institute (1996-7)
  - Child, Adolescent, and Adult Clinical Psychiatry (outpatient and inpatient)

## BOARD CERTIFICATIONS

| | |
|---|---|
| Current | General Psychiatry, American Board of Psychiatry and Neurology |
| Current | Child & Adolescent Psychiatry, American Board of Psychiatry and Neurology |
| Current | Forensic Psychiatry, American Board of Psychiatry and Neurology |

## RESIDENCY AND FELLOWSHIP TRAINING

| | |
|---|---|
| 1995 — 1996 | Fellowship in Forensic Psychiatry, Charlottesville, Virginia<br>University of Virginia: Institute of Law, Psychiatry, and Public Policy |
| 1993 — 1995 | Fellowship in Child and Adolescent Psychiatry, Salt Lake City, Utah<br>University of Utah; School of Medicine and Affiliated Hospitals<br>Chief Resident, 1994-1995 |

1990 — 1993          Residency in Adult Psychiatry, Salt Lake City, Utah
                     University of Utah; School of Medicine and Affiliated Hospital


## EDUCATION


1985 — 1990          Doctor of Medicine (M.D.) Medical College of Wisconsin (formerly Marquette
                     University School of Medicine); Milwaukee, Wisconsin

1984 — 1985          M.S., Columbia University, College of Physicians and Surgeons, New York, NY
                     Thesis: An effect of Beta-adrenergic hormones on flavin metabolism in rats

1983 — 1984          Sarah Lawrence College, Bronxville, New York
                     Coursework: Premedical

1980 — 1983          B.A., University of Oregon; Eugene, Oregon
                     Major: Psychology


## PUBLICATIONS


### Books

Warren, J. and Kovnick, J. (1999). Women who kill. In V.B. Van Hasselt & Hersen, M. (Eds.)
     Handbook of Psychological Approaches with Violent Criminal Offenders: Contemporary
     Strategies and Issues. Plenum Press.

Kovnick, J. (1999). Juvenile Culpability and Genetics. In Botkin, J. (Ed.) Genetic Testing an
     Screening for Mental Health Disorders. (American Psychological Association Press).


### Journals

Kovnick, J., Appelbaum, P., Hoge, K, and Leadbetter, R. (2003).  Competence to Consent to
     Research Among Long-Stay Inpatients with Chronic Schizophrenia.  Psychiatric Services,
     54 (9), 1247-125


Kovnick, J. (1996). (A Revolution Reconsidered. Book Review of Almost a Revolution by Paul
     Appelbaum.) Developments in Mental Health Law 16, (1).

Carpenter, WT, Gold, JM, Lahti, CA, Queern, CA, Conley, RR, "Bartko, JJ, Kovnick, JA, &
     Appelbaum, PS., (2000). Decisional Capacity for Informed Consent in Schizophrenia
     Research.  Archives of General Psychiatry, 57, 533-538.

Jordan, S.A., Wellborn 111, W.R., Kovnick, J.A., & Saltzstein, R. (1991). Understanding and
     Treating Motivation Difficulties in Ventilator-dependent Spinal Cord Injured Patents.
     Paraplegia, 29, 431-442

## <u>PRESENTATIONS AT PROFESSIONAL MEETINGS AND INSTITUTES</u>

Phillips, R., Fitch, L., & Kovnick, J. Competence to Proceed Pro Se, after Moran and Ferguson; Panel at the annual meeting of the American Academy of Psychiatry and Law: Seattle, Washington, 1995.

Kovnick, J. Maternal Filicide. Workshop presented at the 28th Semi-Annual Forensic Symposium sponsored by the Virginia Department of Mental Health, Mental Retardation, and Substance Abuse Services: Charlottesville, Virginia, 1995.

Kovnick, J "Juvenile Competency to be Adjudicated"; Juvenile Basic Forensic Evaluation Training. Institute of Law, Psychiatry, and Public Policy: Charlottesville, Virginia, May 24, 1996.

Kovnick, J. "Competency to be Sentenced, a case review and discussion"; Advanced Forensic Evaluation Training. Institute of Law, Psychiatry, and Public Policy: Charlottesville, Virginia, April 23, 1996.

Kovnick, J. "Assessment of Adolescent Psychopathology"; Forensic Training Program for Probation Officers, Probation Counselors and Correctional Center-staff, conducted by the Institute of Law, Psychiatry, and Public Policy: Charlottesville, Virginia, February 26, 1996.

Kovnick, J. "Disposition of Malingerers found Not Guilty by Reason of Insanity, a case presentation and discussion"; Insanity Acquittee Training at the Institute of Law, Psychiatry, and Public Policy: Charlottesville, Virginia, December 1, 1995.

Kovnick, J. Forensic Implications of Adolescent Psychopathology: Balancing Theoretical and Clinical Perspectives; Workshop to be presented at the 29th Semi-Annual Forensic Symposium sponsored by the Virginia Department of Mental Health, Mental Retardation, and Substance Abuse Services: Charlottesville, Virginia, (May 10, 1996)

Kovnick, J. Juvenile Culpability and Genetics; Presentation at the Snowbird Workshop on Genetic Testing and Screening for Mental Health Disorders: Salt Lake City, Utah, June 1996.

Kovnick, J. Competency related abilities of Schizophrenic Patients to Participate in Clinical Research (Participant in a symposium on Current Research in Competencies. Annual meeting of the American Psychiatric Association, Washington, DC. October 1997.

Kovnick, J. Youth Violence; Presentation at University of Utah, Evening with the Experts: University of Utah Neuropsychiatric Institute, November 1999.

Kovnick, J. Juvenile Competency to Proceed; Presentation at the 2nd Annual Forensic Conference: Utah State Hospital, Provo, UT, November 1999.

Kovnick, J. Kids Who Kill: Prevention and Intervention; Panel presentation at University of Utah, hosted by the University of Utah, Department of Psychology and the Utah Commission on Criminal and Juvenile Justice, November 1999.

## LECTURES

I have presented many lectures on a wide variety of topics and in settings and to staff at hospitals and treatment centers where I have held leadership positions. I have given frequent lectures to medical students  residents and fellows while faculty at the University of Utah. Topics ranged from Forensic issues (Adult Psychiatry and Child & Adolescent Psychiatry), psychopharmacology, and diagnosis of various disorders.

## EXPERTISE

Wide variety of expertise including Mood Disorders, Anxiety Disorders, Posttraumatic Stress Disorder, Sexual and Physical Abuse, Substance Use, Somatic Disorders  Eating Disorders, Psychotic Disorders, Obsessive Compulsive and related Disorders, Sexual Dysfunctions, Neurodevelopmental Disorders, Personality Disorders, Neurocognitive Disorders, and Disruptive/Impulse/Conduct Disorders.

Civil Law expertise in Malpractice, Personal Injury, Emotional injury (including Psychological and Emotional Damages), Liability  Trauma and PTSD, Malingering, Testamentary Capacity and Guardianship, Civil Competencies, Commitment, Social Media and the Internet, Standard of Care, School Violence and others.

Criminal Law expertise in Diminished Capacity, Competency, Crimes involving multiple victims, Risk Assessment, Death Penalty, Sentencing factors, Child Abuse and Neglect, Harassment, Malingering, and others.

Employment Expertise in Disability, Fitness for Duty/IME, Workers Compensation, MHPAEA/ERISA, Workplace Risk Assessment, Fitness for Duty.

## PROFESSIONAL MEMBERSHIPS

American Association of Child and Adolescent Psychiatry
American Academy of Psychiatry and Law
American Psychiatric Association

# Jeffrey A. Kovnick, M.D.

### Offices in Salt Lake City, Utah and Ketchum, Idaho

### Ph: 801-910-5822       Email: jkovnick@gmail.com

### Forensic psychiatry      Child and adolescent psychiatry      Adult psychiatry

---

**Note: Below relates only to depositions or testimony, not cases retained or worked on.**

April 1, 2025

### DEPOSITIONS OR TRIALS PAST 4 YEARS

1. March 3, 2025
   Deposition
   B.M. (individually and on behalf of CM) v. Anthem Blue Cross and Blue Shield and the Cornerstone Employer Solutions Health & Welfare Plan
   Case No. 1:22-cv-98
   Brian King of King Law Group, attorney for plaintiff

2. December 10, 2024
   Trial
   Da Karia Spicer, et al. v. City of Chicago
   Case No. 21 L 8784vConsolidated with Case No. 21 L 8795
   Amanda Guertler of Borkan & Scahill, attorney for defendant

3. September 4, 2024
   Deposition
   Da'Karia Spicer, et al. v. City of Chicago
   Case No. 21 L 8784vConsolidated with Case No. 21 L 8795
   Amanda Guertler of Borkan & Scahill, attorney for defendant

4. May 30, 2024
   Deposition
   KB and AB v Excellus Blue Cross Blue Shield and Univ of Rochester PPO Benefits Plan
   Case no. 6:23-Cv-6224-EAW
   Brian King of King Law Group, attorney for plaintiff

5.  January 12, 2024
    Trial
    Jackilyn Keiter v. Rosemarie Rollins
    Case no. CV03-22-01937
    Nick Crawford of Brassey Crawford, attorney for defendant

6.  December 28, 2023
    Deposition
    Jackilyn Keiter v. Rosemarie Rollins
    Case no. CV03-22-01937
    Nick Crawford of Brassey Crawford, attorney for defendant

7.  September 8, 2023
    Deposition
    Thomas B and TB v Aetna life insurance company et al
    Case No. Civil No. 1:21-cv-00142-DBP; US District Court, Utah, Central Div
    Brian King of King Law Group, attorney for plaintiff

8.  April 18, 2023
    Deposition
    L.R. and M.R  v Blue Cross Blue Shield of Illinois
    Case No. 2:22-cv-00119-HCN-DA)
    Brian King of King Law Group attorney for plaintiff

9.  January 16, 2023
    Deposition
    L.R. and M.R v Blue Cross Blue Shield of Illinois
    Case No. 2:22-cv-00119-HCN-DA)
    Brian King of King Law Group attorney for plaintiff

10. September 15, 2022
    Trial
    Upper Limit adv Oakley
    Case 01385.0006
    Ryan Atkinson and Spencer Brown of Strong & Hanni, attorneys for Defendant

Jeffrey Kovnick, MD

Board Certified, General Psychiatry (American Board of Psychiatry and Neurology (ABPN)
Additional Qualifications, Child and Adolescent Psychiatry (ABPN)
Additional Qualifications, Forensic Psychiatry (ABPN)